Exhibit 1 to Complaint
(Part 1 of 4)

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Suedeen G. Kelly, Marc Spitzer,
Philip D. Moeller, and Jon Wellinghoff.

| | | |
|---|---|---|
| Millennium Pipeline Company, L.L.C. | Docket Nos. | CP98-150-006 |
| | | CP98-150-007 |
| | | CP98-150-008 |
| Columbia Gas Transmission Corporation | | CP98-151-003 |
| | | CP98-151-004 |
| Columbia Gas Transmission Corporation | | CP05-19-000 |
| Empire State Pipeline and | | CP06-5-000 |
| Empire Pipeline, Inc. | | CP06-5-002 |
| | | CP06-6-000 |
| | | CP06-6-002 |
| | | CP06-7-000 |
| | | CP06-7-002 |
| Algonquin Gas Transmission, LLC | | CP06-76-000 |
| Iroquois Gas Transmission System, L.P. | | CP02-31-002 |

ORDER ISSUING AND AMENDING CERTIFICATES, APPROVING
ABANDONMENT, VACATING CERTIFICATE, AND GRANTING AND DENYING
REQUESTS FOR REHEARING AND CLARIFICATION

(Issued December 21, 2006)

1.      In *Millennium Pipeline Company, L.P.*, the Commission authorized Millennium
Pipeline Company, L.L.C. (Millennium) to construct and operate a pipeline from the
United States-Canada border in Lake Erie across southern New York to a terminus in

Docket No. CP98-150-006, et al.                                           - 2 -

Mount Vernon, New York.[1]  In addition, we authorized Columbia Gas Transmission Corporation (Columbia) to abandon jurisdictional facilities and to lease capacity on Millennium's proposed pipeline.  The project was designed to bring new gas supplies from Canada to growing markets in the New York City area.  The Millennium pipeline, however, was never constructed.

2.      Now, the applicants in this proceeding seek to reconfigure the project authorized in the 2002 *Millennium* Order.  Specifically, Millennium proposes to acquire, construct, and operate pipeline facilities from the North Greenwood compressor station in south central New York, east to the Buena Vista measurement and regulation station in Rockland County, New York.  Millennium also requests that the Commission vacate that portion of the 2002 *Millennium* Order that authorized it to construct facilities from the United States-Canada border to North Greenwood and from the Ramapo measurement and regulation station (Ramapo station) to Mount Vernon.  In a contemporaneous application, Columbia requests authority to change some of the facilities it proposes to abandon and to alter the capacity lease proposals.  Empire Pipeline, Inc. (EPI), a newly formed pipeline company, proposes to construct facilities to connect Empire State Pipeline's (Empire) existing system to Millennium at the Corning compressor station, near Corning, New York.  (Empire's existing pipeline extends from the United States-Canada border to a point near Syracuse, New York.)  In addition, EPI requests authorization to operate the facilities to be constructed, as well as Empire's existing system.[2]  At the Ramapo station, Millennium will connect with Algonquin Gas Transmission, LLC (Algonquin).[3]  Algonquin also proposes to construct and operate facilities in order to transport gas from the Ramapo station to a connection with Iroquois Gas Transmission System, L.P. (Iroquois) in the Town of Brookfield, Connecticut.  Iroquois proposes to construct and operate facilities to transport gas into the New York City metropolitan area.  These proposals are known as the Northeast (NE)-07 project.

---

[1] *Interim Order*, 97 FERC ¶ 61,292 (2001), *order issuing certificates, granting and denying requests for rehearing, and granting and denying requests for clarification*, 100 FERC ¶ 61,277 (2002) (the 2002 *Millennium* Order).  In 2006, Millennium Pipeline Company, L.P. changed its name to Millennium Pipeline Company, L.L.C.

[2] Subject to an evaluation of environmental issues, we issued a preliminary determination authorizing EPI's proposals.  *Empire State Pipeline*, 116 FERC ¶ 61,074 (2006) (EPI's preliminary determination).

[3] Millennium will also connect to three local distribution companies along its route.

Docket No. CP98-150-006, et al.                                    - 3 -

3.      This order amends the certificates issued to Millennium and Columbia in the 2002 *Millennium* Order, vacates the portions of the 2002 *Millennium* Order that are no longer needed, issues certificates to EPI to construct and operate facilities and to operate the existing Empire system, grants and denies requests for rehearing and clarification of EPI's preliminary determination, issues a certificate to Algonquin to construct and operate facilities, and amends a certificate issued to Iroquois to construct and operate facilities.

## I.      Background

4.      In 1997, Millennium, a newly formed company with no facilities, filed an application, as amended in 2000, proposing to construct and operate approximately 424 miles of 24- and 36-inch diameter pipeline extending from an interconnection with facilities to be constructed by TransCanada PipeLines Limited (TransCanada) at the United States-Canada border in Lake Erie through southern New York across the Hudson River and Westchester County to a connection with Consolidated Edison Company of New York, Inc.'s (Consolidated Edison) high-pressure pipeline in the City of Mount Vernon, New York. Millennium contemplated that the 36-inch diameter portion of its proposed pipeline would extend from the connection with TransCanada to the Ramapo station – a distance of approximately 373.4 miles – and that the 24-inch diameter portion of its proposed pipeline would extend from the Ramapo station to the pipeline's terminus in Mount Vernon – a distance of approximately 50.6 miles.

5.      Millennium proposed that its pipeline follow the route of Columbia's existing Line A-5 from the vicinity of Columbia's North Greenwood compressor station in Steuben County, New York for approximately 223.9 miles to the Ramapo station. Millennium also proposed to acquire from Columbia and operate approximately 6.7 miles of 24-inch diameter pipeline, known as Line 10338, extending from the Ramapo station to the Buena Vista measuring station in Clarkstown, New York.[4] Thus, under its proposals, Millennium would be using existing utility corridors and easements to be acquired from Columbia for the portion of its pipeline route from North Greenwood to Buena Vista.

6.      In addition, Millennium proposed to acquire and operate: (1) approximately 10.5 miles of 10- and 14-inch diameter pipeline, known as the Milford line, extending in a southwesterly direction from Line A-5 in Rockland County to the Milford compressor

---

[4] Line 10338 begins at the end of Line A-5.

Docket No. CP98-150-006, et al.                                                              - 4 -

station in Pike County, Pennsylvania;[5] (2) the 700-horsepower Milford compressor
station in Pike County;[6] (3) 9.6 miles of short pipeline segments consisting of 4-, 6-, 8-,
12-, and 14-inch diameter pipeline and appurtenances in New York and Pennsylvania;
and (4) various metering and regulating stations and related facilities.

7.      Millennium stated that the capacity of the proposed pipeline was 714,000 Dth per
day, with a maximum allowable operating pressure of 1,440 psig.  At the Ramapo station,
the pressure would drop to approximately 670 psig and, at the terminus of the pipeline in
Mount Vernon, the pressure would drop to 375 psig.  Millennium proposed to deliver
approximately one-half of its capacity by Ramapo and the remaining capacity by Mount
Vernon.

8.      In a companion application, as amended, Columbia requested permission and
approval to abandon Line A-5,[7] measuring and regulating stations along Line A-5 that
Columbia uses to make deliveries to its customers, Line 10338, the Milford line, and the
Milford compressor station.  Specifically, in regard to Line A-5, Columbia proposed to
abandon in place a 129.8-mile segment of 10- and 12-inch diameter line from the North
Greenwood compressor station to the Hancock measuring station in Delaware County,
New York; to abandon by removal a 92.2 mile segment of 8- and 24-inch diameter line
from the Hancock station to the Ramapo station; and to abandon by conveyance a
1.9-mile segment of 12-inch diameter pipeline in Chemung County, New York.

9.      Columbia, however, did not propose to abandon firm transportation service to its
existing Line A-5 customers.  Consequently, the Interim Order authorized Millennium to
lease up to 14,000 Dth per day of capacity on its proposed pipeline to Columbia so that
Columbia could provide transportation service to its Line A-5 customers under the terms
and conditions of Columbia's FERC Gas Tariff.  For the lease capacity, Columbia agreed
to pay a monthly firm charge for an equivalent amount of firm long-haul capacity on
Millennium's system.  In addition, subsequent to Columbia's abandonment of the Line
A-5 facilities, but prior to completion of construction of Millennium's system, the Interim
Order authorized Columbia to lease capacity on Millennium's incomplete system at no
charge to maintain service to Columbia's A-5 customers.  Under the lease proposals, the

---

[5] The portion of the Milford line in New York is also known as Line K and the
portion of the Milford line in Pennsylvania is also known as Line 1278.

[6] The Milford compressor station consists of two 350-horsepower compressor
units.

[7] Line A-5 consists of 24-, 20-, 16-, 12-, 10-, and 8-inch diameter pipeline.

Docket No. CP98-150-006, et al.                                                                     - 5 -

facilities providing the lease capacity would remain the property of Millennium and Millennium would use the necessary provisions of its tariff to maintain operational control of the facilities used for the lease capacity.

10.     The Interim Order found that Millennium's and Columbia's proposals were in the public interest because the facilities would provide fuel for needed electric generation, help relieve constraints on other area pipeline systems, and accommodate anticipated long-term growth in northeastern markets. The Interim Order also found that there were no preferable alternatives. Thus, the Interim Order authorized Millennium's and Columbia's proposals, as well as the lease proposals.

11.     Many residents of Mount Vernon, however, raised significant opposition to pipeline construction through their city and the location of Millennium's termination point with Consolidated Edison. For these reasons, the Interim Order required Millennium to negotiate with elected officials and interested parties and citizens in Mount Vernon to work toward reaching an agreement on a route to an interconnection with Consolidated Edison's high-pressure line. Thus, the Interim Order did not authorize Millennium to construct facilities through Mount Vernon.

12.     At the time the Interim Order was issued, the New York State Department of State (NYSDOS) had not completed its consistency review of Millennium's application under the Coastal Zone Management Act (CZMA).[8] Thus, the Interim Order held that Millennium could not construct facilities until it received an affirmative coastal zone determination from the NYSDOS.

13.     After Millennium and Mount Vernon reached a comprehensive settlement on the route of the pipeline through the city, the 2002 *Millennium* Order issued a final certificate to Millennium to construct and operate its pipeline, including a specific route through Mount Vernon. The 2002 *Millennium* Order, among other things, also held that we did not err in issuing a certificate prior to Millennium's receiving a consistency determination from the NYSDOS under the CZMA.

14.     On May 9, 2002, the NYSDOS found that Millennium's proposals were inconsistent with New York's Coastal Management Program. The NYSDOS decision prevents Millennium from constructing its pipeline across the Hudson River and through portions of Westchester County. Millennium appealed the NYSDOS' decision to the Secretary of Commerce. The Secretary of Commerce denied Millennium's appeal and

_____

[8] 16 U.S.C. § 1451 *et seq*. (2004).

