Exhibit 1 to Complaint
(Part 2 of 4)

Docket No. CP98-150-006, et al.                                    - 41 -

nominations at a contract rate with the highest net present value, until all secondary firm nominations are scheduled.

137.   After firm nominations are scheduled, Millennium will schedule Rate Schedule IT-1 nominations together with Rate Schedule FT-1 overrun nominations, with priority given to confirmed flowing nominations on a *pro rata* basis, followed by other such nominations in the order in which they were received (with nominations submitted the same day receiving equal allocations).

138.   Finally, where applicable, Millennium will schedule Rate Schedule IPP (Interruptible Paper Pools) nominations, followed by Rate Schedule PALS (Parking and Lending Service) nominations.[69]  Specifically, paragraph (e) of section 7.4 provides that if there is insufficient capacity to satisfy all IPP and PALS nominations, the nominations will be rejected and the holders of rejected nominations for IPP and PALS service will be notified so that they can arrange for or implement a transfer between pools under Rate Schedule IPP, arrange for an inventory transfer under section 18 (Transfers of Imbalance Netting and Trading), arrange for a predetermined allocation method, re-nominate directly from a receipt point and not from the IPP pool, or make other arrangements agreed to by Millennium.

### (2)   Commission Holding

139.   In *Columbia Gas Transmission Corporation (Columbia)*,[70] we rejected a proposal to allocate firm secondary capacity based on the present value of the rate paid, finding that it favored shippers with long term contracts.  We held that the length of a contract should not determine how much a shipper values secondary capacity, since one has nothing to do with the other.  Consistent with our decision in *Columbia*, we will reject Millennium's proposal to allocate secondary capacity under Rate Schedule FT-1 based on the net present value of the rate paid, as described in paragraphs (b) and (c) of sections 7.2, 7.3, and 7.4.  Rather, we will require Millennium to allocate nominations for firm secondary capacity *pro rata* based on each shipper's contract demand.  This allocation method is appropriate because:  (1) firm shippers are entitled to use available secondary capacity up to their contract demand within the zone for which they are paying

---

[69] PALS service can only be nominated at receipt and delivery points and IPP service can only be nominated at receipt points.

[70] 100 FERC ¶ 61,084 at P 101 (2002); *order on reh'g, clarification, and compliance filing*, 104 FERC ¶ 61,168 (2003).

Docket No. CP98-150-006, et al.                                    - 42 -

and (2) firm shippers are able to access secondary points on a nondiscriminatory basis, unlike the net present value method.

140.    Moreover, we will require Millennium to explain its proposal in paragraph (d) of sections 7.2, 7.3 and 7.4, to allocate IT-1 and FT-1 overrun quantities based on a queue that gives scheduling priority to nominations involving flowing interruptible and overrun volumes over nominations for volumes whose flow has not yet begun. Millennium should also include in its explanation the reason why it believes such an allocation method is more appropriate than allocating such volumes based on price or *pro rata* based on nominated quantity.

141.    We also note that Millennium has not described the method for allocating receipt point capacity among IPP and PALS nominations under section 7.4(e). We will require Millennium to revise section 7.4(e) to include that description. We will also require Millennium to revise section 7.4(e) to detail the procedures and timelines under which it will implement various alternative scheduling arrangements for rejected PALS and IPP nominations.

142.    Finally, although the tariff refers to backhaul retainage on Sheet No. 6 and defines "backhaul" in section 1.1, it is not clear what scheduling and curtailment priorities have been assigned to backhaul transactions. Thus, we will require Millennium to add tariff language addressing the scheduling and curtailment priorities of backhaul transactions.

### b.    **Interruptions of Service**

#### (1)    **Proposals**

143.    Section 16 describes the circumstances and rules under which Millennium may decrease, suspend, or discontinue the receipt and delivery of gas. Such interruptions may occur due to *force majeure* or other unforeseen conditions; operating conditions such as (but not limited to) performance of routine non-critical maintenance, repairs, tests and modification of the system; for protection of the integrity and performance capability of the system; and to make capacity being utilized by interruptible service available for firm service. Millennium will issue a notice to shippers 72 hours in advance of an interruption due to routine maintenance specifying the date and time for compliance and the lowered flow quantity. Millennium will limit a notice of interruption to shippers only on the affected segment of the system. A shipper failing to comply with the notice will be subject to penalties, as described later in this order.

144.    Section 16.4 describes the order in which Millennium will interrupt the receipt, delivery, or transportation of scheduled and flowing volumes on constrained portions of

Docket No. CP98-150-006, et al.                                    - 43 -

its system. Specifically, Millennium proposes to curtail PALS volumes on a *pro rata* basis according to scheduled parking or lending quantity followed by IT-1 volumes together with FT-1 overrun volumes, FT-1 volumes at secondary receipt or delivery points outside shippers' primary paths, FT-1 volumes at secondary receipt or delivery points within shippers' primary paths, FT-1 volumes at primary receipt points, and FT-1 volumes at primary delivery points.

### (2)    **Commission Holding**

145.    We will require Millennium to revise section 16.4 so that within any constrained portion of its system, all scheduled firm nominations will be curtailed at the same priority, *pro rata* based on scheduled daily quantity. Our policy provides that "once secondary firm capacity is scheduled, primary firm capacity does not have a higher priority for the purposes of bumping or curtailing firm service."[71] In addition, Millennium should explain in detail why it proposes to curtail firm capacity at receipt points ahead of firm capacity at delivery points. Finally, Millennium should add language to section 16.4 describing the curtailment priority of IPP quantities and the method for allocating capacity among such quantities.

### c.    **Penalties**

146.    In section 4(e) of Rate Schedule IT-1, Millennium proposes what appears to be a $5.00 per Dth penalty on unauthorized quantities taken by a shipper under Rate Schedule IT-1 despite the shipper not having an IT-1 service agreement. The language describing this penalty is confusing and would appear to impermissibly duplicate penalties under the shipper's applicable rate schedule or applicable penalties under Millennium's GT&C. We will require Millennium to explain this provision and make clarifying revisions or remove it from the tariff.

147.    Section 19.6 describes a mechanism by which Millennium will credit penalties, net of costs, to non-penalized FT-1 and IT-1 shippers, excluding replacement shippers using released capacity. It is the Commission's policy that penalty revenue credits should be distributed to all the pipeline's customers, because penalties are imposed on all interruptible shippers and all non-offending interruptible shippers should be credited with a portion of these revenues.[72] Interruptible rates also include a representative portion of

---

[71] *Algonquin Gas Transmission Co.*, 104 FERC ¶ 61,118 at P 34 (2003).

[72] Section 284.12(b)(2)(v) requires that pipelines credit penalty revenues to "shippers."

all costs, including fixed costs, of operating the pipeline and all interruptible shippers are entitled to share in the proceeds of credits.[73] Moreover, as explained in Order No. 637, crediting penalty revenues to non-offending shippers provides a positive incentive for shippers to stay in balance in order to help protect the operational integrity of the pipeline. Thus, any replacement shipper under a permanent release of capacity is entitled to be included in the crediting mechanism. We will require Millennium to apply the crediting mechanism to all non-penalized shippers on its system including PALS shippers, IPP shippers, and replacement shippers, not just the FT-1 and IT-1 shippers as proposed.

148.    In addition, we will require Millennium to add a paragraph to section 19.6 stating that it will file a report within 60 days of the close of the contract year (for calculating penalties) showing how it calculated and apportioned the penalty revenues, the costs netted against the penalty revenues, and the resulting penalty revenue credits for each month of the contract year (November 1 to October 31).

149.    In paragraph (b) of section 9.7, Millennium proposes to sell any remaining over delivery imbalance to the shipper whose agreement has terminated at 150 percent of a specific spot market price, plus transportation costs, and to keep all amounts as a reimbursement fee. We will require Millennium to include as penalty amounts in its crediting mechanism any proceeds, net of Millennium's actual costs, from over delivery imbalance sales which exceed 100 percent of the spot market price. Also, in paragraph (c) of section 9.7, Millennium proposes to forward to a shipper 80 percent of the proceeds of the sale of any under delivery imbalance left on the system and confiscated by Millennium at the termination of the agreement, keeping the remaining 20 percent as a reimbursement fee. We will require Millennium to include as penalty revenues in its crediting mechanism any proceeds, net of Millennium's actual costs, from under delivery imbalance sales which exceed amounts forwarded to the shipper whose gas was confiscated.

150.    Finally, we will require Millennium to add a provision to section 19.7 stating that within two weeks of a critical day event, it will post information on its electronic bulletin board describing the events leading up to the declaration of the critical day.

---

[73]*Transcontinental Gas Pipe Line Corp.*, 96 FERC ¶ 61,352 at 62,317 (2001).

Docket No. CP98-150-006, et al.                                        - 45 -

### d.    Creditworthiness

151.    Section 3.9(c) requires insolvent or uncreditworthy FT-1 shippers to provide collateral assurance equal to three months of demand charges in order to receive or continue to receive service. However, Millennium appears not to have provided collateral requirements for shippers using interruptible services. We will direct Millennium to explain this omission or revise section 3.9.

152.    Section 3.9(c) also provides that any deposit held by Millennium will accrue simple interest at the Federal Funds Rate. Our Creditworthiness Policy Statement provides that if a pipeline holds the collateral, the applicable interest rate will be at least the same rate that the pipeline earns.[74] We will require Millennium to explain how this provision of section 3.9(c) is consistent with the Creditworthiness Policy Statement and to make any necessary revisions.

153.    Further, in section 3.9(c), Millennium proposes the right to seek additional security to cover the value of any existing imbalance or estimated future monthly imbalance owed by a non-creditworthy shipper. For a new shipper, the collateral would be based on 10 percent of the shipper's estimated monthly usage. For an existing shipper, the collateral would be based on the largest monthly imbalance the shipper owed to Millennium during the most recent 12 months of service.