Docket No. CP98-150-006, et al.                                    - 6 -

Millennium appealed the denial to the United States District Court for the District of Columbia. The court denied Millennium's appeal.[9] Consequently, the Millennium pipeline was never constructed.

## II.    The Applications

15.    As a result of the decision in *Gutierrez* and to meet the current needs of the natural gas market in the northeast, Millennium states that it redesigned the project approved for construction in the 2002 *Millennium* Order in part to eliminate the need to cross the Hudson River and the parts of Westchester County found to be inconsistent with New York's coastal management plans. The applications involved in the NE-07 project are described in sequential order from west to east below.

### A.    EPI's and Empire's Application

#### 1.    Introduction

16.    Empire is a 24-inch diameter natural gas pipeline that extends approximately 157 miles from a connection with TransCanada at the United States-Canada border near Chippawa, Ontario to a terminus near Syracuse, New York. Empire was constructed under a certificate issued by the New York State Public Service Commission (New York PSC). Currently, Empire provides firm and interruptible transportation services to utilities, power producers, industrial companies, marketers, and other shippers under rates, terms, and conditions regulated by the New York PSC. Empire has a capacity of 556,207 Dth per day.

17.    Empire is a Hinshaw pipeline exempt from the Commission's jurisdiction under section 1(c) of the Natural Gas Act (NGA).[10] Subsequent to the finding that it was a Hinshaw pipeline, the Commission authorized Empire to transport gas for two interstate

---

[9] *Millennium Pipeline Co. v. Gutierrez*, No. 04-233, 2006 U.S. Dist. LEXIS 14273 (D.C. Cir. March 31, 2006) (*Gutierrez*). Millennium did not appeal the *Gutierrez* decision.

[10] *Empire State Pipeline*, 56 FERC ¶ 61,050 at 61,168 (1991). The Hinshaw amendment allows a pipeline located wholly within one state to engage in interstate commerce without becoming subject to the Commission's jurisdiction, if the pipeline's rates, services, and facilities are regulated by the state and the gas is consumed within that state.

Docket No. CP98-150-006, et al.                                                    - 7 -

pipelines – National Fuel Gas Supply Corporation and Dominion Transmission, Inc. –
under a blanket certificate issued pursuant to section 284.224 of the regulations.[11]

## 2.   Proposals

18.    EPI, a new company with no pipeline facilities, proposes to construct and operate
a 78-mile-long, 24-inch diameter pipeline from Empire's existing pipeline in Victor, New
York to a connection with Millennium near Corning, New York.  (Victor is
approximately 60 miles west of Empire's terminus.)  EPI also proposes to construct a
20,620-horsepower compressor station, known as the Oakfield compressor station, west
of Victor on Empire's existing pipeline near Oakfield, New York.  The proposed
connector facilities will have a design capacity of 250,000 Dth per day in the winter
(November through March) and 221,100 Dth per day in the summer (April through
October), and a maximum allowable operating pressure of 1,440 psig.[12]

19.    Starting on the in-service date of the proposed connector facilities, EPI requests
authority to operate the existing 157-mile-long Empire system and the proposed
connector facilities as a jurisdictional pipeline under the NGA.[13]  EPI also requests a
blanket construction certificate under Subpart F of Part 157 and a blanket transportation
certificate under Subpart G of Part 284 of the regulations.

20.    EPI states that it entered into a precedent agreement with KeySpan Gas East
Corporation (KeySpan) to transport 150,750 Dth of gas per day on a firm basis from a
connection with TransCanada at the United States-Canada border to a connection with
Millennium's proposed pipeline at Corning for a primary term of 10 years.  This
represents approximately 60.3 percent of the winter capacity and 68.2 percent of the
summer capacity of the proposed connector facilities.

---

[11] *Empire State Pipeline*, 70 FERC ¶ 61,162 (1995).

[12] EPI states that it will also construct auxiliary facilities such as valves, drips, pig
launchers and receivers, cathodic protection equipment, yard and station piping, electrical
and communication equipment, and buildings under section 2.55 of the regulations.
There are no non-jurisdictional facilities associated with EPI's proposed construction.

[13] Empire requests that the Commission terminate its section 284.224 blanket
certificate on the in-service date of the proposed connector facilities.

Docket No. CP98-150-006, et al.                                            - 8 -

21.    Empire and EPI estimate that the cost of the proposed connector project will be $144.2 million.  They anticipate that corporate funds from National Fuel Gas Company (NFG), their corporate parent, will be used to finance the proposed facilities.

22.    EPI proposes to establish separate firm, interruptible, and overrun rates for the existing and connector facilities, based on the respective cost of service and billing determinants for service using the existing Empire facilities and for service on the proposed connector facilities.  EPI also submitted a *pro forma* tariff for service on the existing facilities and on the proposed Empire connector facilities.  EPI states that it will provide service to new shippers under the form of service agreement in the proposed tariff, while continuing to provide service to Empire's existing shippers using the form of service agreement in the tariff approved by the New York PSC.

23.    On July 20, 2006, in EPI's preliminary determination, we held that contingent on a favorable result in our then pending environmental review, EPI's proposed construction of the connector project and operation of the Empire pipeline and the connector facilities to be constructed were in the public convenience and necessity.  We also required EPI to make numerous revisions to its proposed rates and tariff.  Several parties filed requests for rehearing and clarification of the preliminary determination.  Further, EPI submitted its compliance filing to the preliminary determination addressing various rate and tariff issues.  The issues raised on rehearing and clarification and by the compliance filing will be discussed later in this order.

### B.    **Millennium's Applications**

#### 1.    **Introduction**

24.    On August 1, 2005, Millennium filed an application in Docket No. CP98-150-006 under section 7(c) of the NGA to amend the authorization issued in the 2002 *Millennium* Order.  On December 20, 2005 and May 3, 2006, Millennium filed in Docket Nos. CP98-150-007 and CP98-150-008, respectively, to amend the application in Docket No. CP98-150-006.

25.    Notice of Millennium's application in Docket No. CP98-150-006 was published in the *Federal Register* on December 7, 2005 (70 Fed. Reg. 72811).  Notices of the amendments to Millennium's application in Docket Nos. CP98-150-007 and CP98-150-008 were published in the *Federal Register* on January 13, 2006 (71 Fed. Reg. 2206) and May 16, 2006 (71 Fed. Reg. 28314), respectively.

26.    After the issuance of the 2002 *Millennium* Order, Millennium converted its organizational form from a Delaware limited partnership to a Delaware limited liability

Docket No. CP98-150-006, et al.                                                    - 9 -

company composed of three members: Columbia, KeySpan Corporation, and DTE
Energy. Currently, Columbia holds a 47.5 percent interest in Millennium, with KeySpan
Corporation and DTE Energy each holding a 26.25 percent interest.

## 2.    **Proposals**

27.    In its applications in Docket Nos. CP98-150-006 and CP98-150-007, which were
filed prior to the decision in *Gutierrez*, Millennium proposed to amend the 2002
*Millennium* Order to phase construction of the project. In Phase I, Millennium proposed
to acquire, construct, and operate facilities from the North Greenwood station east to the
Ramapo station, as well as to acquire pipeline facilities from the Ramapo station to the
Buena Vista station in Clarkstown, New York. Millennium requested that the
Commission defer consideration of the portion of the 2002 *Millennium* Order that
authorized the crossing of Lake Erie to North Greenwood and the crossing of the Hudson
River to Mount Vernon until Phase II. Subsequent to the decision in *Gutierrez* upholding
the NYSDOS finding that Millennium's proposals were inconsistent with New York's
Coastal Management Program, Millennium filed an application in Docket No. CP98-150-
008 stating that it no longer seeks to phase construction and requesting that the
Commission vacate the portions of the 2002 *Millennium* Order that relate to the Phase II
facilities and vacate the certificate and environmental conditions that relate to Phase II.

28.    Under its amended proposals, Millennium requests authorization to:

- construct and operate approximately 181.7 miles of 30-inch diameter pipeline
  from the Corning compressor station to the Ramapo station (mileposts (MP) 190.6
  to 376.6) where the pipeline will connect with Algonquin;[14]

- replace approximately 1,278 feet of 10-inch diameter pipeline on Columbia's
  existing Line A-5 from MPs 343.8 to 344.1 with 24-inch diameter line in Orange
  County, New York;

- acquire from Columbia and operate approximately: (1) 3.1 miles of 10- and
  12-inch diameter pipeline in Steuben County, New York, known as Line 10325;
  (2) 0.4 mile of 10-inch diameter pipeline in Broome County, New York, known as
  Line 10356; (3) 52.5 miles of 10-, 12-, and 24-inch diameter segments of Line A-5

---

[14] Millennium will also connect to three LDCs along its route – Central Hudson
Gas & Electric Corporation (Central Hudson), New York State Electric & Gas
Corporation (NYSEG), and Orange and Rockland Utilities, Inc. (Orange and Rockland).

Docket No. CP98-150-006, et al.                                    - 10 -

in Steuben, Chemung, Broome, and Orange Counties, New York; (4) 2.6 miles of
six-inch diameter pipeline in Tioga County, known as Line AD-31; (5) 0.1 mile of
12-inch diameter pipeline in Broome County, known as Line N; and (6) 6.7 miles
of 24-inch diameter pipeline in Rockland County, known as Line 10338;

- acquire from Columbia and operate 23 metering and regulating stations as
  identified in Exhibit Z-1 of Millennium's application;

- construct and operate a 15,002-horsepower compressor station and measuring and
  regulating facilities at a site adjacent to Columbia's existing Corning compressor
  station on property owned by Columbia at MP 190.6;

- construct the Wagoner measurement and regulation station in Deer Park, New
  York at MP 337.9;

- install upgrades to the Ramapo station;

- modify the existing measurement and regulation stations at Tuxedo, Sloatsburg,
  and Ramapo to accommodate the replacement 30-inch line.[15]

29.    Millennium's proposals herein differ from the authorization granted in the 2002
*Millennium* Order in that the proposals:  (1) reduce the length of pipeline to be
constructed from approximately 424 to 181.7 miles; (2) reduce the diameter of the
pipeline from 36 to 30 inches; (3) reduce the maximum allowable operating pressure of
the pipeline from 1,440 to 1,200 psig; (4) reduce the capacity of the pipeline from
714,000 to 525,400 Dth per day; (5) realign approximately 19 miles of approved pipeline
route in three locations as a result of discussions with NYSEG (the NYSEG route
variations);[16] (6) reroute approximately 5,600 feet of pipeline between MPs 350.8 and

---

[15] Orange and Rockland plans to relocate approximately 475 feet of four-inch
diameter non-jurisdictional pipeline adjacent to Line A-5 at the Sloatsburg station at
MP 373.3 to ensure that it has maximum flexibility to continue to receive gas from
Columbia's Line A-5 while Millennium is constructed.  Orange and Rockland's
modifications would not connect directly to Millennium's facilities.  There are no other
non-jurisdictional facilities associated with Millennium's proposals.