154.    In *Gulf South Pipeline Company, LP (Gulf South)*,[75] we approved a provision similar to that in section 3.9(c) for existing shippers based on the largest monthly imbalance over the preceding 12 months. We also found that for new shippers, seven months was an adequate period to establish an imbalance history upon which a collateral requirement could be based. Thus, consistent with *Gulf South*, the imbalance collateral requirement for new shippers during the first seven months of service should be based on 10 percent of the shipper's estimated monthly usage, after which the shipper's collateral requirement should be based upon the highest monthly imbalance over the most recent period of service not to exceed 12 months. With the revision described above, we will approve Millennium's right to seek additional security for the value of imbalances as provided in section 3.9(c).

---

[74] *Policy Statement on Creditworthiness for Interstate Natural Gas Pipelines*, 111 FERC ¶ 61,412 (2005) (Creditworthiness Policy Statement).

[75] 111 FERC ¶ 61,110 (2005).

Docket No. CP98-150-006, et al.                                           - 46 -

155.    Sections 3.10(a) and (b) of the tariff appear to address Millennium's right to suspend service to a shipper that has lost its creditworthiness status, although the word "suspension" is not used.  Paragraph (b) provides that regardless of whether the shipper has lost its creditworthiness status, is insolvent, or does not desire to continue service, the shipper will continue to be liable for all charges due Millennium.  Under the Creditworthiness Policy Statement, a pipeline is not permitted to impose reservation charges during a period of suspension, nor is the suspended shipper permitted to release its capacity.[76]  Because sections 3.10(a) and (b) do not expressly state whether the shipper's service is suspended in such circumstances, we will require Millennium to explain whether this is the case and to clarify its tariff consistent with the Creditworthiness Policy Statement.

156.    Section 3.10(c) addresses the circumstances under which Millennium may terminate a service agreement, if a shipper fails to pay any outstanding balance or provide adequate credit assurance within a 30-day notice period.  Millennium should revise this section to include a requirement that a pipeline seeking to terminate a release of capacity to a replacement shipper on account of the termination of a releasing shipper's contract must provide the replacement shipper with the opportunity to continue receiving service if the replacement shipper agrees to pay, for the remaining term of the replacement shipper's contract, the lesser of:  (1) the releasing shipper's contract rate; (2) the maximum tariff rate applicable to the releasing shipper's capacity; or (3) some other rate that is acceptable to the pipeline.[77]  Millennium should also revise section 14.12, which addresses termination of a releasing shipper's contract, to be consistent with this requirement.

### e.    Discounting

157.    Under section 20.2, Millennium proposes that it "may agree to a discount which provides for increasing (or decreasing) a discounted rate for service under one rate schedule to make up for a decrease (or increase) in the maximum rate for a separate service provided under another rate schedule."  This provision, in effect, would appear to establish a maximum recourse rate that would be applicable to a combination of services.  We will require Millennium to justify this provision under our policy or remove it from the tariff.

---

[76] Creditworthiness Policy Statement at P 24.

[77] *Id.* at P 32.

Docket No. CP98-150-006, et al.                                          - 47 -

### f.    Auctions of Available Firm Service

158.    Under section 4, Millennium provides both contractual and regulatory rights of first refusal to shippers receiving service under an agreement with a term of 12 or more consecutive months at the recourse rate.  We will require Millennium to revise section 4 to apply the regulatory rights of first refusal to multi-year seasonal agreements at the maximum recourse rate.  Millennium may also apply its contractual rights of first refusal provisions to such multi-year seasonal agreements.[78]

### g.    Termination of Service Agreement

159.    Section 154.602 of the regulations requires a natural gas company to notify the Commission at least 30 days prior to terminating a shipper's contract.  Sections 10.4 (Suspension of Termination for Nonpayment) and 14.12 (Termination) are not consistent with this requirement.  Thus, we will require Millennium to revise these sections.

### h.    Non-Conforming Agreements

160.    Section 5.1 requires shippers to enter into service agreements "under [the] applicable standard Form of Service Agreement or Assignment Agreement," but also provides that a "Service Agreement that was in effect on the effective date of this Tariff shall remain in effect until it is replaced . . . or expires by its own terms, and shall be considered as an executed Service Agreement to the extent that its provisions are not superseded by or in conflict with . . . this Tariff."  We will advise Millennium that this language does not preclude its compliance with section 154.112(b) of the regulations, requiring that Part 284 contracts that deviate in any material aspect from the form of service agreement must be filed with the Commission and referenced in the tariff.

---

[78] In reviewing Millennium's tariff, we also found several minor errors that should be corrected.  Specifically, Millennium should substitute the word "Millennium" for the words "El Paso" in section 15.3(b)(iii); update its tariff to reflect the version of the North American Energy Standards Board (NAESB) Standards, including annual plan items and recommendations, in effect at the time it files actual tariff sheets; substitute "NAESB" for all references to "GISB;" and, in section 3.9(k), move the comma from after the first occurrence of the word "Days" to before the first occurrence of the word "within" to conform to NAESB Standard 0.3.9.

Docket No. CP98-150-006, et al.                                                      - 48 -

### i.  **Fuel Retainage**

161.   In section 35, Millennium proposes tariff language which appears intended to implement an annual fuel tracking mechanism similar to the currently effective provisions in Columbia's tariff.  Millennium's proposed tariff provides for an annual filing to adjust the retainage quantities, but does not specify that the annual filing will account for over- and under-recovered company use and LAUF.  Further, the proposed tariff language lacks a detailed description of the mechanism by which it will separately calculate current retainage and over- and under-recovered retainage.  Thus, we will direct Millennium to revise its tariff to incorporate clarifying language as discussed above.

### F.   **Requests for rehearing and clarification of EPI's Preliminary Determination**

162.   EPI, Hess Corporation (Hess),[79] and the New York PSC filed requests for rehearing and clarification of EPI's preliminary determination.

### 1.   **Acquisition Adjustment**

### a.   **Request for Rehearing**

163.   The preliminary determination held that EPI could not include in its rate base the proposed $36 million acquisition adjustment reflecting a portion of the amount paid in excess of net book value when NFG acquired Empire in 2003.  In making this holding, the preliminary determination found that EPI did not meet the two-prong test found in *Longhorn Partners Pipeline, L.P. (Longhorn)*,[80] because EPI did not show that it was placing utility assets in jurisdictional service for the first time and because it did not show that the write-up would confer substantial benefits on ratepayers.  On rehearing, EPI asserts that it meets the requirements of an exception to the original cost policy established in *Longhorn*, because:  (1) it will be subject to the Commission's jurisdiction for the first time and (2) the benefits to customers are substantial and can be quantified.

164.   As to the first prong, EPI asserts that the Commission erred in finding that its facilities were devoted to NGA jurisdiction simply because Empire accepted a blanket

---

[79] Hess was formerly known as Amerada Hess Corporation.

[80] 73 FERC ¶ 61,355 (1995).

Docket No. CP98-150-006, et al.                                              - 49 -

certificate under section 284.224 of the regulations.[81]  EPI claims that for assets to be subject to Commission jurisdiction, they must be subject to the rate and certificate jurisdiction, as well as the Commission's open access requirements.  EPI points out that section 284.224 provides that it does not "subject the certificate holder to the [NGA] jurisdiction [of] the Commission except to the extent necessary to enforce the terms and conditions of the certificate."  Thus, EPI asserts that Empire is coming under the Commission's jurisdiction for the first time.  Further, EPI contends that the Commission erred in relying on the *Enbridge Pipelines* (*Enbridge*) case,[82] asserting that *Enbridge* did not address the issue of placing assets into jurisdictional service for the first time, because *Enbridge* did not raise the issue.[83]

165.    As to the second prong, EPI contends that it demonstrated that the acquisition of the Empire system and construction of the connector project will confer substantial benefits on pre-existing shippers by enhancing the reliability and flexibility of the system and by enabling the shippers to use their capacity to deliver gas to Millennium and downstream markets.  Specifically, EPI asserts that:  (1) it took into account expansion capacity held by KeySpan and future expansion shippers, since more gas can flow to Corning on a secondary basis over and above the full contract quantities of KeySpan and other expansion shippers; (2) its calculations are not speculative or excessive, since it described in detail how it determined the annual benefits for existing shippers; and (3) as a result of NFG's acquisition of Empire, NFG's new management began development of the connector project and that the benefits to the existing shippers stem from the acquisition.

166.    EPI contends that the integration of the proposed expansion project with Empire's existing facilities will enhance system reliability for existing shippers.  Further, EPI asserts that existing shippers will now have the ability to deliver gas to Millennium and to downstream markets in New York City and Long Island.  EPI calculates $5.3 million in annual benefits for existing shippers who use the Millennium point on a secondary basis,

---

[81] Empire currently transports gas for two interstate pipelines under a blanket certificate issued under section 284.224.

[82] EPI's preliminary determination at P 59, *citing Enbridge*, 100 FERC ¶ 61,260 at P 52 (2002), *order on reh'g*, 102 FERC ¶ 61,310 (2003).

[83] *Citing Enbridge,* 102 FERC ¶ 61,310 at P 17 (stating that "KPC has not previously argued that it should be given rate base treatment for its acquisition premium because it was putting facilities in FERC jurisdictional service for the first time either at the hearing or on exceptions").

Docket No. CP98-150-006, et al.                                                    - 50 -

or release their capacity to other shippers that use that point. EPI asserts that it calculated the benefits by: (1) determining the amount of unused firm capacity under existing operations, based on an average of the system usage for the past two years; (2) estimating the extent to which that capacity could be used for delivery of gas into Millennium; and (3) estimating the value of the resulting capacity. According to EPI's calculations, it determined that the value of the secondary capacity would be $.05 per Dth in the summer and $.30 per Dth in the winter.