[16] The locations are the Chemung variation from MPs 198.0 to 203.6, the Tioga-
Broome variation from MPs 232.2 to 245.0, and the Delaware variation from MPs 284.4
to 284.9.

Docket No. CP98-150-006, et al.                                           - 11 -

351.6 to avoid a planned residential subdivision in the Town of Warwick, New York (the Warwick Isle route variation); (7) seek to acquire from Columbia approximately 7.1 miles of 24-inch diameter pipeline between MPs 340.5 and 347.7 in Orange County, rather than replacing the pipeline with larger diameter line; (8) seek to construct a compressor station and measuring and regulating facilities next to Columbia's existing Corning compressor station on property owned by Columbia; (9) no longer seek approval to acquire the Milford line and the Milford compressor station; and (10) use alternate construction techniques/measures for crossing bodies of water at 12 places, rather than using a horizontal bore technique.[17]

30.    Millennium states that it conducted an open season for its amended project from June 13 to June 30, 2005. Millennium asserts that it entered into precedent agreements with Consolidated Edison, KeySpan, Columbia, and Central Hudson. Specifically, Millennium states that it will transport (1) 150,000 Dth of gas per day on a firm basis for Consolidated Edison, increasing to 180,000 Dth per day after the first year of service; (2) 150,000 Dth of gas per day on a firm basis for KeySpan, increasing to 175,000 Dth per day after the first year of service and to 200,000 Dth per day after the second year of service; (3) 5,000 Dth of gas per day on a firm basis for Central Hudson, increasing to 10,000 Dth per day after the third year of service; and (4) 24,600 Dth per day on a firm basis for Columbia.[18] The precedent agreements with Consolidated Edison, KeySpan, Central Hudson, and Columbia are for 10 years.

### 3.    Rates

31.    Millennium estimates that the cost to construct its proposed project will be $663,818,878, which includes the acquisition cost for Columbia's facilities.[19] Millennium proposes to finance the construction and acquisition of facilities through a combination of its partners' equity contributions and non-recourse debt.

---

[17] The bodies of water are Catharine Creek, Catatonk Creek, Chenango River, Owego Creek, Nanticoke Creek, Susquehanna River, West Branch Delaware River, East Branch Delaware River, Wallkill River, and Pochuck Creek.

[18] Columbia also holds another 25,400 Dth per day of forward-haul capacity on Millennium through a capacity lease agreement that is discussed below.

[19] In Docket No. CP98-150-008, Millennium states that it reduced the cost to acquire Columbia's facilities from $40,218,018 to $30,676,147, as a result of Columbia's decision to retain the Milford line. Millennium states that any associated cost savings will be reflected in its Contingency Fund.

Docket No. CP98-150-006, et al.                                      - 12 -

32.    Millennium proposes four services: firm transportation service under Rate Schedule FT-1, interruptible transportation service under Rate Schedule IT-1, parking and lending service under Rate Schedule PALS, and interruptible paper pools under Rate Schedule IPP. Millennium proposes to charge recourse and negotiated rates.[20] To support the recourse rates, Millennium proposes a capital structure of 70 percent debt and 30 percent equity, with a 14 percent return on equity and a 6.5 percent cost of debt resulting in an overall rate of return of 8.75 percent.[21] Millennium proposes to depreciate the facilities over a 30-year period at a rate of 3.33 percent.

33.    Millennium requests negotiated rate authority, which was granted in the Interim Order,[22] and has agreed to negotiated rates in its precedent agreements, which include rate caps. Millennium states that the negotiated rates are designed under a levelized cost-of-service rate design. Millennium states that it assumes the risk for any annual revenue shortfalls associated with the design of the negotiated rates when such rates exceed the rate cap and that any revenue shortfall under negotiated rates will not be adjusted for in the design of the recourse rates. Consistent with our policy, Millennium indicates that it will file negotiated rate agreements or tariff sheets that reflect the essential elements of such agreements in sufficient detail to enable shippers to evaluate whether they are similarly situated to a particular negotiated rate customer. Millennium asserts that it will also maintain separate and identifiable accounts for volumes transported, billing determinants, rate components, surcharges, and revenues associated with the negotiated rates in sufficient detail so that they can be identified in Statements G, I, and J in any future NGA section 4 or 5 rates cases.

---

[20] The proposed recourse rates are as follows: Rate Schedule FT-1 has a maximum reservation charge of $19.7690 per Dth and a commodity charge of $0.0019 per Dth; Rate Schedule IT-1, which is based on a 100 percent load factor rate of Rate Schedule FT-1, has a maximum commodity charge of $.6518 per Dth and a minimum commodity charge of $0.0019 per Dth; and Rate Schedule PALS has a maximum parking and lending service charge of $.6518 per Dth. Millennium does not propose a rate for Rate Schedule IPP.

[21] The proposed capital structure, rate of return, and cost of debt are consistent with the rate structure approved in the Interim Order at 62,323, as modified in the 2002 *Millennium* Order at P 117-119.

[22] Interim Order at 62,323-4.

Docket No. CP98-150-006, et al.                                          - 13 -

### 4.    Justification for Proposals

34.    Millennium states that its proposals will have no adverse effect on existing
pipelines and their captive customers and that it has minimized the potential for adverse
impacts on landowners and communities affected by the project.  Millennium also
contends that the proposals will provide the northeast with access to gas supplies from the
Dawn hub in Ontario and the upstream Chicago hub.  In addition, Millennium asserts that
its proposals will increase pipeline capacity in southeastern New York and provide access
to existing storage fields in western New York.  Finally, Millennium contends that
demand for gas in the New York City area  is increasing and that the precedent
agreements demonstrate a strong market demand and commitment to the Millennium
project.

### C.    Columbia's Applications

### 1.    Introduction

35.    On August 1, 2005, Columbia filed an application in Docket No. CP98-151-003
under sections 7(b) and 7(c) of the NGA, as amended on May 3, 2006, in Docket
No. CP98-151-004, to amend the 2002 *Millennium* Order.

36.    Notice of Columbia's application in Docket No. CP98-151-003 was published in
the *Federal Register* on December 7, 2005 (70 Fed. Reg. 72805).  The amendment to
Columbia's application in Docket No. CP98-151-004 was noticed in the *Federal Register*
on May 16, 2006 (71 Fed. Reg. 28313).

37.    Columbia is a natural gas company under the NGA that transports gas and
operates storage fields in interstate commerce.  Columbia operates facilities in Delaware,
Kentucky, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania,
Tennessee, Virginia, and West Virginia.

### 2.    Proposals

38.    Columbia proposes to abandon in place approximately 4.5 miles of 10-inch
diameter pipeline, 82.8 miles of 12-inch diameter pipeline, 0.2 mile of 16-inch diameter
pipeline, and 2.5 miles of 20-inch diameter pipeline in Steuben, Chemung, Tioga,
Broome, Orange, and Delaware Counties.  These segments are part of Line A-5.

39.    Columbia also proposes to abandon by removal approximately 55.5 miles of
12-inch diameter pipeline, 16.6 miles of 10-inch diameter pipeline, and 8.8 miles of
8-inch diameter pipeline in Delaware, Sullivan, Orange, and Rockland Counties.  These

Docket No. CP98-150-006, et al.                                      - 14 -

segments are part of Line A-5. Further, Columbia proposes to abandon the Walton Deposit metering and regulating station in Delaware County.

40.     Finally, Columbia proposes to abandon by conveyance to Millennium approximately: (1) 3.1 miles of 10- and 12-inch diameter pipeline in Steuben County, known as Line 10325; (2) 0.4 mile of 10-inch diameter pipeline in Broome County, known as Line 10356; (3) 52.5 miles of 10-, 12-, and 24-inch diameter segments of Line A-5 in Steuben, Chemung, Broome, and Orange Counties; (4) 2.6 miles of six-inch diameter pipeline in Tioga County, known as Line AD-31; (5) 0.1 mile of 12-inch diameter in Broome County, known as Line N; and (6) 6.7 miles of 24-inch diameter pipeline in Rockland County, known as Line 10338. Finally, Columbia proposes to abandon 23 metering and regulating stations.

41.     Millennium will replace the facilities that Columbia proposes to abandon in place or to abandon by removal with new pipeline facilities. Millennium will continue to use the facilities that it will acquire by conveyance.

### 3.     The Leases and Limited-Term Certificate

42.     The Interim Order authorized Millennium to lease capacity to Columbia when Millennium commences service. The Interim Order also authorized Millennium to lease capacity on its incomplete system to Columbia at no charge after Columbia's abandonment of Line A-5, but prior to completion of Millennium's system. The leases were designed to enable Columbia to provide transportation service to its Line A-5 customers.

43.     Columbia proposes to amend the lease authorizations. Under the amended lease proposals, Millennium will lease capacity to Columbia but, rather than Millennium leasing capacity to Columbia at no charge prior to Millennium's in-service date, the new lease will not commence until Millennium goes into service (Columbia's lease). The lease will enable Columbia to provide transportation service to its Line A-5 customers. Columbia proposes to lease 25,400 Dth per day of capacity from Millennium.

44.     In addition, in lieu of leasing capacity prior to Millennium's completion, Columbia requests a limited-term certificate of public convenience and necessity, with pre-granted abandonment authority, to temporarily operate segments of Millennium's incomplete pipeline to continue service to its existing Line A-5 customers. The interim certificate will expire when Millennium places its proposed pipeline into service. Columbia states that it will provide service to the Line A-5 customers under the terms of its tariff. Columbia also states that its lease will not require any payment to Millennium. As part of its proposal, Columbia requests that the Commission waive the certificate

compliance and/or reporting requirements that may pertain to the interim use of Millennium's pipeline segments.

45.    The Interim Order authorized Columbia to abandon to Millennium the Milford line and the Milford compressor station.[23]  As a result of the proposed amendments here, Columbia will retain the facilities and not abandon them.  Nevertheless, Columbia now proposes to lease 29,248 Dth per day of capacity on these facilities to Millennium (Millennium's lease).  Columbia contends that the lease will provide Millennium with capacity comparable to what it would have obtained through the acquisition of the Milford line and compressor station and that the lease will eliminate the construction of duplicate facilities.

46.    Columbia's lease and Millennium's lease will become effective on the date that Millennium commences transportation service through its proposed pipeline.  Each lease is for a term of 10 years.  Millennium and Columbia will use the capacity they lease to provide service under their tariffs.  Millennium will retain operational control of the facilities involved with the lease to Columbia and Columbia will retain operational control of the facilities involved with the lease to Millennium.