### b.    **Commission Holding**

167.    Our policy is to permit a pipeline to include no more than the facilities' depreciated original cost in rate base. We make exceptions only when a pipeline can show that its acquisition of existing facilities at more than their net book value will result in substantial benefits to ratepayers under the two-prong test set forth in *Longhorn*. First, the acquiring pipeline must show that it is converting utility assets to a new public use, or that it is placing utility assets in jurisdictional service for the first time. Second, the acquiring pipeline must show by clear and convincing evidence that the acquisition provides substantial, quantifiable benefits to ratepayers.

168.    EPI's contention that it meets the first prong of *Longhorn* because it is placing utility assets into jurisdictional service for the first time is at odds with the facts in this proceeding. Empire has been subject to Commission authority since it received a blanket certificate issued under section 284.224 of the regulations to transport gas for two interstate pipelines.[84] Empire also received Commission authorization to construct and operate its natural gas facilities between the United States and Canada.[85] Acknowledging these facts, EPI asserts that in order for facilities to be subject to the Commission's jurisdiction under *Longhorn*, they must be subject to the rate and certificate jurisdiction as well as our open access requirements. However, EPI offers no support for its position and we conclude that it is not required by the wording of *Longhorn* which states, "[f]irst, [a pipeline] must show that it is either converting utility assets to a new public use, or it must show that it is placing utility assets in FERC-jurisdictional service for the first time."[86] We find the fact that Empire held a limited jurisdictional certificate under which

---

[84] *National Fuel Gas Supply Corp.*, 70 FERC ¶ 61,162 (1995).

[85] *Empire State Pipeline* 56 FERC ¶ 61,050 (1991), *order granting rehearing in part and denying rehearing in part and denying a motion to consolidate*, 61 FERC ¶ 61,091 (1992), *order on motion for clarification*, 64 FERC ¶ 61,035 (1993).

[86] *Longhorn*, 73 FERC ¶ 61,355 at 61,122.

Docket No. CP98-150-006, et al.                                                          - 51 -

it rendered interstate transportation service sufficient to preclude a finding that Empire is coming under our jurisdiction for the first time under *Longhorn*.

169.    In reviewing whether to allow the inclusion of amounts in excess of depreciated original cost, we have emphasized the need to protect consumers from write-ups that force them to pay more depreciation for the same facilities.[87] Here, Empire previously devoted its existing facilities to interstate gas service, as well as intrastate gas service. Moreover, Empire's existing customers, who paid for Empire's existing facilities, are the same customers who will be charged for the acquisition premium. Thus, if the acquisition premium is included in rate base, existing natural gas customers will be paying more for depreciation for the same facilities. For these reasons, we find that EPI is not placing Empire's utility assets into jurisdictional service for the first time. Thus, we find that EPI fails to meet the first prong of the *Longhorn* test.

170.    We also disagree with EPI's assertion that we incorrectly relied on *Enbridge* in the preliminary determination. While we agree that the main focus of the *Enbridge* Order was whether the pipeline was converting its utility assets to a new public use, other orders issued in the *Enbridge* proceedings addressed the issue of whether the facilities were newly placed under the Commission's jurisdiction. For example, in the *Enbridge* rehearing order to which EPI cites, we found that that the pipeline was not dedicating facilities to interstate natural gas service for the first time because it had a limited certificate for certain facilities at the time of the acquisition.[88]

171.    Even if it were found that the acquisition resulted in the facilities being converted to jurisdictional service for the first time, the second prong of the *Longhorn* test requires a pipeline to demonstrate that the acquisition premium provides substantial quantifiable benefits to ratepayers. Here, EPI has not shown that the benefits alleged are directly related to the acquisition. The acquisition premium was paid by NFG, Empire's affiliate, for Empire's existing system and was unrelated to its proposed expansion. Empire will provide service to its existing customers regardless of the expansion facilities, which are being constructed downstream of the existing service. Notably, the existing shippers are

---

[87] *See Enbridge,* 100 FERC ¶ 61,260 at P 58.

[88] *Enbridge*, 102 FERC ¶ 61,310 at P 16 n.17. *See also Enbridge,* 109 FERC ¶ 61,042 at P 28 (2004) (finding that there was insufficient evidence to determine that the acquisition resulted in any of the facilities being used for jurisdictional gas service for the first time because, among other things, portions of the facilities were being used to provide service under a limited jurisdiction NGA certificate).

Docket No. CP98-150-006, et al.                                    - 52 -

not entitled to use the expansion facilities unless they pay incremental rates for the expansion facilities. Thus, there clearly is no direct benefit to existing shippers from the acquisition.

172.   The $5.3 million in annual benefits to ratepayers claimed by EPI is based on the ability of existing shippers (or replacement shippers via capacity release) to deliver gas to Millennium in order to serve downstream markets in New York City and Long Island and to realize $.05 per Dth in the summer and $.30 per Dth in the winter. The future capacity usage on the existing system, the availability of capacity on the expansion, as well as the future value of capacity between Niagara and Corning are simply not known at this time. Thus, we find that EPI's alleged benefits are speculative and do not provide any certainty that the proposed $36,120,986 acquisition adjustment will be recovered. We conclude that EPI has not met its burden of demonstrating that the $5.3 million in alleged annual benefits is the type of tangible and quantifiable benefit required under the second prong of the *Longhorn* test.

173.   Consequently, for the reasons stated above, we affirm the finding in the preliminary determination that EPI can not include the proposed $36,120,986 acquisition adjustment in its rates.

## 2.   **Inflation Adjustment**

### a.   **Request for Rehearing**

174.   The preliminary determination required EPI to remove the proposed four percent inflation adjustment from operation and maintenance (O&M) expenses, administrative and general (A&G) expenses, and taxes other than income for the cost of service of the existing pipeline. The order held that EPI did not demonstrate that the proposed inflation adjustment had any relevance or historic comparability to Empire's existing operating costs and held that it was inconsistent with Commission policy.

175.   EPI contends that the four percent inflation adjustment is reasonable, because it is based on a number of independent third-party measurements of inflation. For example, EPI states that the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics (BLS) increased 3.4 percent between December 2004 and December 2005; that, over the same time frame, the BLS' producer price index for all finished products increased by 5.4 percent; and that the Construction Cost Index published by McGraw Hill's *Engineering News Record* increased by five percent over a recent one year period. EPI contends that these indices in combination reflect changes in costs facing a pipeline company and concludes that its four percent inflation adjustment is proper.

Docket No. CP98-150-006, et al.                                    - 53 -

176.    In addition, EPI asserts that its proposed inflation adjustment has historic comparability to Empire's existing costs.  Specifically, EPI contends that "[b]etween the twelve-month period ending March 31, 2004, and the twelve-month period ending March 31, 2006, Empire's operating and maintenance expenses increased from $3,582,159 to $4,128,291, an average annual increase of 7.6 percent, and that its property taxes increased from $4,653,217 to $4,896,480, an average annual increase of 2.59 percent."[89]  EPI also maintains that the cases cited in the preliminary determination are distinguishable, contending that it does not propose an inflation tracker as in *Columbia Gulf Transmission Co. (Columbia Gulf)*[90] and that its proposals are supported by actual data unlike in *Williston Basin Interstate Pipeline Co. (Williston Basin)*[91] and *Transcontinental Gas Pipe Line Corp. (Transco)*.[92]

177.    EPI claims that the Commission recognized the need to use projections and account for inflation from historical data in establishing initial rates in *Maritimes & Northeast Pipeline (Maritimes)*.[93]

### b.    Commission Holding

178.    In this proceeding, EPI developed its cost of service for its existing facilities using a base period of 12 months of actual expenses ending March 31, 2005.  EPI increased the base period actuals for O&M, A&G, and taxes other than income taxes by a four percent inflation adjustment per year in order to derive the proposed expenses for the projected in-service date of November 1, 2007.[94]  On rehearing, EPI claims that between the 12-month period ending March 31, 2004 and the 12-month period ending March 31, 2006, its O&M expenses showed an average annual increase of 7.60 percent and its property taxes showed an average annual increase of 2.59 percent.

---

[89] EPI's rehearing request at 29.

[90] 75 FERC ¶ 61,206 at 61,682 (1996).

[91] 56 FERC ¶ 61,360 at 61,371 (1991).

[92] 11 F.P.C. 94 at 106-07 (1952).

[93] 80 FERC ¶ 61,346 at 62,185 (1997).

[94] EPI proposes an inflation adjustment of $464,303 for O&M and A&G expenses and $513,830 for taxes other than income.

Docket No. CP98-150-006, et al.                                               - 54 -

179.   We do not permit a pipeline to adjust its actual cost of service components to include an inflation adjustment because an inflation adjustment is not the type of "known and measurable" costs contemplated by our regulations.[95]  On their face, the numbers presented by EPI do not support its claim that certain of its cost components will increase by four percent due to inflation on an annual basis until November 2007.  We note that EPI based its cost of service on actual expenses for the 12 months ending on March 31, 2005.  However, the effect of inflation over this period has already been included in EPI's proposed cost of service.  Moreover, EPI is using a measure of inflation for the 2004-2005 period to increase certain cost components not only to the end of 2005, but through October 2007.  There is nothing in the record that supports the proposition that the inflation factors for 2004-2005 will continue over this extended period.  Also, it is unclear whether these increased costs are due to inflation or attributable to increased plant costs.  Finally, EPI's analysis is incomplete because it fails to include any analysis of A&G costs.  In short, EPI's claim that certain cost components of its rates will increase by four percent on an annual basis until its proposed in-service date of November 2007 is speculative.[96]

180.   EPI's reliance on the Commission's decision in *Maritimes* to support its proposed inflation adjustment is misplaced.  Maritimes was a new pipeline company that based its proposed cost of service on estimates at the time of filing.  In that decision, we wanted to ensure that Maritimes' proposed rates and a competing pipeline's rates were stated on a comparable basis.  Thus, we directed Maritimes to update its estimates based on the more current cost estimates that had been used by the competing pipeline.  Here, in contrast, EPI will take over operation of an existing pipeline with actual cost data.  EPI is not proposing to update its expenses based on more current information; rather EPI is using inflation factors to project the level of its expenses to November 2007, or more than two years from the date of the filing.  Thus, the *Maritimes* case is distinguishable from the proposal here.