### 4.    Lease Rates

47.    For the Columbia lease, Columbia proposes to pay Millennium a monthly lease charge of $455,824, which is based on 25,400 Dth per day multiplied by $17.9458 per Dth for an annual payment of $5,469,890.[24]  Columbia contends that the charge is based on the amount of firm long-haul capacity that would have been available to Millennium had Columbia not required capacity to serve its customers at existing service levels.  Columbia proposes to treat the lease as an operating lease under the Uniform System of Accounts and to record the costs in Article IV of the lease agreement to Account 858 as operational Account 858 costs.  Columbia proposes to begin the recovery of Account 858 costs through a filing under its Transportation Cost Rate Adjustment (TCRA) to be effective with its general section 4 rate case in which the costs of the Line A-5 facilities are removed from its rate base.

---

[23] The Milford line is 10.5 miles long and crosses the New York-Pennsylvania border.  The Milford compressor station is in Pennsylvania.

[24] The proposed rate of $17.9458 per Dth reflects the maximum transportation rate to be paid by Columbia, resulting in the most conservative net benefit to Columbia's customers.  The minimum charge is $15.7387 per Dth, resulting in a monthly charge of $399,762.98 for an annual payment of $4,797,156 per year.

Docket No. CP98-150-006, et al.                                    - 16 -

48.    Under the Millennium lease, Millennium proposes to pay Columbia $36,677 per month, which is based on 29,248 Dth per day multiplied by $1.254 per Dth per day for an annual payment of $440,124.

### 5.    Justification for Proposals

49.    Columbia asserts that its proposals are an integral part of the NE-07 project. Columbia contends that its customers will benefit from the proposals, because they will receive continued service via the Columbia lease through new pipeline facilities with their "attendant efficiencies," without having to incur replacement costs in future years. Columbia also asserts that the proposals will enable Millennium to use Columbia's existing facilities and rights of way, while eliminating the necessity to construct duplicate facilities. Further, Columbia contends that Millennium's lease will not affect Columbia's ability to meet its existing firm service obligations, because the lease merely replicates the amount of capacity that would have been provided through the facilities that would otherwise have been conveyed to Millennium. Finally, Columbia avers that the proposals will not affect the rates paid by its Line A-5 shippers.

### D.    Columbia's Application in Docket No. CP05-19-000

#### 1.    Introduction

50.    On November 2, 2004, Columbia filed an application in Docket No. CP05-19-000 under sections 7(b) and 7(c) of the NGA for a certificate of public convenience and necessity to construct and operate replacement facilities on Line A-5. These proposals are known as the Line A-5 replacement project.

51.    Notice of Columbia's application was published in the *Federal Register* on November 18, 2004 (69 Fed. Reg. 67556).

#### 2.    Proposals

52.    Under its Line A-5 replacement project, Columbia proposes to replace approximately 8.8 miles of 8- and 16-inch diameter segments of Line A-5 with 30-inch diameter pipeline in Orange and Rockland Counties, to modify the Tuxedo, Sloatsburg, and Ramapo measurement and regulation stations, and to abandon in place approximately one mile of Line A-5.

53.    The 2002 *Millennium* Order authorized Columbia to abandon the facilities that make up the Line A-5 replacement project. In 2003, with the construction of

Docket No. CP98-150-006, et al.                                      - 17 -

Millennium's facilities delayed, Columbia met with the United States Department of Transportation (DOT) and the New York PSC[25] and agreed to replace a deteriorated 37-mile portion of Line A-5 between the Huguenot station and the Ramapo station with 10-inch diameter pipeline. The deteriorated 37-mile portion of line included the 8.8-mile segment of line in the Line A-5 replacement project. Columbia states that in 2005 it re-evaluated its plan to replace the 8.8-mile segment of Line A-5 with 10-inch diameter pipeline and decided to replace the segment with 30-inch diameter pipeline in an attempt to avoid repeated disturbance of environmentally sensitive areas in the event that the Millennium system was constructed in the future. As a result, Columbia filed its application in Docket No. CP05-19-000.

54.     Subsequent to the filing in Docket No. CP05-19-000, Millennium and Columbia filed to amend the 2002 *Millennium* Order. In light of the amended filings, Columbia now proposes to abandon by removal the pipeline facilities that make up the Line A-5 replacement project and Millennium proposes to replace the 8.8 miles of 8- and 16-inch diameter segments of Line A-5 with 30-inch diameter pipeline. Millennium also proposes to modify the Tuxedo, Sloatsburg, and Ramapo stations and to abandon in place approximately one mile of Line A-5.[26]

     E.     **Algonquin's Application**

          1.     **Introduction**

55.     On March 1, 2006 Algonquin filed an application in Docket No. CP06-76-000 under sections 7(b) and 7(c) of the NGA for a certificate of public convenience and necessity authorizing it to abandon, construct, and operate facilities in New York and Connecticut as part of the NE-07 project.

56.     Notice of Algonquin's application was published in the *Federal Register* on March 17, 2006 (71 Fed. Reg. 13820).

57.     Algonquin is engaged in the transportation of natural gas in interstate commerce subject to the jurisdiction of the Commission. Algonquin owns and operates a pipeline system that extends from Lambertville and Hanover, New Jersey through New York,

---

[25] The New York PSC acted as an agent for DOT's Office of Pipeline Safety.

[26] The 8.8-mile pipeline segment is included in the 181.7 miles of 30-inch diameter pipeline that Millennium proposes to construct.

Docket No. CP98-150-006, et al.                                          - 18 -

Connecticut, Rhode Island, and Massachusetts to points near the Boston metropolitan area.

## 2.  **Proposals**

58.     Algonquin states that its proposals are designed to enable it to receive gas from Millennium at the Ramapo station and to transport gas for Consolidated Edison and KeySpan, as part of the NE-07 project. Specifically, Algonquin proposes to:

- replace approximately 4.8 miles of 26-inch diameter pipeline with 42-inch diameter pipeline in Rockland County;

- construct and operate a compressor station consisting of three turbine compressor units, totaling 37,700 horsepower, in Oxford, Connecticut;

- construct and operate two compressor units, totaling 18,010 horsepower, at the existing Southeast station in the Town of Southeast, New York;

- construct and operate two 7,700-horsepower turbine compressor units to replace two existing 4,700-horsepower compressor units and upgrade a 12,600-horsepower compressor unit to 15,000 horsepower at the existing Stony Point station in Stony Point, New York; and

- construct and operate a 7,700-horsepower turbine compressor unit at the existing Hanover station in Hanover, New Jersey.

59.     Algonquin also proposes minor pipe replacement on the west side of its existing Hudson River crossing to improve throughput, piping modifications at two existing interconnections, and the addition of a new delivery point at an existing interconnect with Iroquois at Brookfield, Connecticut.[27] Algonquin estimates that the cost of its proposed facilities will be $191,701,900.

60.     Algonquin states that it entered into precedent agreements with Consolidated Edison and KeySpan. Specifically, Algonquin states that it will provide 125,000 Dth per day of firm transportation for Consolidated Edison for 10 years from the Ramapo station to an interconnect with Iroquois at Brookfield. In addition, Algonquin states that it will provide 150,000 Dth per day of firm transportation for KeySpan, increasing to

---

[27] There are no non-jurisdictional facilities associated with Algonquin's proposals.

Docket No. CP98-150-006, et al.                                      - 19 -

200,000 Dth per day of firm transportation over a two-year period, from the Ramapo station to an interconnect with Islander East Pipeline Company, L.L.C. (Islander East) at the Cheshire compressor station in Connecticut.[28]  The agreement with KeySpan is for 15 years.

### 3.    Rates

61.    Algonquin proposes to charge an incremental reservation rate under Rate Schedule AFT-1 to those shippers using the proposed facilities.  The incremental reservation rate charged for use of the proposed facilities will be in addition to the Rate Schedule AFT-1 system rate.  The cost of service for the proposed initial incremental reservation rate was developed using Algonquin's cost of service factors approved in Docket No. RP99-262. The rate of return is 10.37 percent, the depreciation rate is 1.81 percent, the operation and maintenance expense factor of 2.8 percent, and the tax expenses other than income equal 1.85 percent.  The surcharge for the service on the proposed facilities was designed to recover the remainder of the cost of service of the facilities that was not recovered under the AFT-1 system reservation rate.  The recourse rates for the shippers using the proposed facilities comprise the AFT-1 (F-1/WS-1) reservation and usage charges in effect for the month of service, plus the incremental reservation rate which will be $3.788 per Dth.

62.    Algonquin proposes to reflect fuel use and lost and unaccounted-for fuel (LAUF) associated with the proposals in the fuel retention percentages, calculated under section 32 of the General Terms and Conditions (GT&C) of the Algonquin's FERC Gas Tariff, as indicated on Sheet No. 40.  Algonquin filed a *pro forma* tariff sheet reflecting the proposed initial incremental rates.

63.    Under section 46 of the GT&C, Consolidated Edison and KeySpan were given the option of selecting negotiated rates or the recourse rates.  Both shippers opted to sign negotiated rate service agreements.  Algonquin states that prior to commencement of service it will file numbered tariff sheets that state the name of the shipper paying the negotiated rate, the negotiated rate, the applicable receipt and delivery points, and the volume to be transported.  Also, Algonquin states it will maintain separate and identifiable accounts for volumes transported, billing determinants, rate components,

---

[28] We authorized the construction of the Islander East pipeline from Connecticut to Long Island in *Islander East Pipeline Co., L.L.C.*, 97 FERC ¶ 61,363 (2001), *order on reh'g and issuing certificates*, 100 FERC ¶ 61,276 (2002), *order on reh'g*, 102 FERC ¶ 61,054 (2003).  The Islander East pipeline has not yet been constructed.

Docket No. CP98-150-006, et al.                                                          - 20 -

surcharges, and revenues associated with the negotiated rates in sufficient detail so that
they can be identified in Statements G and I in any future NGA section 4 or 5 rate case.

### 4.    Justification for Proposals

64.    Algonquin contends that its existing customers will not subsidize the project, that
the project will have no adverse effect on existing customers or existing pipelines and
their captive customers, and that it has minimized the potential for adverse impacts on
landowners and communities affected by the project.  In addition, Algonquin asserts that
the project will enhance the flexibility and reliability of its system and provide capacity
for the NE-07 project .

### F.    Iroquois' Application

### 1.    Introduction

65.    On March 29, 2006, Iroquois filed an application in Docket No. CP02-31-002 to
amend the authorization issued in *Iroquois Gas Transmission System*, 101 FERC
¶ 61,131 (2002) (the *Iroquois* Order).[29]  The *Iroquois* Order authorized Iroquois to
construct and operate a compressor station in Brookfield, Connecticut.