---

[95] *See Williston Basin*, 56 FERC at 61,371; *Columbia Gulf Transmission Co.*, 67 FERC ¶ 61,242 at 61,802 (1994).

[96] Because EPI's projections are not supported by actual data, we find that its attempt to distinguish the *Williston Basin* and *Transco* cases is not relevant here.  We agree with EPI that its proposal does not constitute the type of tracker that was rejected in *Columbia Gulf.*

Docket No. CP98-150-006, et al.                                           - 55 -

181.   For these reasons, we find that EPI's reliance on general trends in inflation to support the inclusion of an inflation adjustment is speculative and is not a good predictor of its actual costs.  Thus, the preliminary determination did not err in requiring EPI to remove the proposed four percent inflation adjustment from O&M, A&G, and taxes other than income for the cost of service of the existing pipeline.  Nevertheless, if EPI experiences increased expenses due to inflation or otherwise, it may file under section 7 to amend its certificate filing to reflect such updated expenses prior to placing the facilities into service, or submit a section 4 filing after the facilities are placed into service.  This approach is consistent with our policy[97] and with our holding in *Maritimes*.

## 2.    Treatment of Interruptible Revenues

### a.    Request for Rehearing

182.   EPI proposed to allocate interruptible transportation revenues of $191,000 on Empire's existing system and to credit a portion of interruptible revenues to firm and interruptible shippers using the connector facilities.  The preliminary determination held that the proposed $191,000 allocation of interruptible revenues only reflected transportation on the existing system for the 12-month period that ended March 31, 2005 and that EPI projected no throughput as a result of the proposed expansion of its system. The preliminary determination also required EPI to credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers paying the maximum rates. Finally, the preliminary determination directed EPI to adequately explain and justify the difference in treatment of interruptible revenues between the existing pipeline and the connector pipeline.

183.   EPI states that the $191,000 reflects the actual level of interruptible transportation on Empire's system for the 12-month period that ended March 31, 2005 and reflects the reality of Empire's recent operations.  EPI contends that the finding in the preliminary determination is not consistent with existing policy since pipelines may choose to allocate fixed costs to interruptible service or to credit the interruptible revenues to firm and interruptible shippers.  As to the requirement that it credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers, EPI asserts that the two cases that the order relied on do not support this requirement.

184.   For the connector pipeline, EPI explains that section 18.3 of the GT&C provides for the crediting of a portion of interruptible revenues to firm and interruptible shippers

---

[97] Interim Order at P 116.

Docket No. CP98-150-006, et al.                                         - 56 -

using that pipeline. The percentages that would be used for the credit would be the capacity that is subscribed on the connector facilities. EPI claims this approach is reasonable because it should be permitted to retain revenues associated with capacity for which it is at risk.

### b.    Commission Holding

185.    In regard to new interruptible services, we require a 100 percent credit of interruptible revenues, net of variable costs, to firm and interruptible customers or an allocation of costs and volumes to these services.[98] For the existing pipeline, EPI allocated $191,000 to interruptible service which is equal to its interruptible revenues for the 12 months ended March 31, 2005. This is the same period used by EPI to design its rates. While the throughput may increase on the existing pipeline due to EPI's expansion, the increase in throughput is not known at this time. With the uncertainty concerning projected increases in throughput on EPI, we will grant rehearing and remove the condition that EPI credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers for the existing pipeline.

186.    However, for the connector pipeline, we find that EPI did not provide sufficient support to deviate from our policy. In the absence of an allocation of costs to this service, we will require EPI to credit 100 percent of interruptible revenues to the firm and interruptible recourse rate shippers using the connector pipeline.[99] Because EPI has not assumed any risk associated with interruptible service, requiring 100 percent crediting is appropriate whether or not the pipeline is fully contracted on a firm basis.

### 3.    Discount Adjustment

### a.    Request for Rehearing

187.    The preliminary determination found that a discount adjustment may be appropriate, but that EPI must make a filing recalculating the proposed adjustment. As

---

[98] *E.g., Maritimes & Northeast Pipeline, L.L.C.*, 80 FERC ¶ 61,136 at 61,475, *order on reh'g*, 81 FERC ¶ 61,166 at 61,725-26 (1997); *Steuben Gas Storage Co.*, 75 FERC ¶ 61,331 at 62,068 (1996).

[99] *See Steuben Gas Storage Co.*, 75 FERC ¶ 61,331 at 62,068 (1996); *Young Gas Storage Co., Ltd.*, 67 FERC ¶ 61,375 (1994); *National Fuel Gas Supply Corp.*, 62 FERC ¶ 61,200, *order on reh'g*, 63 FERC ¶61,291 (1993).

Docket No. CP98-150-006, et al.                                             - 57 -

part of the filing, the order required EPI, among other things, to exclude any negotiated
rate contracts and, for any discounts given to affiliates or non-affiliates, EPI must show
that the discount was given for competitive reasons.

188.   EPI contends that Empire's rates are bounded by the applicable minimum and
maximum rates established by the New York PSC and that none of Empire's current
agreements are negotiated rate agreements in the negotiated/recourse rate context.  While
EPI acknowledges that the rate provisions under some existing agreements would not fall
completely within the straight-fixed variable maximum and minimum rates under EPI's
FERC tariff and that EPI would need to file these discounted agreements as negotiated
rate agreements, EPI asserts that we should not exclude these discounted agreements
from the discount adjustment calculations.

189.   EPI also seeks clarification that the usual presumption that discounts to non-
affiliates are competitively justified is applicable to EPI.  In addition, EPI seeks
clarification that a currently effective long-term discount granted to National Fuel Gas
Distribution Corporation (National Fuel Distribution) will be considered a non-affiliated
discount to which such presumption applies, because National Fuel Distribution was not
affiliated at the time the discount was negotiated, even though it is an affiliate now.[100]

                    **b.    <u>Commission Holding</u>**

190.   We will permit EPI to include in its proposed discount adjustment the billing
determinants related to the contracts resulting from the existing system that will convert
to service under EPI's Part 284 tariff.[101]  EPI adequately explained that these contracts
were priced on a cost-of-service basis and that the company did not assume the risk of
under recovery.  We will also clarify that the presumption that discounts given to non-
affiliates are competitively justified is applicable here.[102]

191.   Regarding the National Fuel Distribution transportation contract, we note that
National Fuel Distribution was not affiliated with Empire at the time the contract was

---

[100] Empire entered into a 20-year discount agreement with National Fuel
Distribution in 1994 more than eight years prior to NFG's acquisition of control of
Empire in 2003.  NFG is EPI's corporate parent.

[101] The issues relating to Empire's existing contracts are addressed below.

[102] *E.g., Williston Basin Interstate Pipeline Co.*, 67 FERC ¶ 61,137 at 61,379-80
(1994); *Southern Natural Gas Co.*, 65 FERC ¶ 61,347 at 62,831 (1993).

Docket No. CP98-150-006, et al.                                    - 58 -

entered into in 1994. NFG did not acquire an interest in Empire until 2003. Thus, we
find that this contract is an arm's-length transaction and can be treated as a non-affiliated
transaction for purposes of calculating the discount adjustment.[103]

### 4.    Rate of Return

#### a.    Request for Clarification

192.   The preliminary determination adopted a 12.5 percent return on equity and a
capital structure of 60 percent debt and 40 percent equity for Empire's existing facilities.
EPI contends that the order does not explicitly address total return or debt costs. EPI
requests clarification that the Commission meant to adopt the 10.16 percent total return
(including the 8.6 percent debt cost component) approved by the New York PSC for the
existing facilities.

#### b.    Commission Holding

193.   Our intent in the preliminary determination was to adopt the rate of return
components underlying Empire's existing rates approved by the New York PSC. As
requested, we will clarify that EPI is authorized to adopt an overall rate of return of
capital of 10.16 percent, which includes the 8.6 percent debt cost underlying Empire's
current New York PSC approved rates.

### 5.    LAUF

#### a.    Request for clarification

194.   The preliminary determination required EPI to "revise its tariff to state the date
that it will file an annual fuel reimbursement report for each year to support the
compressor fuel and LAUF gas factors used for a 12-month period" and required EPI "to
revise its tariff to provide that if a negative compressor fuel or LAUF gas factor occurs on
a given month, that negative balance must be carried forward to the next month."

195.   EPI requests clarification, contending that the references to LAUF must have been
inadvertent. EPI contends that section 23.2 of its GT&C provides that compressor fuel
will be recovered via a compressor fuel factor, posted on its website on a monthly basis.

---

[103] Our finding assumes that the contract will not be renegotiated in the future. If
the contract is renegotiated, EPI will have to justify a discount given to an affiliate.

Docket No. CP98-150-006, et al.                                          - 59 -

However, EPI explains that the recovery of LAUF is governed by section 23.4, which
provides that actual LAUF experienced during a month will be reflected in each shipper's
cumulative imbalance for that month and resolved pursuant to its imbalance resolution
process.

### b.     Commission Holding

196.   We will grant EPI's request for clarification, since LAUF will be not be recovered
through the same monthly posting mechanism as compressor fuel. However, consistent
with the requirement we imposed for compressor fuel, we will require EPI to file an
annual report in support of the LAUF volumes during each year.