66.    Notice of Iroquois' application was published in the *Federal Register* on April 13,
2006 (71 Fed. Reg. 19181).

67.    Iroquois transports natural gas in interstate commerce.  Iroquois' pipeline extends
from the United States-Canada border near Iroquois, Ontario through New York and
Connecticut to South Commack, New York on Long Island and to Hunts Point, New
York in the Bronx.  Iroquois interconnects with Algonquin at Brookfield, Connecticut.
At Brookfield, since the pressure in the Iroquois pipeline is substantially higher than the
pressure in Algonquin's pipeline, Iroquois is only able to deliver gas into, but not receive
gas from, the Algonquin system.

68.    In the *Iroquois* Order, we authorized Iroquois to construct and operate a
10,000- horsepower compressor unit at Brookfield.  Iroquois designed the compressor
unit to enable it to provide up to 85,000 Dth per day of firm transportation capacity for
two shippers planning on building electric generation plants in the New York City area.

---

[29] *Order on reh'g and clarification*, 102 FERC ¶ 61,129 (2003).

Docket No. CP98-150-006, et al.                                      - 21 -

Both shippers, however, decided not to go forward with their electric generation projects and the Brookfield compressor station was not constructed.

## 2.    Proposals

69.    Iroquois states that it designed the proposals herein to enable it to receive gas from Algonquin at Brookfield and to transport the gas to Consolidated Edison at Hunts Point, as part of the NE-07 project.  Specifically, Iroquois proposes to:  (1) reduce the size of the compressor unit authorized in the *Iroquois* Order from 10,000 to 7,700 horsepower; (2) convert the authorized compressor to a transfer compressor unit capable of receiving gas from Algonquin; and (3) install gas cooling facilities at the Brookfield compressor station and at its existing compressor station in Dover, New York.[30]  Iroquois estimates that the total cost of its proposals will be $41,600,000.

70.    Iroquois states that it conducted an open season that ended on May 31, 2005.  In addition to the open season, Iroquois states that it solicited its existing firm transportation customers for turnback capacity that could be used by expansion shippers.  As a result of the solicitation, Reliant Energy released 10,000 Dth per day of capacity.  Also, Iroquois asserts that it will use 30,000 Dth per day of firm capacity that is unsubscribed on a year-round, long-term basis for the NE-07 project.  Following the open season and turnback solicitation, Iroquois states that it executed a binding precedent agreement with Consolidated Edison for 100,000 Dth per day of firm transportation service under Rate Schedule RTS from Brookfield to Hunts Point.

## 3.    Rates

71.    Iroquois proposes to charge as initial recourse rates the currently effective Part 284 rates under the Rate Schedule RTS applicable to service on the Eastchester extension for deliveries to Hunts Point.[31]  Iroquois also proposes to charge Consolidated Edison a negotiated rate for firm transportation service in accordance with the Negotiated Rate

---

[30] Iroquois states that Connecticut Light & Power Company will need to extend an electric utility line to serve the proposed facilities at Brookfield.  No other non-jurisdictional facilities are required for Iroquois' project.

[31] These rates are subject to a rate moratorium and will not change before December 31, 2011.  *Iroquois Gas Transmission System, L.P.*, 109 FERC ¶ 61,059 (2004).

Docket No. CP98-150-006, et al.                                          - 22 -

Policy Statement[32] and the negotiated rate provisions contained in its tariff.[33] Iroquois indicates that prior to commencing service to Consolidated Edison, it will file a numbered tariff sheet stating the applicable negotiated rate for Commission review and approval, and that it will account for these volumes and revenues separately so that they can be identified in subsequent rate proceedings.

72.    Iroquois proposes to roll the costs associated with construction and operation of the compressor unit and associated facilities into the costs of its Eastchester project in the next general section 4 rate proceeding applicable to the Eastchester rates after the in-service date of the proposed facilities. Iroquois contends that its existing shippers will receive operational benefits as a result of the project, as well as financial benefits upon the roll-in of facility costs and billing determinants to Iroquois' currently approved Eastchester rates. Iroquois further contends that the proposed service includes a positive net fuel contribution, resulting in an incremental Eastchester fuel cost benefit of approximately $60,000 (based on an average annual gas cost of $9.81 per Dth).[34]

### 4.    Justification for Proposals

73.    Iroquois contends that its existing customers will not subsidize the project and that the project will have no adverse effect on its existing customers or existing pipelines and their captive customers. Iroquois states that Brookfield was selected for the new compressor station because it is an existing interconnection between Algonquin and Iroquois, which minimizes the need for construction of new pipeline facilities as well as the impact on the environment. Iroquois points out that in the *Iroquois* Order, the Commission found that a larger compressor station was in the public interest. Iroquois states that there have been no intervening events that would compel a contrary finding here for a smaller compressor station.

---

[32] *Natural Gas Pipeline Negotiated Rate Policies and Practices*, 104 FERC ¶ 61,134 (2003).

[33] *See* section 32, Negotiated Rates, of the GT&C of Iroquois' FERC Gas Tariff.

[34] Average Daily Midpoint (Iroquois Zone 2) reported in "*Gas Daily*" for the period March 6, 2005 through March 6, 2006.

Docket No. CP98-150-006, et al.                                                    - 23 -

## III.    Interventions

74.    The parties in Appendix A filed timely, unopposed motions to intervene in the listed dockets.[35]  In addition, the New York PSC filed notices of intervention in Docket Nos. CP98-150-006, CP05-19-000, CP06-76-000, and CP02-31-002.

75.    The motions to intervene of the Town of Cortlandt, New York (Cortlandt) and the Village of Croton-on-Hudson, New York (Croton-on-Hudson) in Docket Nos. CP98-150-006 and CP98-150-007 and Woodstone Lakes Development, LLC (Woodstone) in Docket Nos. CP98-150-006 and CP98-151-003 included protests.  Millennium filed an answer to the protests.  Cortlandt and Croton-on-Hudson filed an answer to Millennium's answer.  Millennium filed an answer to Cortlandt's and Croton-on-Hudson's answer. Croton-on-Hudson filed an answer to Millennium's answer.

76.    The Cities of Charlottesville and Richmond, Virginia (Charlottesville and Richmond) filed a joint motion, protesting Columbia's application in Docket No. CP05-19-000.  Columbia filed an answer to Charlottesville's and Richmond's protest. Charlottesville and Richmond filed an answer to Columbia's answer.

77.    Answers to protests and answers to answers are not allowed under our rules.[36] Nevertheless, we will accept all of Millennium's and Columbia's answers to the protests, as well as all of the answers to Millennium's and Columbia's answers, because these pleadings provided information that assisted us in our decision making.

78.    The parties listed in Appendix B filed untimely motions to intervene.  All of the late motions to intervene have demonstrated an interest in this proceeding and have shown good cause for intervening out of time.  Further, the untimely motions will not delay, disrupt, or otherwise prejudice this proceeding.  Thus, we will grant the untimely motions to intervene.[37]

---

[35] Timely, unopposed motions to intervene are granted by operation of Rule 214.

[36] 18 C.F.R. § 385.213 (a)(2) (2006).

[37] 18 C.F.R. § 385.214(d) (2006).

Docket No. CP98-150-006, et al.                                  - 24 -

**IV.    Consolidation of Docket No. CP05-19-000**

79.    On August 1, 2006, Columbia filed a motion, requesting that its application in Docket No. CP05-19-000 involving the Line A-5 replacement project be consolidated with Millennium's amended applications.

80.    The facilities in the Line A-5 replacement project are the same facilities that are involved in Millennium's proposals. The only difference is that now Millennium proposes to replace the existing facilities with 30-inch diameter pipeline and upgrade the compressor stations, rather than as Columbia proposed in Docket No. CP05-19-000. We note that numerous parties filed motions to intervene and comments to Columbia's application. In addition, Columbia, our staff, and many environmental permitting agencies have done extensive work on Columbia's proposals. Thus, rather than dismissing Columbia's application, we believe that the interests of all parties will be best served by consolidating this docket with Millennium's application and considering the environmental issues relating to the Line A-5 replacement project raised by the intervenors, commenters, and permitting agencies when addressing Millennium's proposals.

81.    As to the non-environmental issues raised in this docket, Charlottesville and Richmond contend that Columbia failed to demonstrate that its existing customers would not subsidize the Line A-5 replacement project, that Columbia did not solicit the turnback of capacity from its existing customers, and that Columbia did not support the level of costs associated with the replacement project. Piedmont Natural Gas Company, Inc. (Piedmont) filed comments, contending that the Commission should ensure the proper allocation of costs, given Columbia's proposal to roll in the portion of project costs that would have been attributable to a 10-inch diameter replacement project. Baltimore Gas and Electric Company (Baltimore Gas) requests a technical conference, contending that Columbia should be required to show cause for any proposed increase in its overall rate base, if Columbia intends to roll in the cost of the proposed Line A-5 replacement project.

82.    Columbia no longer proposes to replace the Line A-5 facilities, nor does it propose to roll the cost of the replacement facilities into its rate base since Millennium now proposes to own and operate the facilities. Thus, we find that Charlottesville's and Richmond's joint protest is moot, as are the concerns of Piedmont. Further, we find that no purpose would be served by convening a technical conference as requested by Baltimore Gas.

Docket No. CP98-150-006, et al.                                    - 25 -

## V.    <u>Discussion</u>

83.    Since the construction, operation, and abandonment of the proposed facilities would involve the transportation of natural gas in interstate commerce, the proposals are subject to the jurisdiction of the Commission under sections 7(b) and 7(c) of the NGA.

### A.    <u>Applicability of the Certificate Policy Statement</u>

84.    Millennium contends that the Commission should not apply the Certificate Policy Statement to its amended proposals herein.[38]  Millennium asserts that it is not filing a new proposal, but only seeks to amend a certificate that was previously approved under the construction policy that existed prior to the adoption of the Certificate Policy Statement. To support its position, Millennium quotes from the Certificate Policy Statement, which holds that it "will not be applied retroactively where the case has already been issued and the investment decisions made."[39]  Millennium states that under the prior construction policy, its amended applications should be approved because it has entered into long-term binding precedent and lease agreements for 80 percent of the pipeline's capacity.

85.    Under our policy as it existed prior to the issuance of the Certificate Policy Statement, an applicant was required to demonstrate that it had entered into long-term, executed contracts or binding precedent agreements (*i.e.*, 10-year contracts or precedent agreements) for a substantial amount of the firm capacity of the proposed facilities.[40] The minimum level of firm commitment that we recognized as sufficient for new on-shore facilities was 25 percent of the pipeline's proposed capacity.[41]

86.    In contrast, the Certificate Policy Statement established criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explained that in deciding whether to authorize the construction of major new pipeline facilities, we balance the

---

[38] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *order on clarification*, 90 FERC ¶ 61,128, *order on clarification*, 92 FERC ¶ 61,094 (2000) (*Certificate Policy Statement*).