### 6.     Deferred New York State Taxes

### a.     Request for Clarification

197.   The preliminary determination permitted a three-year amortization of deferred
New York state taxes ($1,161,936 per year, reflecting a three-year amortization of
$3,485,808). The order also held that EPI should separately report the recovery of this
expense in its three-year cost and revenue study or in a section 4 rate case.

198.   The New York PSC requests clarification, or in the alternative rehearing, that the
three-year amortization of deferred state income taxes will be collected as a separate
surcharge over a three-year period, rather than being included in EPI's initial rates. If it
is included in initial rates, the New York PSC contends that this will guarantee that EPI
will overrecover the deferred amount.

### b.     Commission Holding

199.   The deferred state income tax amount is a non-recurring expense. Upon further
consideration, we agree with the New York PSC that because this is a non-recurring item,
it is appropriate to ensure that EPI collects no more than the deferred amount. We find
that the New York PSC's request that the three-year amortization of deferred state
income tax be collected as a separate surcharge is a reasonable approach to achieving this
objective. EPI could also file a separate set of initial rates, with these deferred amounts
excluded, that would become effective when EPI fully recovers its deferred tax balance.
Thus, when it re-files its initial rates, we will require EPI to adopt one of these two
methods for recovering its deferred state income tax amount.

Docket No. CP98-150-006, et al.                                              - 60 -

### 7.    Non-Conforming Service Agreements

### a.    The Preliminary Determination

200.   In the application, EPI stated that Empire currently provides firm transportation
service under four contracts that were executed within the regulatory framework of the
New York PSC (existing contracts).  EPI proposed to continue to provide service under
the existing contracts under its Part 284 blanket certificate for the duration of the term of
the contracts.  EPI's *pro forma* tariff proposal included two *pro forma* service agreements
– a New York PSC *pro forma* service agreement that would have been applicable to the
existing contracts and a *pro forma* service agreement for new Part 284 firm shippers
transporting gas on the existing or the expansion portions of the pipeline (standard *pro
forma* service agreement).  EPI stated that the existing contracts materially deviated from
its New York PSC *pro forma* service agreement and sought a determination from the
Commission accepting such contracts as non-conforming agreements.[104]  Citing the
competitively sensitive nature of the agreements, EPI filed public and non-public
versions of its application, seeking privileged treatment for the existing contracts and
EPI's summaries of their non-conforming provisions in the non-public application.

201.   The preliminary determination directed EPI to remove the New York PSC *pro
forma* service agreement, as well as any reference to the New York agreements in its
proposed tariff.  The order also required EPI, in order to provide jurisdictional service to
existing customers, to renegotiate its existing contracts using the standard *pro forma*
service agreement as the starting point for drafting any negotiated rate or contract.
Further, to the extent that EPI seeks to grandfather any provision in the existing contracts,
the order directed EPI to file the agreements reflecting the deviations from the standard
*pro forma* service agreement in red line/strike out format.  In such filing, the order
required EPI to explain the basis for any deviations and demonstrate that the deviations
are not unduly discriminatory.

202.   The preliminary determination denied EPI's request for confidential treatment.  In
denying this request, the order stated that where a contract deviates materially from the
form of service agreement, the Commission and the public have not had an opportunity to

---

[104] EPI also noted that some of the non-conforming provisions are included in
supplemental agreements to the existing contracts, and that "agreements of this kind are
disfavored" by the Commission.  Nonetheless, EPI requested that the Commission accept
the supplemental agreements as reflecting the regulatory environment in which they were
executed.

Docket No. CP98-150-006, et al.                                          - 61 -

review the material deviation, and the contract must be filed and made public.[105]  The
order explained that public disclosure of contracts with material deviations is required,
because such disclosure prevents undue discrimination through secret rates or terms.
Consequently, the order directed EPI to make public its service agreements, if the
agreements have a material deviation from the standard form of service agreement in
EPI's tariff.  The order required such agreements to be filed at least 30 days prior to the
commencement of service.

### b.    **Requests for Rehearing**

203.    EPI requests that it be permitted to continue to provide service under the existing
contracts, subject to the terms and conditions of its proposed FERC tariff, and that the
Commission act on the request it made in the application for an up-front determination
accepting the existing contracts as non-conforming agreements.

204.    EPI claims that we erred in rejecting the request to preserve its existing contracts
based on reasons that relate solely to the New York PSC *pro forma* proposal.[106]
Specifically, EPI points out that our rejection focused on references in the existing
contracts to the New York PSC, to services and rate schedules that Empire offered as an
intrastate pipeline but are not included in its FERC tariff, and to certain provisions in the
New York PSC *pro forma* service agreement (*force majeure*, waiver, warranty, and
indemnification) that are not consistent with EPI's proposed FERC tariff.  EPI asserts that
our reasons do not justify a rejection of the request to preserve the existing contracts,
because these inconsistencies will disappear with the removal of the New York PSC *pro
forma* service agreement.

205.    EPI also contends that we erred in failing to make an up-front determination
accepting the four existing contracts as non-conforming agreements.[107]  EPI states that it

---

[105] 18 C.F.R. § 154.1(d) (2006).

[106] EPI states that it does not seek rehearing of the rejection of the New York *pro
forma* proposal and that it will remove the New York *pro forma* tariff and references to it
from its FERC tariff.

[107] On October 5, 2006, Sithe/Independence Power Partners, L.P., one of the four
shippers with an existing contract, withdrew its request for rehearing and clarification of
the preliminary determination, stating that it had reached an agreement on rates, terms,
and conditions of service with EPI and that the service agreement reflecting the

(continued)

Docket No. CP98-150-006, et al.                                                    - 62 -

is aware of our strong preference for non-conforming service agreements to originate from *pro forma* agreements in a pipeline's tariff, but contends that this policy cannot be applied to Empire and other state-regulated pipelines with long-term agreements that were in effect for many years prior to the pipeline's becoming jurisdictional. EPI believes this policy would result in abrogation of its existing agreements. As an alternative, EPI proposes that we focus on whether the existing contracts contain provisions that create a conflict with our substantive policies or give rise to undue preference or discrimination.

206.    EPI maintains that the existing contracts will not compromise our substantive policies, since EPI will provide unbundled transportation under the provisions of Part 284 and other applicable regulations.[108]  Also, EPI claims that the existing agreements will not give rise to undue discrimination or preference, since the differences between the proposed FERC *pro forma* tariff and the existing New York PSC *pro forma* tariff are immaterial.[109]  Further, EPI asserts that the provisions in each existing contract that deviate from the New York PSC *pro forma* tariff are not unduly discriminatory or preferential.[110]  Finally, EPI asserts that our decision here is not consistent with Commission precedent, citing the decisions in *Kansas Pipeline Co. (Kansas Pipeline)*[111] and *Saltville Gas Storage Co. (Saltville).*[112]

---

agreement will conform to the firm transportation form of service agreement in EPI's FERC *pro forma* tariff.

[108] Hess also requests that the Commission permit EPI to continue to provide service in accordance with Hess' contracts for the remaining unexpired terms of the contract.

[109] *See* Exhibit 3, Part 3 of EPI's application or Appendix A to EPI's request for rehearing for a comparison of the differences between the proposed FERC *pro forma* tariff and the existing New York *pro forma* tariff.

[110] *See* EPI's rehearing request at 14-15 for EPI's analysis of the provisions in each pre-existing service agreement that deviate from the New York *pro forma* tariff.

[111] 87 FERC ¶ 61,020, *reh'g denied*, 87 FERC ¶ 61,329 (1999).

[112] 109 FERC ¶ 61,353 (2004).

Docket No. CP98-150-006, et al.                                      - 63 -

207.   EPI acknowledges that we do not usually make decisions on non-conforming agreements during certificate proceedings, but maintains that these agreements represent a large percentage of its existing business and that it needs an up-front determination that these agreements will be allowed to continue in effect before proceeding with spending $144 million to construct the connector project.

c.     **Commission Holding**

208.   In the preliminary determination, we did not reject or otherwise rule on the merits of grandfathering any provision contained in the existing contracts into EPI's jurisdictional contracts. Rather, we ruled that EPI must renegotiate its existing contracts using its standard FERC *pro forma* service agreement as the starting point for drafting any negotiated rate or contract consistent with our policies.[113]  The order also stated that to the extent EPI seeks to grandfather any provision in the existing contracts, EPI must file the agreements reflecting the deviations from the standard FERC *pro forma* service agreement in red line/strike out format, explaining the basis for any deviations and demonstrating that the deviations are not unduly discriminatory.[114]  After EPI complies with this directive, we will rule on the merits of any requests to grandfather provisions of the existing contracts, consistent with our policies on non-conforming service agreements.

209.   We disagree that there is no valid basis for requiring the renegotiation of the existing contracts. In this proceeding, EPI proposes to provide jurisdictional service which requires that its contracts be based, to the maximum extent possible, on EPI's Commission-approved jurisdictional tariff. Moreover, to the extent that a provision in a contract is to control over a generally applicable tariff provision, it must be clearly delineated so that there is no ambiguity regarding what provision is applicable. The preliminary determination is also consistent with the requirements of the NGA and our regulations that require that service be provided in a not unduly discriminatory manner. Finally, our action here is consistent with the decisions in *Kansas Pipeline* and *Saltville.* In those proceedings, we did not merely accept the existing contracts with customers as jurisdictional contracts, as EPI requests us to do here. Rather, we required the companies to renegotiate contracts with their existing customers using the *pro forma* service agreement approved by the Commission, and to file any contracts that contained

---

[113] *See National Gas Pipeline Negotiated Rate Policies and Practices,* 104 FERC ¶ 61,134 (2003).

[114] EPI's Preliminary Determination at P 136.

Docket No. CP98-150-006, et al.                                         - 64 -

deviations as non-conforming service agreements.[115] This is exactly the procedure we have directed EPI to follow here.