[39] *Certificate Policy Statement*, 88 FERC at 61,750.

[40] *El Paso Natural Gas Co.*, 65 FERC ¶ 61,276 (1993).

[41] *See, e.g., Ouachita River Gas Storage Co.*, 76 FERC ¶ 61,139 (1996); *Steuben Gas Storage Co.*, 72 FERC ¶ 61,102 (1995).

Docket No. CP98-150-006, et al.                                          - 26 -

public benefits against the potential adverse consequences. Our goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

87.    The Certificate Policy Statement applies to applications filed after July 29, 1998, which is the date that we issued the Notice of Proposed Rulemaking (NOPR) that resulted in the issuance of the Certificate Policy Statement.[42] Since Millennium filed its original application in Docket No. CP98-150-000 on December 22, 1997, we did not apply the Certificate Policy Statement to Millennium in the 2002 *Millennium* Order.

88.    Millennium claims that the Certificate Policy Statement should not apply here, because it only seeks to amend its certificate and not file a new proposal. We disagree with Millennium's premise. While the goals of the proposals herein remain the same – increasing gas supply in the New York City area – many of the specifics of the NE-07 project are different from the proposals certificated in the 2002 *Millennium* Order. Here, Millennium proposes to reduce the length of facilities to be constructed from 424 to 181.7 miles, reduce the diameter of the pipeline from 36 to 30 inches, reduce the capacity of the pipeline from 714,000 Dth to 525,000 Dth per day, and reduce the operating pressure of the pipeline from 1,440 to 1,200 psig. In addition, the shippers that Millennium proposes to serve from the NE-07 project are all different from the shippers who requested service under the original proposals. Finally, Millennium's initial amended application was filed on August 1, 2005, more than seven years after the issuance of the NOPR. Considering the changes here from the proposals approved in the 2002 *Millennium* Order and the length of time that has passed between the NOPR and the filing of the amended applications, we believe that it is appropriate to require Millennium to comply with the same standards as all other pipelines that have sought certificate authority for construction of facilities over the last seven years. Our holding will not be burdensome to Millennium, as the information we need to make our decision under the Certificate Policy Statement is contained in Millennium's pleadings. Thus, we will apply the Certificate Policy Statement here.

---

[42] *Certificate Policy Statement*, 88 FERC at 61,751 (concurring opinion).

Docket No. CP98-150-006, et al.                                                   - 27 -

### B.    The Certificate Policy Statement

89.    Under the Certificate Policy Statement, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, we will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will we proceed to complete the environmental analysis where other interests are considered.

### 1.    Subsidization

90.    Millennium is a new pipeline company with no existing customers. The threshold requirement of no subsidization from a pipeline's existing customers is not applicable here. Thus, we find that there is no risk of subsidization of Millennium's proposed pipeline.

91.    Algonquin's proposals will not be subsidized by its existing customers, since it proposes to charge an incremental rate to Consolidated Edison and KeySpan that will fully recover the costs of the proposed facilities. Further, as discussed below, we will require that Algonquin ensure that no expansion fuel costs attributable to the proposed construction will be charged to existing shippers. We have previously determined that where a pipeline proposes to charge an incremental rate for new construction, it satisfies the threshold requirement that its proposals will not be subsidized by its existing shippers.[43]

92.    We also conclude that Iroquois' existing customers will not subsidize the proposed expansion service. Exhibit Z-1 of Iroquois' application demonstrates that revenues will exceed expenses for each of the first three years of service at a progressively higher amount, resulting in cumulative revenues exceeding the cost of service by $39,441,491

---

[43] *See Eastern Shore Natural Gas Co.*, 95 FERC ¶ 61,344 (2001); *Transcontinental Gas Pipe Line Corp.*, 94 FERC ¶ 61,380 (2001); *Texas Eastern Transmission Corp.*, 92 FERC ¶ 61,285 (2000).

Docket No. CP98-150-006, et al.                                    - 28 -

over the initial three years of service. Thus, we will make a predetermination here that rolled-in rate treatment in Iroquois' next section 4 rate proceeding would be appropriate, absent material changes in the relevant facts and circumstances. To ensure that all parties have full knowledge of the costs and revenues attributable to the expansion, we will require Iroquois to account for the construction and operating costs and revenues separately in its next section 4 rate proceeding. With such information, the parties and the Commission can evaluate the costs of the project and protect existing shippers from cost overruns and be able to identify any change in material circumstances that may warrant a re-examination of rolled-in rate treatment.

## 2.    Existing Customers, Competing Pipelines, and Landowners

93.    Millennium's proposals will not have a negative impact on its existing services, since it does not have any current customers. Algonquin's and Iroquois' proposals will not degrade service to their existing customers. In Algonquin's case, the proposals will provide a direct connection to a new source of supply in the northeast, which will improve reliability and supply stability for its customers. Similarly, for Iroquois, the proposed project will establish the first alternative receipt point for Canadian supplies for its system, which will afford its customers a measure of supply security. The proposals also will not adversely affect existing pipelines in the region or their customers, since the proposals are designed to meet new requests for service by Consolidated Edison and KeySpan.

94.    Under section 7(h) of the NGA, an applicant with a Commission-issued certificate has the right to exercise eminent domain to acquire the land necessary to construct and operate its proposed facilities, when it cannot reach a voluntary agreement with the landowner. Landowners whose land may be condemned have an interest in the applicant's proposals, as does the community near the right-of-way.[44] In our consideration of landowner and community interests under the Certificate Policy Statement, we seek to avoid unnecessary construction in order to minimize the applicant's need to condemn land to construct facilities under the eminent domain rights conveyed by our certificate.[45]

95.    Almost all of Millennium's proposed pipeline facilities will be constructed in powerline or pipeline rights of way. New segments of rights of way are distributed along

---

[44] *Certificate Policy Statement*, 88 FERC at 61,748.

[45] *Id. See also Order on Clarification*, 90 FERC at 61,398.

Docket No. CP98-150-006, et al.                                    - 29 -

the Millennium pipeline route and are incorporated into the proposed route because of topography, engineering, or residential constraints in areas adjacent to the existing rights of way. The Sterling Forest State Park/Laurel Ridge alternative and the Warwick Isle Route variation are designed to avoid planned residential communities along Millennium's route.

96.     Algonquin's proposed replacement of approximately 4.8 miles of pipeline facilities will take place in its existing 75-foot-wide permanent right of way. Algonquin's addition of compressor units will be at three existing compressor stations on property that Algonquin owns. As for the proposed Oxford compressor station, Algonquin has entered into an agreement to purchase the land where the station will be located.

97.     Iroquois' proposed construction at Brookfield and Dover will take place at existing compressor stations on land that it owns. Iroquois states that it will engage in minimal tree clearing and that the remaining trees and foliage will provide an additional barrier to minimize potential visual and noise impacts of the new compressor unit.

98.     For the reasons discussed above, we find that Millennium's, Algonquin's, and Iroquois' proposals will have minimal adverse impacts on landowners and communities near the project.

### 3.     Public Convenience and Necessity Finding

99.     Millennium's, Algonquin's, and Iroquois' proposed facilities will be constructed without subsidies. Also, the proposals will not degrade service to any of the applicants' existing customers, nor will the proposals adversely affect existing pipelines in the region or their customers, or nearby landowners and communities.

100.    In addition, the NE-07 project will provide the northeast with access to gas supplies from the Dawn hub in Ontario and the upstream Chicago hub. The project will increase pipeline capacity in southeastern New York and provide access to existing storage fields in western New York. Also, the demand for natural gas in the New York area is increasing due to electric generation plants fueled primarily by natural gas.[46] Further, we recognized that gas demand in New York is close to exceeding the capacity

---

[46] *ISO Power Trends 2005: A Report by the New York Independent System Operator* (April 2005).

Docket No. CP98-150-006, et al.                                        - 30 -

of the pipelines serving it .[47]  In addition, market studies continue to indicate a growth in demand in the New York City metropolitan area.[48]

101.    Algonquin's and Iroquois' proposed facilities are necessary to provide the new transportation services contemplated by the NE-07 project.  The NE-07 project will provide significant benefits to Algonquin's system by introducing a direct connection to a new source of supply, which will improve reliability and supply stability for its customers.  Also, the NE-07 project will improve access to market-area storage for Algonquin's shippers.  Further, the NE-07 project will establish the first alternative receipt point for Canadian supplies for Iroquois' system, which will afford its customers a measure of supply security.

102.    Accordingly, for the reasons stated above, we find that, consistent with the Certificate Policy Statement and section 7(c) of the NGA, that the public convenience and necessity requires the approval of Millennium's, Algonquin's, and Iroquois' proposals.

### C.    The Applicants' Rates

#### 1.    Millennium

103.    We will accept Millennium's proposed recourse rates because the proposed capital structure, rate of return, and cost of debt are consistent with the Interim Order and recent Commission rulings.

104.    Consistent with our precedent and the holding in the Interim Order,[49] we will require Millennium to file a cost and revenue study at the end of its first three years of actual operation to justify its existing recourse rates or to propose alternative recourse rates to be effective no later than three years after the in-service date of its facilities.  In its filing, Millennium's projected units of service must be no lower than those upon which the approved initial rates are based.  The filing must include a cost and revenue

---

[47] FERC Presentation at 2004 Northeast Energy Infrastructure Conference.

[48] *See, e.g.*, Department of Energy, Energy Information Administration, "Annual Energy Outlook 2006 with Projections to 2030," Tables 1 and 2, available at http:\\www.eia.doe.gov/oiaf/aeo/index/html.

[49] Interim Order at 62,324.

Docket No. CP98-150-006, et al.                                      - 31 -

study in the form specified in section 154.313 of the regulations, updating cost-of-service data.

### 2.    Algonquin

105.    We find that the incremental reservation rate under Rate Schedule AFT-1 is designed to recover the cost of service of the proposed facilities and is consistent with the Certificate Policy Statement. Thus, we conclude that the reservation rate is appropriate. However, Algonquin must file a tariff sheet to place the rate into effect at least 60 days prior to commencement of service on the proposed facilities.

106.    New England Local Distribution Companies (New England LDCs)[50] filed a motion to intervene and comments in the Algonquin proceeding, contending that use of Algonquin's fuel retention percentages to recover the cost of fuel use and LAUF associated with the 71,810 horsepower increase in compression could result in the existing firm shippers subsidizing the proposals. The New England LDCs assert that Algonquin's application contains insufficient information to make a determination that existing firm shippers will not subsidize the two expansion shippers. The New England LDCs request that the Commission direct Algonquin to provide sufficient information to confirm that there will be no subsidy by existing firm customers with respect to the fuel use and LAUF associated with the proposed 71,810 horsepower increase in compression.