210.    We also clarify that it is our intent to rule in this proceeding on the merits of any non-conforming provision contained in a renegotiated contract filed by EPI consistent with our directives in the preliminary determination. While we do not usually review non-conforming contracts in the context of a certificate application, we will do so here because of the unique issues regarding the renegotiation of the existing contracts. In order that we have sufficient time to complete our review of any non-conforming contracts filed by EPI, we will require EPI to file any renegotiated contract containing non-conforming provisions at least 90 days prior to the commencement of service, rather than the 30 days required in the preliminary determination.

## 8.    Compliance Filing

### a.    Preliminary Determination

211.    In EPI's preliminary determination, we required EPI to revise its Rate Schedule FT and IT recourse rates relating to various rate base and rate design issues for service on the existing and connector pipelines. Further, we required that a cost and revenue study be filed within the first three years of actual operations and required numerous revisions to the *pro forma* tariff. We will discuss below EPI's compliance filing.

### b.    Commission Holding

212.    EPI revised the recourse rates for Rate Schedule FT and IT service by: (1) eliminating the proposed $36 million acquisition adjustment for service on the existing pipeline; (2) adjusting the cash working capital for the existing and connector pipelines, consistent with the lead-lag study included in its March 17, 2006 supplemental data response; (3) removing the proposed inflation adjustment for O&M and taxes other

---

[115] *See Kansas Pipeline Co.,* 83 FERC ¶ 61,107 at 61,509 (1998) (clarifying that the applicant needs to file its new service agreements with existing customers only if they are materially different from the authorized Form of Service Agreement; *Saltville,* 109 FERC ¶ 61,353 at P 5 (2004) (granting request for additional time to file non-conforming service agreements, based on the recognition that Saltville and its customers could not initiate discussion with respect to any revisions to their preexisting contracts without knowing what Saltville's new initial rates and tariff would require).

Docket No. CP98-150-006, et al.                                      - 65 -

than income taxes applicable to its existing pipeline; (4) adjusting the depreciation rate
for the existing pipeline reflecting a 2.5 percent rate; (5) adjusting the rate of return on
equity to 12.5 percent, with a capital structure of 60 percent debt and 40 percent equity
and debt cost of 8.60 percent for the existing pipeline, which reflects the rates approved
by the New York PSC; and (6) recalculating the discount adjustment for the existing
pipeline applying the iterative process, using as a starting point the revised cost of service
and unadjusted billing determinants.  We find that EPI's proposed changes to the rates
comply with the changes required in our preliminary determination and we accept them
as proposed.[116]

213.    In compliance with the preliminary determination, EPI revised its *pro forma* tariff.
EPI revised provisions about:  (1) the reimbursement of fuel, company-use, and LAUF;
(2) using the FERC *pro forma* service agreements for all its contracts; (3) the *force
majeure* definition; (4) parking and lending service; (5) netting and trading of
imbalances; (6) reservation charge credits; (7) imbalance resolution; (8) liability in
damages; (9) capacity release; (10) reservation of capacity for expansion projects;
(11) requests for service involving construction of new facilities; and (12) miscellaneous
tariff changes.[117]  EPI also made other minor revisions for corrections and typographical
errors.[118]

214.    We note that EPI has included in its applicable rate sheets at *pro forma* Sheet
Nos. 6 and 7, the Annual Charge Adjustment (ACA) of $0.0018 based on 2005 levels.
When EPI files its tariff sheets, we will require EPI to change the ACA surcharge on
Sheet Nos. 6 and 7 from $0.0018 to $0.0000.  Section 154.402 of the regulations requires
a company to pay its bill for annual charges before applying the ACA unit surcharge to
its rates.  Except for the changes to EPI's ACA surcharge, we accept the proposed
changes to the tariff sheets as consistent with the preliminary determination.[119]  We will

_____

[116] As discussed above, we denied EPI's rehearing requests on several rate issues.

[117] When responding to the requests for rehearing and clarification above, we
addressed several tariff issues.  We will require EPI to modify its tariff to conform with
our discussion of those issues.

[118] We will accept EPI's proposal not to change the periodic adjustment provision
in section 18.1 of the GT&C, finding that it is consistent with section 154.403 of the
regulations.

[119] We will accept EPI's additional corrections and other minor revisions to its *pro
forma* tariff.

Docket No. CP98-150-006, et al.                                                                 - 66 -

also require EPI to file actual tariff sheets at least 90 days before the in-service date of its
facilities to reflect compliance with the NAESB standards in effect at that time and the
modifications discussed in this order and the preliminary determination.

### 9.    Conclusion

215.    The preliminary determination found that EPI's proposed facilities would be
constructed without subsidies; that there were no identified adverse effects on existing
customers, other pipelines, landowners, or communities; and that EPI's proposed
facilities would be the upstream supply link in the NE-07 project. Thus, pending
environmental review, the preliminary determination approved EPI's proposals. We
affirm those findings here and conclude that EPI's proposals are in the public
convenience and necessity.

### G.    Environment

216.    On January 10, 2006, we issued a *Notice of Intent to Prepare a Supplemental
Environmental Impact Statement* (NOI) for the NE-07 project.[120]  The NOI was sent to
approximately 2,781 individuals and organizations, including affected landowners along
the project route and site locations; landowners within one-half mile of the new and
modified compressor stations; federal, state, county, and local agencies; elected officials
(United States representatives and senators, state governors, and other local and state
representatives); environmental and public interest groups; Native American tribes; local
newspapers and libraries; and other individuals.  The NOI was published in the *Federal
Register*.

217.    The NOI requested written comments on the scope of the analysis for the draft
supplemental EIS and requested federal, state, and local agencies with jurisdiction and/or
special expertise regarding environmental issues to cooperate with the Commission in
preparation of the draft supplemental EIS.  The scoping period ended on February 10,
2006, although our staff accepted public and agency comments after this date, to the
extent practicable, and these comments were addressed in the draft supplemental EIS.

218.    On June 15, 2006, we issued a Notice of Availability (NOA) of the draft
supplemental EIS that established a comment period ending on July 31, 2006.  We mailed
the draft supplemental EIS to 3,273 agencies, groups, and individuals.  We received

---

[120] A final environmental impact statement (EIS) for Millennium's and
Columbia's original proposals was issued in October 2001.

Docket No. CP98-150-006, et al.                                                    - 67 -

56 comment letters from four federal agencies, eight state agencies and state
representatives, two Indian nations, two county and municipal agencies, and
32 individuals and groups.[121]  In addition, on July 18, 2006, we held a public meeting
at Brookfield, Connecticut to receive comments on the draft supplemental EIS.  We
addressed all comment letters on the draft supplemental EIS and oral comments from the
public meeting in Appendix I of the final supplemental EIS.

219.    Our staff prepared the final supplemental EIS to consider the environmental
impacts of the proposed NE-07 project.  The final supplemental EIS incorporates the
analysis in the October 2001 final EIS for Millennium's original proposals and the
environmental assessment for Iroquois' original proposals.[122]  The final supplemental EIS
updates the information included in the 2001 final EIS for Millennium and the
environmental assessment for Iroquois and provides an analysis of the project proposed
here.  The final supplemental EIS addresses the purpose and need for the NE-07 project;
alternatives to the proposed route and to aboveground facilities, including the "no-action"
alternative; geologic resources and hazards; soils; groundwater and surface water;
wetlands; vegetation and wildlife; fisheries, including essential fish habitat; endangered
and threatened species; land use including residential areas, recreation and public interest
areas, Coastal Zone Management Consistency, and visual resources; cultural resources;
air quality and noise; and reliability and safety.

220.    On October 13, 2006, we issued an NOA of the final supplemental EIS.  The final
supplemental EIS was mailed to 1,016 federal and state agencies, local governments,
elected officials, interveners, and individuals who filed comments with the Commission
or requested to be on the mailing list for environmental documents.

221.    After the NOA was issued, and after the final supplemental EIS went to print, we
received comments from the Environmental Protection Agency (EPA) and the United
States Department of the Interior, Office of the Secretary, Office of Environmental Policy
and Compliance (DOI).  In its October 31, 2006 comments, the EPA states that based on
its review of the final supplemental EIS, it does not believe that the NE-07 project will
cause significant adverse impacts to environmental and cultural resources.  In comments
filed November 15, 2006, the DOI states that it will provide a letter of concurrence or

---

[121] A few commenters submitted more than one comment.

[122] We issued the environmental assessment for Iroquois' proposals in
August 2002.

Docket No. CP98-150-006, et al.                                    - 68 -

non-concurrence under separate cover to the Commission and the United States Army
Corp of Engineers (COE).[123]

222.    We also received comment letters from the United States Department of
Commerce, National Oceanic and Atmospheric Administration; the Oneida Indian
Nation; the National Marine Fisheries Service (NMFS); Ms. Alice Supa; Mr. Peter
Supa;[124] Mr. Donald Lewis; the Northern Tuxedo Residents Association; Laura and
Brandon Rainoff; and Ms. Colleen Carroll.  The New York State Office of Parks,
Recreation and Historic Preservation (OPRHP) and Palisades Interstate Parks
Commission (PIPC) filed joint comments.  Algonquin and EPI also filed supplemental
information.  Algonquin's supplement reported about its survey for Indiana bats.  EPI's
supplement requests a slight route variation.[125]

## 1.    **Alternatives**

223.    In accordance with the National Environmental Policy Act of 1969 (NEPA)[126] and
the Commission's policy, our staff evaluated alternatives to each section of the NE-07
project to determine whether it would be reasonable and environmentally preferable to
the proposed action.  As part of this evaluation, we examined the "No Action" or
"Postponed Action" alternative for each project component.  In addition, our staff
evaluated system alternatives, major route alternatives, minor route variations, and
aboveground facility alternatives for each component of the NE-07 project.