107.    We agree with the New England LDCs' comments on fuel retention. The Certificate Policy Statement requires that expansion facilities be financially viable without subsidies from existing customers. Here, Algonquin seeks to charge the system fuel retention rate for the expansion service, but does not specify if it intends to apply any under or over recoveries to its fuel tracker account. To the extent that fuel use on the expansion facilities exceeds the system charge, existing customers could subsidize the expansion shippers. This would be contrary to our policy. Thus, we will require Algonquin to ensure that expansion fuel use costs are the responsibility of only the expansion shippers and Algonquin and that no costs attributable to the proposed expansion will be charged to existing shippers.[51] We will also require Algonquin to delineate the actual fuel use and LAUF associated with the proposal in its annual fuel tracker filing required by section 32 of the GT&C of its tariff. Existing shippers can

---

[50] The New England LDCs consist of Bay State Gas Company, City of Norwich, Department of Public Utilities, Connecticut Natural Gas Corporation, New England Gas Company, Northern Utilities, Inc., NSTAR Gas Company, and The Southern Connecticut Gas Company.

[51] *Texas Eastern Transmission, LP*, 101 FERC ¶ 61,120 at P 36 (2002).

Docket No. CP98-150-006, et al.                                               - 32 -

review the costs included in Algonquin's tracker filings to verify that only expansion
shippers are assessed fuel costs attributable to expansion service.

### 3.    <u>Iroquois</u>

108.    We will approve Iroquois' recourse rate for the proposed transportation service,
because it is the Rate Schedule RTS rate applicable to the Eastchester project facilities
through which the service will be provided.

### 4.    <u>Negotiated Rates</u>

109.    Millennium, Algonquin, EPI, and Iroquois propose negotiated rate agreements
with their shippers. While we do not approve negotiated rate agreements in certificate
proceedings,[52] in order to comply with the Alternative Rate Policy Statement[53] and our
decision in *NorAm Gas Transmission Co.*,[54] we will direct Algonquin and Iroquois to file
their negotiated rate expansion contracts or numbered tariff sheets at least 60 days, and
Millennium and EPI at least 90 days, prior to the commencement of service on the
expansion facilities stating for each shipper paying a negotiated rate: (1) the exact legal
name of the shipper; (2) the total charges (the negotiated rate and all applicable charges);
(3) the receipt and delivery points; (4) the volumes of gas to be transported; (5) the
applicable rate schedule for the service; (6) any formula upon which the negotiated rate is
designed; and (7) a statement affirming that the negotiated rate contract does not deviate
in any material respect from the form of service agreement in their FERC Gas Tariffs.
Millennium, Algonquin, EPI, and Iroquois must also disclose all consideration received
that is associated with their agreements. Finally, Millennium, Algonquin, EPI, and
Iroquois must also maintain separate and identifiable accounts for volumes transported,

---

[52] *See East Tennessee Natural Gas Co.*, 98 FERC ¶ 61,331 (2002); *Texas Eastern
Transmission Corp.*, 95 FERC ¶ 61,057, *order on reh'g*, 95 FERC ¶ 61,367 (2001); and
*Independence Pipeline Co.*, 91 FERC ¶ 61,102 and 92 FERC ¶ 61,022, *order on reh'g
and clarification*, 92 FERC ¶ 61,367 (2000).

[53] *Alternative to Traditional Cost-of-Service Ratemaking for Natural Gas
Pipelines and Regulation of Negotiated Transportation Services of Natural Gas
Pipelines,* 74 FERC ¶ 61,076 (1996), *reh'g and clarification denied,* 75 FERC ¶ 61,024
(1996), *reh'g denied,* 75 FERC ¶ 61,066 (1996); *petition for review denied, Burlington
Resources Oil & Gas Co. v. FERC,* Nos. 96-1160, *et al.,* U.S. App. Lexis 20697 (D.C.
Cir. July 20, 1998) (Alternative Rate Policy Statement).

[54] *NorAm Gas Transmission Co.,* 77 FERC ¶ 61,011 (1996).

Docket No. CP98-150-006, et al.                                           - 33 -

billing determinants, rate components, surcharges and revenues associated with their
negotiated rates in sufficient detail so that they can be identified in Statements G, I, and J
in any future NGA section 4 or 5 rate case.

### 5.    Cost Overruns

110.    In the Certificate Policy Statement, we urged pipelines and project customers to
use their business expertise and negotiating skills to apportion the risks of construction
cost overruns in their service contracts,[55] noting that the parties are in the best position to
allocate such risks at the time of contracting, rather than leaving such issues for litigation
at the Commission.[56]

111.    Millennium has addressed the issue of cost overruns, with Millennium and its
shippers agreeing to rate caps over a ten-year term as set forth in an amendment to
section 3 of the *pro forma* firm transportation service agreements.  To the extent the
negotiated rate methodology would yield a rate above the cap due to project cost
overruns, Millennium will bear the cost of such overruns.  When Millennium files its
statement on construction costs within six months after the facilities are constructed in
compliance with section 157.20(c)(3) of the regulations, Millennium will be required to
compare the projected construction costs to the actual costs and explain any significant
differences.  Thus, we find that Millennium has adequately addressed the issue of cost
overruns.

112.    We find that Iroquois and Consolidated Edison have addressed the issue of cost
overruns in their negotiated rate agreement, since the agreement provides for a rate cap
for the firm transportation service tied to the cost of the new facilities, which protects
Iroquois' other customers from cost overruns.  Further, if the facilities exceed a given
cost, the rate charged to Consolidated Edison will not go above the cost specified in the
negotiated rate agreement and Iroquois will bear the cost of the overruns.  However, for
recourse rate shippers, Iroquois and the prospective shippers are encouraged during
contract negotiations to reach an agreement concerning who will bear the risk of cost
overruns.  The Certificate Policy Statement found that the responsibility for cost overruns
should be apportioned between the pipeline and the new customers that have subscribed

---

[55] *Certificate Policy Statement*, 88 FERC ¶ 61,227 at 61,747.

[56] *Order on Clarification*, 90 FERC ¶ 61,128 at 61,396.

Docket No. CP98-150-006, et al.                                    - 34 -

for the new capacity, so that the overruns will not become the responsibility of the existing shippers.[57]

### D.     Columbia's Proposals

#### 1.     Abandonment Authorization

113.    The proposed abandonment will permit Millennium to use Columbia's existing facilities and rights of way to provide more gas to the New York City metropolitan area, while eliminating the necessity to construct duplicate facilities.  Even though it proposes to abandon facilities, Columbia's Line A-5 customers will continue to receive service through Millennium.  Nevertheless, the A-5 customers will not have to bear the costs to replace deteriorated existing facilities that would otherwise be incurred by Columbia in the future.  The proposed abandonment will not affect Columbia's ability to meet its firm service obligations or the rates paid by the Line A-5 customers.  Thus, we find that Columbia's proposed abandonment of facilities is in the public interest.

#### 2.     The Leases and Limited-Term Certificate

114.    Our test for approving the lease arrangements is whether the lease payments are less than, or equal to, the lessor's firm transportation rates for comparable service over the terms of the lease on a net present value basis.[58]  Here, we compared the cost of Columbia's annual lease payments of $5,029,766[59] to the cost of service savings of $6,381,235[60] realized from the abandonment and found that the lease payments were less

---

[57] *Certificate Policy Statement*, 88 FERC ¶ 61,227 at 61,747.

[58] *See, e.g., Columbia Gas Transmission Corp.*, 79 FERC ¶ 61,160 at 61,755-59 (1997); *Midwestern Gas Transmission Co.*, 73 FERC ¶ 61,320 at 61,888 (1995); and *Mobile Bay Pipeline Projects*, 55 FERC ¶ 61,358 at 62,078 (1991).

[59] Columbia's annual lease payment of $5,029,766 consists of its annual lease charge of $5,469,890 to Millennium for service provided under Columbia's lease, less Millennium's annual lease charge of $440,124 to Columbia for service provided under the Millennium lease.

[60] *See* Columbia's November 30, 2006 data response.  Columbia's cost of service savings of $6,381,235 consists of Columbia's $6,821,359 reduction in costs realized from the abandonment of facilities, less Millennium's $440,124 monthly lease payment to Columbia.

Docket No. CP98-150-006, et al.                                          - 35 -

than the lessor's firm transportation rates for comparable service over the terms of the
lease on a net present value basis.

115.    The combination of the reduction in Columbia's cost of service and the
Millennium lease payments results in a projected net reduction to Columbia's cost of
service of $1,351,469. We find that Columbia and its Line A-5 customers will realize a
net economic benefit from the proposed lease arrangement.

116.    The Columbia lease will enable Columbia's Line A-5 customers to continue to
receive service at existing levels through Millennium's pipeline. The Columbia lease
will eliminate the necessity for Millennium to construct duplicative facilities. In addition,
Columbia's lease will not affect the rates paid by the Line A-5 customers. Likewise, the
Millennium lease will enable Millennium to serve its customers and will eliminate the
need for Millennium to construct duplicative facilities. Neither lease will affect
Columbia's other system wide customers. Finally, the proposed limited-term certificate
will allow Columbia to continue to serve its Line A-5 customers without interruption
while the Millennium pipeline is constructed. For the reasons stated above, we find that
the Columbia lease, the Millennium lease, and Columbia's limited-term certificate, with
pre-granted abandonment authority, are in the public convenience and necessity.

117.    As to its request for waiver of the certificate compliance and reporting
requirements, Columbia is an interstate pipeline, engaging in a jurisdictional activity
when it transports gas to serve its customers on Millennium's incomplete system. As a
transporter, Columbia must account for the revenues and expenses involved in the
transportation activity. Moreover, we do not know how long the transportation service
will continue, because there is no way of knowing at this time how long the limited-term
certificate will continue in effect. Thus, we will not waive the certificate compliance and
reporting requirements for Columbia's limited-term certificate.

118.    Columbia proposes to begin recovery of the lease payments recorded in Account
858 through a TCRA filing,[61] effective with Columbia's next general section 4 rate filing
in which the costs of the existing Line A-5 facilities are removed from Columbia's base
rates. To avoid the potential for double recovery of Columbia's lease payments to
Millennium through the TCRA adjustment while it is still charging its Line A-5
customers, we will prohibit Columbia from submitting a TCRA filing to recover the

---

[61] Columbia submits its annual TCRA filing on or before March 1 to become
effective April 1. *See* Sixth Revised Sheet No. 452 of Columbia's FERC Gas Tariff,
Second Revised Volume No. 1.

Docket No. CP98-150-006, et al.                                              - 36 -

Account 858 costs associated with the Millennium lease until Columbia submits a
section 4 filing to remove the costs of the Line A-5 facilities from its base rates.