224.    We also compared the original Millennium project to the NE-07 project.  The
original Millennium project required approximately 5,956 acres for construction,
including approximately 797.6 acres in the United States portion of Lake Erie.  The
permanent land requirement for easements and aboveground facilities required
approximately 3,139 acres.  The land requirement for the NE-07 project will be

------

[123] The DOI's comments about wetland and waterbody impacts are included in the
discussions relating to surface water and wetlands below.

[124] Ms. Alice Supa's letters were filed on October 19 and November 15 and 21,
2006.  Mr. Peter Supa's letters were filed on November 16 and 17 and December 19,
2006.

[125] We will address the comments letters, as well as EPI's and Algonquin's filings,
under the appropriate topic headings below.

[126] 42 U.S.C. § 4321 *et seq.*

Docket No. CP98-150-006, et al.                                    - 69 -

approximately 3,494.9 acres for construction and 1,683.5 acres for operation of the proposed facilities.

225.    The NE-07 project will have less impact on waterbodies than the original Millennium project, since the NE-07 project will not include 32.9 miles of construction in the United States waters of Lake Erie or a 2.1-mile-long crossing of the Hudson River.

226.    The NE-07 project will also have less impact on wetlands than the original Millennium project.  Construction of the original Millennium project would have directly affected approximately 414.3 acres of wetlands and operation would have affected an estimated 247.8 acres of wetlands.  In contrast, the NE-07 project will affect approximately 228.7 fewer wetland acres during construction and 128.4 fewer acres during operation.  Also, impacts to all wetland types will be less for the NE-07 project. For example, the original Millennium project would have affected an estimated 71.6 acres of forested wetlands during construction and 43.8 acres during operation.  The NE-07 project will reduce impacts to forested wetlands during construction by approximately 39.9 acres and permanent impacts by 22.5 acres.

### a.    **Millennium**

### (1)    **The NYSEG Variations**

227.    Millennium developed the NYSEG variations after consultations with NYSEG identified the need to move the pipeline so that it would be at least 55 feet from grounded powerline structures in certain areas.  The consultations were a requirement of the Interim Order.[127]  The final supplemental EIS compared segments of the previously approved Millennium pipeline route to the NYSEG variations that Millennium proposed here.[128]

228.    Some affected landowners filed comments about the NYSEG variations.  They were concerned about the project's impact on their properties and suggested that the pipeline be constructed elsewhere.  We addressed similar suggestions from commenters that the pipeline be constructed elsewhere in the final EIS for the original Millennium project, as well as in the Interim Order and the 2002 *Millennium* Order.  In addressing the

---

[127] *See* environmental condition 45.

[128] The NYSEG variations include the Chemung route variation, the Tioga-Broome route variation, and the Delaware route variation.  The NYSEG variations are located along NYSEG's powerline.

Docket No. CP98-150-006, et al.                                    - 70 -

comments, the final supplemental EIS determined that no new information had been filed to support modifying the pipeline route. [129]

(a)    **The Supa Family**

229.    The Supa family resides near the Tioga-Broome route variation, which runs from MPs 232.2 to 243.5.

230.    In her October 19 and November 15, 2006 letters, and in his November 16, 2006 letter, Ms. Alice Supa and Mr. Peter Supa, respectively, filed comments, asserting that the Millennium pipeline should follow Columbia's Line A-5, rather than the powerline through there property. [130]   In supporting the Line A-5 route, or a route close to Line A-5, Ms. Supa refers to information that was filed in 1998, including a Millennium data response concerning a route 75 feet down slope from Line A-5 off Boswell Hill Road. Ms. Supa believes that the route should be changed from the powerline, since the pipeline will impact the front yard of a residence; be close to a working barn; and will destroy wells, septic systems, a pet cemetery, a pond, a hunting cabin, and a water supply system on her property or her neighbors' properties.   She states that the "DEC" has a concern about "fault currents."

231.    Mr. Peter Supa asserts that when the pipeline was moved to the route along the powerline corridor it created an identical problem for the properties on Bradley Creek Road.  Further, Mr. Supa contends that Millennium's proposals should be considered a "greenfield" project since the pipeline will be constructed along and outside of the existing powerline corridor rather than within the corridor and between the powerline towers as originally contemplated.  Mr. Supa asserts that if Line A-5 is replaced along a segment of pipeline that is less than one-half mile from the Mitchell and Lewis properties, there will be no homes within the 150 foot requirement and that a "dangerous and aging" pipeline will be removed.

232.    We addressed alternatives to the Millennium pipeline route along the powerline through the Supa property in the final EIS for the original Millennium project, the 2002

---

[129] In comments filed November 15, 2006, the OPRHP supports the selection of the Chemung variation.

[130] Representative Sherwood Boehlert also filed these comments for Ms. Supa and requested that they be included in the record.

Docket No. CP98-150-006, et al.                                              - 71 -

*Millennium* Order,[131] and in the final supplemental EIS for the NE-07 project. In each instance, we concluded that the pipeline route along the powerline was preferable to following Line A-5 in this area. This includes the alternative routes mentioned by Mr. Supa. We did not see the need to obtain any additional information about the offset route along Boswell Hill Road since field observation of the route, the close proximity of several residences adjacent to the existing pipeline right-of-way, and additional impact identified by residents along Boswell Hill Road showed that it was not a reasonable alternative. For this reason, we did not send Millennium additional data requests and determined that additional analysis was not required. We note that if pipeline construction damages any wells, Millennium will repair or replace the water supplies and provide temporary water supplies until the repairs are made. Millennium will also repair septic systems, if they are damaged by construction. The location of the pet cemetery on the Lewis property was known prior to the 2002 *Millennium* Order, as were the potential impacts to the other features mentioned by Ms. Supa. There is no 150 foot requirement for the separation of natural gas pipelines and residences as Mr. Supa claims.

233.    In regard to Ms. Supa's concerns about "fault currents," environmental condition 45 in the Interim Order required Millennium to consult with the NYSEG regarding pipeline construction and operation adjacent to powerlines between MPs 232.2 to 243.5. As a result of this consultation, Millennium moved its pipeline 55 feet from grounded powerline structures, as recommended by NYSEG. No new information has been filed in this proceeding that would persuade us to modify our prior conclusion that the preferred alignment of the Millennium pipeline is along the NYSEG powerline through the Supa property.

234.    Mr. Supa contends that the Tioga-Broome route variation is a "greenfield" project. The Tioga-Broome right-of-way will be adjacent to the existing powerline right-of-way. It will widen the utility corridor, but it will not create a new corridor. Thus, we conclude that Tioga-Broome route variation will not be a greenfield project.

235.    Ms. Supa states that the Tioga-Broome route variation is not documented in Millennium's August 31, 2006 supplemental filing. Ms. Supa contends that she was surprised to learn of the latest realignment during a January 26, 2006 site visit.

236.    The Tioga-Broome route variation has been a part of Millennium's amended proposals, since Millennium filed its amended application in Docket No. CP98-150-006 in August 2005. In an August 31, 2006 filing, Millennium asserts that it mentioned the

---

[131] 100 FERC at P 206-211.

Docket No. CP98-150-006, et al.                                           - 72 -

possibility of a pipeline realignment within the Supa property downhill from the spring
during a January 26, 2006 site visit.  Millennium contends that construction impacts can
be successfully mitigated along the preferred route and that the alternative alignment
mentioned in January 2006 will not be needed.  Pending completion of the report about
the potential impact of pipeline construction on the Supa water supply system, as required
in environmental condition 58 of the Interim Order, we will not require a route change at
this point.[132]

### (b)    Mr. Donald Lewis

237.    In his November 20, 2006 comment letter, Mr. Lewis expresses concern about the
proximity of the pipeline to wells, sewer systems, a pet cemetery, residences, and apple
trees.  Mr. Lewis is concerned about construction impacts on streams, springs that feed a
pond, access to a hunting cabin, and limits on future land use.  Mr. Lewis asserts that
Millennium personnel are not willing to work with him and that decisions made at one
meeting are changed at the next meeting.  Finally, Mr. Lewis states that he did not
receive a copy of the final supplemental EIS and that there is no reference to the
problems on his property.

238.    On November 29, 2006, Millennium filed a response, contending that it remains
committed to working with Mr. Lewis and other stakeholders regarding the project.

239.    We mailed the final supplemental EIS to over 1,000 individuals, organizations,
and agencies.  We regret that Mr. Lewis did not get a copy.[133]  Nevertheless, Mr. Lewis'
comments were addressed in Appendix I of the final supplemental EIS.  Many of the
issues he raised were also addressed in the original Millennium proceeding.

### (c)    Conclusion

240.    For the reasons discussed above, we concur with environmental condition 18,
which requires Millennium to use the NYSEG variations, rather than the corresponding
pipeline segments previously approved in the Interim Order and the 2002 *Millennium*
Order.

### (2)    The Warwick Isle Route Variation

---

[132] *See* the Groundwater discussion below.

[133] We did not learn that Mr. Lewis had not received a copy of the final
supplemental EIS until he filed the comment letter.

Docket No. CP98-150-006, et al.                                      - 73 -

241.    The Warwick Isle route variation was developed to avoid a planned residential development. We received no comments about this variation. Thus, we concur with environmental condition 20, which requires Millennium to use the Warwick Isle route variation, rather than the corresponding pipeline segment previously approved in the Interim Order and the 2002 *Millennium* Order.

### (3)    Neversink River

242.    Millennium proposes to acquire and operate a 7.1-mile-long segment of Columbia's 24-inch diameter Line A-5, which crosses the Neversink River. Millennium's proposal will avoid direct disturbance to the Neversink River, which is considered a sensitive waterbody due to the possible presence of federally endangered species. Our staff evaluated this proposal. We concur with the requirement in environmental condition 19 that Millennium use the existing pipeline segment rather than replace it with 30-inch diameter pipeline.