### 3.     Gas Quality Specifications

119.   On June 5, 2006, Consolidated Edison and Orange and Rockland jointly protested
Columbia's tariff filings in Docket Nos. RP06-231-002 and RP06-365-000 and requested
that we convene a consolidated technical conference in the dockets involved in
Columbia's tariff filings and the dockets involved in Millennium's and Columbia's
proceedings to discuss Columbia's proposed gas quality specifications.

120.   Columbia's proposed gas quality specifications are part of an ongoing section 4
proceeding in Docket Nos. RP06-231-002 and RP06-365-000 in which we held a
technical conference on July 25, 2006.  Since a technical conference on the same issue is
not necessary in Millennium's and Columbia's proceedings, we will deny the requests for
a consolidated technical conference.

### E.     Other Issues Relating to Millennium

### 1.     Motion to Vacate

121.   In its original proposals filed in 1997 and 2000, Millennium proposed to construct
facilities across the Hudson River through Westchester County to Mount Vernon.  The
construction of facilities across the Hudson River through portions of Westchester
County involved New York's coastal zone.  Thus, in approving its proposals in the 2002
*Millennium* Order, we required Millennium to obtain a CZMA determination from
NYSDOS before commencing the construction of those facilities to Mount Vernon.
NYSDOS found that Millennium's proposals were inconsistent with New York's Coastal
Management Program.  Millennium appealed the NYSDOS finding.

122.   In its applications in Docket Nos. CP98-150-006 and CP98-150-007, Millennium
proposed to amend the 2002 *Millennium* Order to phase construction of the project.  In
Phase I, Millennium proposed to acquire, construct, and operate facilities from the North
Greenwood station east to the Ramapo station, among other things.  Millennium
requested that the Commission defer consideration of the portion of the 2002 *Millennium*
Order that authorized the crossing of the Hudson River to Mount Vernon until Phase II,
because its appeal of NYSDOS' decision was pending.  Millennium also requested that
the Commission defer consideration of the Lake Erie to North Greenwood portion of
pipeline, because that segment was no longer needed due to changes in the market.

Docket No. CP98-150-006, et al.                                                    - 37 -

123.   Subsequent to its filings in Docket Nos. CP98-150-006 and CP98-150-007, the
*Gutierrez* decision upheld NYSDOS' finding that the proposed construction of facilities
across the Hudson River through portions of Westchester County were inconsistent with
New York's Coastal Management Program. In Docket No. CP98-150-008, Millennium
filed a motion to vacate the portion of the 2002 Millennium Order that authorized
construction from Lake Erie to North Greenwood and from Ramapo to Mount Vernon,
*i.e.*, the Phase II facilities. In support of its motion, Millennium states that it no longer
seeks authority to construct the Phase II facilities because it does not intend to request
review of the District Court's decision in *Gutierrez*, which precludes the construction of
facilities across the Hudson River through Westchester County.

124.   Croton-on-Hudson and Cortlandt protested Millennium's applications in Docket
Nos. CP98-150-006 and CP98-150-007, objecting to the proposed phasing of the 2002
*Millennium* Order. The County of Westchester, New York (Westchester) filed comments
also objecting to the proposed phasing. In their answers to the motion to vacate,
Cortlandt and Westchester state that they support the motion. Croton-on-Hudson states
that it will not oppose Millennium's motion as long as Millennium does not have
authority to construct facilities on any route that does not comply with the CZMA, that
the proposed facilities approved here comply with all applicable statutory and regulatory
requirements, that no other phases of the Millennium project are approved here, and that
additional proposals for future phases must be the subject of a new application by
Millennium.

125.   In its motion to vacate, Millennium states that it does not intend to construct
facilities from Lake Erie to North Greenwood or from the Ramapo station to Mount
Vernon. No party opposes Millennium's motion. Thus, we find that it is in the public
interest to vacate the portions of the 2002 *Millennium* Order that relate to these facilities
and to vacate the corresponding certificate and environmental conditions.

126.   In regard to Croton-on-Hudson's concerns, the amended certificate approved
herein authorizes Millennium to construct facilities from Corning to the Ramapo station
only. The certificate is conditioned upon Millennium's compliance with the applicable
NGA and environmental regulations and does not authorize Millennium to construct
facilities on any route that raises CZMA concerns. If Millennium wishes to construct any
facilities other than those authorized in this order, it must seek additional authorization
from the Commission.

## 2.    Status as a Natural Gas Company

127.   Millennium requests that the Commission make a finding that it will not be
considered a "natural gas company" subject to the Commission's jurisdiction until it

Docket No. CP98-150-006, et al.                                                          - 38 -

commences the transportation of natural gas in interstate commerce. Millennium raises this issue because Columbia is requesting a limited-term certificate to temporarily operate segments of Millennium's pipeline to continue service to Columbia's existing Line A-5 customers, while other segments of Millennium's pipeline are under construction.

128.   Section 2(6) of the NGA defines a "natural gas company," in part, as a "person engaged in the transportation of natural gas in interstate commerce . . . ." Section 7(c)(1) of the NGA provides, in part, that:

> No natural gas company or person which will be a natural gas company upon completion of any proposed construction or extension, shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission . . . unless there is in force with respect to such natural gas company a certificate of public convenience and necessity . . . .

129.   Section 2(6) implies that a person must be engaged in the transportation of natural gas in interstate commerce to be a natural gas company. Section 7(c)(1) implies that to be a new natural gas company, a person must complete any proposed construction. At the time Columbia operates segments of Millennium's pipeline under the limited-term certificate, Millennium will not have engaged in any transportation in interstate commerce, nor will it have completed the construction of its facilities. Thus, we find that Millennium will not be a natural gas company when Columbia operates segments of Millennium's system under Columbia's limited-term certificate.

### 3.   Accounting

#### a.   Book Depreciation Rate

130.   For financial accounting purposes, Millennium proposes to use a straight-line depreciation rate of 3.33 percent per year over a 30-year period for the proposed transportation facilities. A straight-line method to record book depreciation is acceptable because it is a systematic and rational method consistent with the Commission's Uniform System of Accounts. Thus, we will approve a 3.33 percent depreciation rate for Millennium.

#### b.   Regulatory Assets

131.   Millennium proposes to record a regulatory asset for differences in depreciation amounts recorded on its books and depreciation amounts recovered in its negotiated rates by debiting Account 182.3, Other Regulatory Assets, and by crediting Account 407.4, Regulatory Credits. Millennium also proposes to extinguish or amortize the regulatory

Docket No. CP98-150-006, et al.                                     - 39 -

asset by crediting Account 182.3 and debiting Account 407.3, Regulatory Debits, as the amounts are recovered in rates. Millennium contends that the depreciation component of the proposed levelized negotiated rates will, by the end of the contract term, equal the accumulated book depreciation. Millennium also contends that it is assured of recovery of the regulatory asset, because of binding commitments in executed precedent agreements with its shippers.

132.   Under our Uniform System of Accounts, it is appropriate to record a regulatory asset for costs that would otherwise be chargeable to expense only when it is probable that the costs will be recovered in future rates.[62] For rate levelization proposals, we have previously concluded that the Order No. 552 probability test is met to the extent that a pipeline's capacity is subscribed when the facilities are authorized.[63] Thus, we allow regulatory assets, or liabilities, to be recorded for the differences between book depreciation expense and the amount of depreciation included in rates to the extent the pipeline's capacity is subscribed.

133.   Millennium indicates that it currently has approximately 80 percent of its total firm capacity subscribed under precedent agreements at negotiated rates. To the extent Millennium has executed contracts for its usable capacity over the respective terms of the shippers' agreements, we conclude that it would be appropriate for Millennium to record a regulatory asset for differences in depreciation amounts recorded on its books and depreciation amounts recovered in its negotiated rates. Nevertheless, we will condition our approval of Millennium's proposed accounting treatment: (1) on Millennium and its shippers executing and filing service agreements that are consistent with their precedent agreements and which provide assurance of recovery of the regulatory asset and (2) on future Commission acceptance of the negotiated rate filings.[64] Further, we will not allow

---

[62] The term "probable," as used in the definition of regulatory assets, refers to that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain or proved. *Revisions to Uniform System of Accounts to Account for Allowances under the Clean Air Amendments of 1990 and Regulatory-Created Assets and Liabilities and to Form Nos. 1, 1-F, 2, and 2-A*, Order No. 552, FERC Stats. & Regs., Regulations Preambles January 1991-June 1996 ¶ 30,967 (1993).

[63] *E.g., TransColorado Gas Transmission Co.*, 67 FERC ¶ 61,301 at 62,064, *order on reh'g*, 69 FERC ¶ 61,066 (1994); *Mojave Pipeline Co.*, 69 FERC ¶ 61,244 (1994), *order issuing certificate and denying reh'g*, 72 FERC ¶ 61,167 (1995), *order vacating prior orders and dismissing motions*, 75 FERC ¶ 61,108 (1996).

[64] *Northwest Pipeline Corp.*, 116 FERC ¶ 61,151 at P 28 (2006).

Docket No. CP98-150-006, et al.                                    - 40 -

Millennium to shift any unrecovered costs associated with the negotiated rate agreement to any of its other customers.[65]

134.   Our acceptance is subject to Millennium's continuing obligation to meet the criteria for recognition of its regulatory asset.  Should circumstances change so that Millennium is no longer entitled to recognize a regulatory asset, Millennium must promptly notify the Commission in an appropriate filing that would propose to remove the regulatory asset from its accounts.[66]

### 4.    Tariff

135.   We find that Millennium's *pro forma* tariff generally complies with Commission policy and precedent, except for certain provisions noted below.  In accordance with the discussion below, we will require Millennium to file actual tariff sheets at least 90 days prior to the in-service date of the proposed facilities.

### a.    Scheduling

### (1)    Proposals

136.   Section 7.1 describes the order of scheduling when nominations exceed available capacity.[67]  According to section 7.1, Millennium proposes to schedule capacity first at delivery points, followed by internal constraint points, and finally receipt points.  At each location, Millennium will first schedule nominations for firm primary capacity, followed by nominations for firm secondary capacity.  Millennium will schedule nominations for firm secondary capacity within a shipper's primary path ahead of nominations for firm secondary capacity outside the primary path.[68]  Within each group of secondary firm nominations (within-the-path versus outside-the-path), nominations at the maximum tariff rate will be allocated capacity *pro rata* based on nominated quantities, followed by

---

[65] *Id.* at P 29.

[66] *Northwest Pipeline Corp.*, 116 FERC ¶ 61,151 at P 30.

[67] Unless otherwise indicated, references to Millennium's tariff are to sections in the GT&C.

[68] Millennium defines the primary path as capacity physically located between the primary receipt and delivery points designated by a shipper, taking into consideration the flow direction from receipt point to delivery point.