### (4)    The Line A-5 Replacement Project

243.    For the Line A-5 replacement project, our staff evaluated three route alternatives that would avoid construction through the Laurel Ridge community in Tuxedo Park, New York: the County Road 84 and Warwick Brook Road alternative; the Route 17/17A alternative; and the Sterling Forest State Park/Laurel Ridge alternative. Most of the comments filed about the Line A-5 replacement project concerned the replacement of Line A-5 in Laurel Ridge. Although the Sterling Forest State Park/Laurel Ridge alternative will affect land within the Sterling Forest State Park, Millennium developed, in consultation with the PIPC, an Environmental Management and Construction Plan (EM&CP) which describes the environmental construction and mitigation procedures it will use to minimize environmental impacts to the park. We believe that use of the EM&CP will mitigate construction impacts in the park and that the Sterling Forest State Park/Laurel Ridge alternative will avoid construction through the Laurel Ridge residential area. We agree with the final supplemental EIS' requirement that Millennium should use the Sterling Forest State Park/Laurel Ridge alternative.[134]

244.    In comments filed November 15, 2006, the OPRHP and PIPC support the selection of the Sterling Forest State Park/Laurel Ridge alternative. They recognize that Algonquin's proposals will require the replacement of a 26-inch diameter pipeline along

---

[134] *See* environmental condition 21.

Docket No. CP98-150-006, et al.                                      - 74 -

the border of Harriman State Park and that this activity will affect park land. The OPRHP and PIPC assert that they will work with Algonquin to minimize impacts to Harriman State Park and its resources, because they expect Millennium and Algonquin to adhere to the construction and restoration measures identified in its Environmental Construction Standards (ECS) and the EM&CP for construction in Harriman and Sterling Forest State Parks.[135]

### (5)    The Ramapo River HDD Variation

245.    Our staff evaluated an alternative to the proposed horizontal direct drilling (HDD) crossing of State Route 17, the Metro-North Railroad, the Ramapo River, and Interstate 87 on the A-5 replacement project. As proposed, Millennium's line would follow Line A-5. The alternative would pass through a planned residential community. The community's real estate developer suggested moving the pipeline closer to the original Millennium project route along Line A-5. Millennium developed the Ramapo River HDD variation, which moved the pipeline out of the planned residential development. We compared the Ramapo River HDD variation to the alternative route and the route approved for the original Millennium project. We believe that the Ramapo River HDD variation is reasonable and will avoid the planned residential development. We concur with the finding in the final supplemental EIS that requires Millennium to use the Ramapo River HDD variation.[136]

### (b)    EPI

246.    Our staff evaluated numerous broad corridors and minor route variations between Victor and Corning, New York and determined that EPI's proposed route was reasonable, because it avoided or minimized impacts to environmental resources and, in particular, minimized impacts to agricultural resources. Originally, EPI considered looping the existing Empire system along the northern-most 1.2 miles of the project. However, during the pre-filing period, and based on landowner input, EPI decided to propose replacing that segment of pipeline with a larger diameter pipeline to minimize impacts to abutting landowners. As for the Oakfield compressor station, our staff compared three aboveground facility site alternatives to the proposed site (Alternative Site 1) and

---

[135] In comments filed November 10, 2006, the Northern Tuxedo Residents Association also support the selection of the Sterling Forest State Park/Laurel Ridge alternative.

[136] *See* environmental condition 22.

Docket No. CP98-150-006, et al.                                    - 75 -

concluded that EPI's proposed site was the preferred alternative for the new compressor station.

247.    In an October 23, 2006 filing, EPI reports that it conducted additional pipeline alignment, environmental, and cultural resource surveys along its proposed route during the spring and early summer of 2006.  EPI states that it conducted the surveys on some properties where access had been denied previously, where route modifications were made mainly at the request of landowners, or where issues of constructability were observed.  These route modifications are minor and within the same properties as shown on the route alignment maps filed by EPI in March 2006, with the exception of Variation #53 (between approximate MPs 29.2 and 29.5).  Variation #53 will return the pipeline alignment to the original location proposed in EPI's October 11, 2005 application and will avoid certain impacts to businesses immediately north and south of New York State Route (NYSR) 14A, including an existing drainage system beneath a parking lot (south side of NYSR 14A) and one or more septic system storage tanks (north side of NYSR 14A).  The parking lot is crossed by heavy tractor trailer traffic to one of the businesses. Variation #53 will avoid impacts to these areas and move the pipeline route into an adjacent agricultural area, adding approximately 195 feet to the pipeline length.  EPI did not identify any wetlands, waterbodies, cultural resources, or residences during surveying the alternative route.  Since Variation #53 affects agricultural land, EPI will implement its Erosion and Sedimentation Control and Agricultural Mitigation Plan (ESCAMP), developed in consultation with the New York State Department of Agriculture and Markets (NYSDA&M), for construction in agricultural areas.

248.    On November 17, 2006, EPI filed supplemental information about Variation #53, asserting that it will avoid a saucer-shaped depression on the affected property and some drain tiles where feasible and will repair any tiles that are damaged.  EPI states that it will use the best management practices identified in its ESCAMP for topsoil stripping, management, and replacement.  We find that EPI's use of Variation #53 is reasonable.

### (c)    Algonquin

249.    Algonquin proposes to replace existing pipeline facilities, modify facilities at three existing compressor stations and a meter station, and construct a new metering and regulating station.  Our staff did not evaluate alternative sites to the proposed modifications of Algonquin's existing compressor stations, because modification of existing facilities is preferable to the construction of new facilities at alternative sites when feasible.  Further, because the proposed replacement of existing pipeline will have less environmental impact and is considered preferable to the creation of new routes or corridors, no major route alternatives or minor route variations were considered for the pipeline replacement portion of the project.

Docket No. CP98-150-006, et al.                                                    - 76 -

250.   Algonquin also proposes to construct a new compressor station. Our staff
evaluated five alternative sites (Sites B through F) to the originally proposed site (Site A)
for the Oxford compressor station. Subsequently, we issued a *Notice of Alternative
Project Site* to inform the public that Site F was being considered as the preferred site.[137]
The owner of Site A submitted comments, expressing concerns about the proposed use of
the property. Algonquin commented that the property may no longer be for sale. The
draft supplemental EIS concluded that Sites A and F would be reasonable for the
compressor station. On June 13, 2006, Algonquin requested that Site F be considered the
preferred site for the Oxford compressor station. Local officials also filed comments in
support of Site F, since it would be adjacent to a planned commercial development. The
Connecticut Siting Council (CSC) independently reviewed the information about the
proposed and alternative sites for the Oxford compressor station and found Site F to be
preferable.[138]

### (d)    Iroquois

251.   On October 23, 2006, Ms. Colleen Carroll filed a comment letter that was similar
to several form letters that were filed in opposition to the construction of the Brookfield
compressor station at the High Meadow Road site in Brookfield by Iroquois and to the
construction of the meter and regulation station at the same site by Algonquin.
Ms. Carroll raised concerns about the compressor station's proximity to the Whisconier
Middle School, residences, air quality, aquifer impacts, noise, and alternative locations.
In addition to letters from Ms. Carroll and others, during the scoping and comment period
for the draft supplemental EIS, homeowners in Brookfield expressed concern about these
facilities, as did the Attorney General of Connecticut and other Connecticut state and
local government representatives.

252.   In combination with the final supplemental EIS about Millennium's original
proposals and the environmental assessment about the Brookfield compressor site, our
staff evaluated five alternative sites, including the Vale Road site suggested by the city
officials of Brookfield and other concerned citizens and parties. The alternative sites are
on properties where the Iroquois and Algonquin pipelines are co-located. One of these

---

[137] The Notice was issued on March 8, 2006.

[138] On June 30, 2006, the CSC issued its *Findings of Fact and Opinion and
Recommendations* about Algonquin's proposed project in Connecticut. The CSC's
environmental condition 40 requires Algonquin to use Site F for the Oxford compressor
station.

sites has been developed and is no longer available. Our staff identified wetlands and other resources on the remaining properties that would limit the available area for construction of a compressor station. Although the Vale Road site alternative is preferred by a number Brookfield residents and public officials who feel that the proposed site is too close to Whisconier Middle School and a number of private residences, we concluded in the *Iroquois* Order that the Vale Road site was not preferable to the High Meadow Road site. Further, we found that the compressor station could be safely constructed and operated at the High Meadow Road site and found no conflicts or significant safety issues with the location relative to the school.

253.    All of the issues raised in Ms. Carroll's comment letter and in other comments were addressed in the final supplemental EIS. Further, similar issues were addressed in the 2002 *Iroquois* Order. In each instance, the Vale Road site was not recommended. The final supplemental EIS determined that construction and operation of the Brookfield compressor station and related facilities at the proposed High Meadow Road site can be accomplished in a safe and reliable manner. The final supplemental EIS also found that the High Meadow Road site is the preferred alternative, if Iroquois constructs and operates the facilities in accordance with the procedures identified in its application and supplemental filings and with the additional mitigation required in environmental conditions 51 to 54. We concur with that finding.[139]

## 2.    Geology

254.    The NE-07 project's impact on exploitable mineral resources will be minimal. The final EIS for the original Millennium project listed active mining operations that would be crossed or would be within 1,500 feet of the pipeline. Millennium's proposed pipeline will not cross any additional active mining operation sites. EPI's right-of-way will cross one active New York State Department of Environmental Conservation (NYSDEC)-permitted sand and gravel pit property south of the New York State Thruway.

255.    Geologic hazards (seismicity, landslides, and karst terrain) will not pose a significant hazard for the project. Blasting will be required in areas of shallow, hard bedrock where other methods of trench excavation are not successful. Where blasting is

---

[139] In its June 30, 2006 Order, the CSC compared the High Meadow Road site to the Vale Road site and found that the High Meadow Road site is the preferred location for the compressor station, because the High Meadow Road site will have less environmental impact and there will be fewer residences in close proximity to the site.