Exhibit 1 to Complaint
(Part 3 of 4)

required, Millennium, EPI, and Algonquin will conduct pre- and post-blast surveys of all structures with willing landowners and utilities within 150 feet of the construction work area to assess any damage to existing structures. Licensed contractors will blast in accordance with appropriate regulations. Iroquois does not anticipate the need to blast.

### 3.    Soils

256.    Construction of the NE-07 project will disturb soils and increase the potential for soil erosion, compaction, loss of soil productivity, and damage to existing drainage tiles. Each applicant will implement specific erosion and sedimentation control measures consistent with the Upland Erosion Control, Revegetation, and Maintenance Plan (Plan) and Wetland and Waterbody construction and Mitigation Procedures (Procedures). These measures include compaction testing and mitigation and repair of any drainage tiles damaged during construction. Approximately 3.3 acres of prime farmland soils, as classified by the Natural Resource Conservation Service, will be permanently converted to developed areas at EPI's Oakfield compressor station. In addition, EPI's pipeline will cross agricultural areas containing soils with high water tables, which are prone to compaction. EPI will implement its ESCAMP, developed in consultation with the NYSDA&M, to minimize potential impacts on agricultural lands and will develop overwintering procedures for use in these areas, if restoration cannot be completed before October 1. Millennium and EPI will continue to work with the NYSDA&M regarding specialized construction and overwintering procedures in agricultural areas. We find that implementation of these procedures will minimize impact on soils.

### 4.    Groundwater

257.    EPI's proposed facilities overlie four New York State Department of Health-mapped principal aquifers. Algonquin's proposed facilities overlie four EPA-designated principal aquifer areas. Algonquin's facilities will also overlie two EPA-designated sole source aquifers, a town-designated aquifer (Haines Pond aquifer system), and a Primary Recharge Zone of the Town of Brookfield Aquifer Protection District (under Algonquin's Brookfield meter station and Iroquois' Brookfield compressor station). The Great Swamp Aquifer underlies Iroquois' existing Dover compressor station and is a principal aquifer for the region.

258.    In addition to the private water supply wells and springs listed in the final EIS for Millennium's original project, the construction areas for the three NYSEG variations and the Warwick Isle route variation will be within 150 feet of 63 private wells or springs. Further, we identified seven private water supply wells within 150 feet of the construction area along the Line A-5 replacement project, nine private wells or springs within 150 feet of EPI's construction areas, and eleven private water supply wells within

Docket No. CP98-150-006, et al.                                               - 79 -

150 feet of Algonquin's replacement pipeline construction area. Algonquin plans to conduct pre-construction surveys to verify the presence and location of any other wells within 150 feet of the pipeline construction right of way and its Brookfield meter station. Environmental condition 15 requires that Millennium, EPI, Algonquin, and Iroquois provide an update, prior to construction, to the information filed about locations of water wells and springs within 150 feet of construction workspaces. Environmental condition 16 requires that Millennium, EPI, and Algonquin develop a plan to report any complaints that they may receive during project construction concerning water supply yield or quality and how each was resolved.

259.   All of the applicants have Spill Prevention Control and Countermeasures (SPCC) Plans for their projects that include procedures to avoid spills of hazardous materials, to clean up spills, and to report incidents during construction and operation of the facilities. Environmental condition 42 requires Algonquin to modify its SPCC Plan to address daily vehicle maintenance (*i.e.*, to inspect for leaks to further minimize possible impact due to operation of construction equipment) for consistency with the other applicants' SPCC Plans.

260.   We do not believe that construction and operation of the NE-07 project will adversely affect groundwater quality. The applicants will construct and operate facilities in accordance with approved project-specific environmental construction plans, SPCC plans, and the Plan and Procedures to minimize any potential for groundwater impacts. Also, the applicants will avoid and minimize impacts to groundwater resources by the use of standard and specialized construction procedures. The applicants will identify regulated wellhead protection zones around public groundwater supplies and implement appropriate protection measures during construction and operation in these areas. Further, the applicants will offer to conduct pre- and post-construction testing of private water wells within 150 feet of the construction work areas. If it is determined that any private water supply well is damaged as a result of the project, a temporary source of water will be provided until the damaged supply well is restored to its former capacity.

### a.   The Supa Family

261.   In her October 19 and November 15, 2006 letters, and in his November 16 and 17, 2006 letters, Ms. Alice Supa and Mr. Peter Supa, respectively, contend that the wells drilled to study the water supply on their property, as required in the Interim Order, have damaged the family's water system. They allege that the damage includes sedimentation and contamination by a petroleum product. They request that the Commission require Millennium to repair the damage. Ms. Supa also asserts that Millennium "took us to court under the law of eminent domain."

262.   As discussed in the 2002 *Millennium* Order, Mr. Peter Supa requested that Millennium prepare a report with site specific diagrams to illustrate the flow of water to his spring and cistern and to prepare a plan to avoid his water supply.[140]  Environmental condition 58 of the Interim Order required Millennium to prepare site specific diagrams to illustrate the flow of water to the spring and cistern prior to beginning pipeline construction.  If the results of the testing indicated that the pipeline trench would convey water away from the spring, we required Millennium to develop engineering and/or other mitigation measures (including a re-route upslope to avoid the water table) to maintain uninterrupted flow to the spring and cistern.  To meet this testing requirement, Millennium installed piezometers in the wells drilled along the pipeline route on the Supa property and recorded water measurements in the wells for over a year.  We note that Millennium initiated an eminent domain proceeding in order to get access to the Supa property to comply with the requirement of environmental condition 58.

263.   The Supa property is on the south side of Harrington Road in Johnson City, New York and the residence is near the road at an elevation of approximately 1,010 to 1,020 feet.  A review of the topographic map for this area shows that the Supa spring is at an elevation of approximately 1,130 to 1,140 feet, meaning that the spring is an estimated 120 to 130 feet higher in elevation than the residence.  South of, and upslope of, the spring are the three existing powerline towers within the NYSEG right-of-way.  The pipeline right-of-way is farther south and upslope from the powerlines.  Elevations vary along the powerline and pipeline corridor but, directly south of the spring, the ground surface where the pipeline will be installed is at an elevation of approximately 1,200 feet.  At this location, the pipeline right-of-way will be 70 to 80 feet higher in elevation than the spring.  The Supa spring is approximately 1,400 feet from the residence and the pipeline will be an estimated 300 feet from the spring.

264.   On November 29, 2006, Millennium filed supplemental information about the Supa's comments, contending that the well testing has not damaged the Supa water supply system.  Millennium states that its consultant conducted a year-long hydrologic study on the Supa property by installing 16 piezometers to monitor groundwater levels, characterize the source of water supply, and evaluate water quality.  Initial hydrologic evaluation activities occurred from September 27 through October 6, 2005 and included drilling, sampling soil and rock, and installing piezometers.  Millennium states that it drilled 10 borings along the pipeline route to depths of 10 to 20 feet, which is deeper than the seven to eight feet anticipated for the excavated depth of the pipeline trench, and three borings upslope from the Supa spring and downslope from the pipeline trench.

---

[140] 100 FERC at P 210.

Docket No. CP98-150-006, et al.                                        - 81 -

265.    After the borings were drilled, Millennium installed piezometers. Two
piezometers were installed in borings 10, 11, and 12. The tops of the borings were filled
with concrete and protective steel casings with lockable caps. The piezometers were
removed between October 23 and October 27, 2006, at the conclusion of the test period.
The borings were plugged by removing the concrete and protective casing, followed by
grouting with a bentonite slurry.

266.    Millennium asserts that the Supas reported two instances where their cistern water
was cloudy. The first was in October 2005 when the Supa's reported sediment in the
cistern. Millennium contends that this coincided with several days of steady rainfall that
began on October 7, 2005 and ended a three or four month drought. Millennium states
that it recommended to the Supas that the cistern be flushed. Millennium asserts that
Mr. Supa flushed the cistern on two consecutive days and reported to Millennium that the
water cleared and that the sediment in the system was removed.

267.    Millennium states that the second instance occurred in early 2006, following
record-breaking rainfall that caused flooding in central and eastern New York. The
Supas contacted Millennium to report that sediment was again in the cistern and that the
cistern was making unusual gurgling noises. Millennium contends that members of its
team went on site to assess the problem a few days later, but that there was no longer any
sediment and the gurgling noises had ceased. Millennium believes these instances are the
result of the extremely high rainfall.

268.    Millennium also commented about the presence of petroleum hydrocarbons that
were found in well number one on January 12, 2006. Millennium states that prior to that
time, no hydrocarbons had been detected. Soil samples did not show any hydrocarbon
and there was no evidence of any hydrocarbons during the installation of the piezometers.
Millennium states that during the readings taken on January 12, 2006, a hydrocarbon
coating was observed on the water level probe when it was removed, together with an
odor of hydrocarbon, and a sheen was found on the water sample, as well as some
product globules within the water sample. Millennium contends that it analyzed this
water sample and found it to be diesel fuel. Millennium has not commented about
possible sources of the diesel fuel. Millennium states that it hand delivered the results of
the analysis to Ms. Supa on February 15, 2006. When piezometer one was removed on
October 27, 2006, Millennium's consultant conducted a routine health and safety meeting
with the Supas prior to its removal to address the considerations associated with diesel
fuel. All personal protective equipment worn by on-site personnel was worn in
accordance with standard safety requirements outlined in site-specific health and safety
plans. Millennium states that this was done as a precautionary measure, not because
there was any evidence suggesting the presence of any significant quantity of
hydrocarbons.

Docket No. CP98-150-006, et al.                                                                    - 82 -

269.    Millennium's November 29, 2006 supplemental filing did not indicate whether
diesel fuel or any other product was observed prior to or after the instance reported on
January 12, 2006.  Further, Millennium does not indicate possible sources for the diesel
fuel.  For these reasons, we will require Millennium to report to the Commission the
potential sources for the diesel fuel observed on January 12, 2006 and whether there was
any further evidence of diesel fuel after the January 12, 2006 occurrence.  Thus, we will
add environmental condition 55 to this order, which states that:

> Prior to construction, Millennium shall file with the Secretary of the
> Commission (Secretary), for review and written approval of the Director of
> the Office of Energy Projects (OEP), a report about the diesel fuel observed
> on the Supa property in test boring one on January 12, 2006.  The report
> shall provide information about potential sources of diesel fuel and shall
> address whether further evidence of diesel fuel was observed during any
> subsequent instances of monitoring the test borings.  The report shall also
> address the issue of the need for clean up and a plan for clean up.

270.    Millennium's report about the potential impact of project construction on the
Supa's water system is pending.  Millennium asserts that when the report is completed, it
will file the report as required with the Commission for review and written approval.
Further, Millennium contends that it will file a site-specific construction plan for crossing
the Supa property, giving consideration to alternative construction methods in a manner
consistent with environmental condition 23 in this order.

271.    If the Supa's water system was damaged by well testing, Millennium states that it
will make appropriate repairs.  Millennium also states that it will implement
environmental condition 23 of this order, which requires it to file a site-specific plan for
construction and restoration of affected areas on the Supa property and to consider
alternative construction methods, such as stove-pipe construction and limits to access
across the Supa property to further mitigate construction impact.  Further, consistent with
environmental condition 58.e. of the Interim Order, if the hydrologic study shows that the
pipeline trench will convey water away from the spring, Millennium must develop
engineering and other mitigation measures, or both (including a re-route upslope from the
proposed pipeline route to avoid the water table), to maintain uninterrupted flow to the
spring and cistern.  Since Millennium has already agreed to make repairs to the Supa's
water system if repairs are needed and since Millennium's report about the Supa's water
supply is pending, we do not believe that additional environmental conditions are
required at this time.

Docket No. CP98-150-006, et al.                                    - 83 -

### 5.   Surface Water

272.   The effect of the NE-07 project on surface waters will be mainly associated with pipeline construction. Construction of aboveground facilities will not directly affect surface waters. The applicants propose to use appropriate erosion and sediment controls and SPCC Plans to minimize and control runoff from areas disturbed by construction. The applicants will restore all construction workspaces after construction. The draft supplemental EIS finds that operation of the NE-07 project facilities will have minimal impact on surface water.

273.   Millennium's construction will affect 556 waterbodies (including waterbodies crossed by access roads and located adjacent to workspaces), of which 500 will be crossed by pipeline construction using dry crossing techniques (e.g., dam and flume, HDD, or dry ditch). This includes all of the intermittent streams and all but three of the perennial waterbodies. An additional 53 streams will be crossed by access roads or will be adjacent to the project. The pipeline crossings of Owego Creek and Nanticoke Creek will be in areas where there has been severe erosion, which may require restorative work outside construction workspaces. Millennium filed site specific plans addressing how these areas will be restored after construction. Millennium proposes to cross Wallkill River by a dam and flume, but if water flow is too high, it may use an HDD as a contingency plan.

274.   Due to the potential presence of federally endangered Indiana bats in some parts of its project area, Millennium will conduct tree clearing between October 1 and March 30. Millennium will install equipment bridges across waterbodies to facilitate this activity. The NYSDEC informed us that it may require a variance from the section 401 Water Quality Certificate for this activity, since this timing will conflict with the waterbody construction timing window.[141] Environmental condition 25 requires Millennium to provide, prior to construction, the milepost locations of the waterbodies that will be included in the section 401 variance request.

275.   The NYSDEC requested that Millennium investigate the feasibility of crossing Catharine Creek by HDD. The NYSDEC identified Catharine Creek as the highest quality trout stream in western New York and that, along with the NYSDEC-regulated

---

[141]   The construction timing windows for coldwater fisheries are from June 1 through September 15 and coolwater and warmwater fisheries are from June 1 through November 30.

Docket No. CP98-150-006, et al.                                                          - 84 -

wetland, is the most sensitive location on the west end of Millennium's project.[142] We
believe that Millennium's site specific plans to cross Catharine Creek by HDD are
reasonable. Environmental condition 24 requires Millennium to file a plan when an HDD
crossing is unsuccessful for review and written approval prior to use of the alternative
crossing method, if needed.

276.    The National Park Service, Upper Delaware Scenic and Recreational River (NPS)
is concerned about project impacts on the Delaware River and the cumulative impact of
multiple waterbody crossings within its drainage basin. Environmental condition 26
requires Millennium keep the NPS informed about the schedule for crossing waterbodies
within this area and to update the progress of construction within the Delaware River
drainage basin.

277.    As a result of detailed engineering and constructability reviews made subsequent
to issuance of the final EIS for Millennium's original proposals and our draft
supplemental EIS, Millennium proposes to change crossing methods for 231 waterbodies.
Most of the changes involve the substitution of a type of dry-ditch crossing method,
rather than the method identified previously. Only a few of the changes in the
construction methodology were substantive in nature. Millennium also consulted with
the NYSDEC, COE, FWS, The Nature Conservatory, and Trout Unlimited regarding the
crossing methods for the larger or more sensitive waterbodies to develop the most
appropriate crossing method that will have a high degree of successful completion. On
July 31, 2006, Millennium filed site specific plans for crossing several of these
waterbodies. We addressed the use of these plans in the final supplemental EIS and
concluded that the plan's use is reasonable. Because the NYSDEC and COE have been
consulted and requested these changes, we expect that they will approve the plans as part
of their permitting processes.

278.    EPI's construction will cross 111 waterbodies, including 50 perennial waterbodies,
of which 48 will be crossed using dry crossing techniques. EPI will cross 61 intermittent
waterbodies during no flow periods or will employ dry crossing methods. An additional
five waterbodies will be crossed by access roads. At the request of the NYSDEC, EPI is
conducting engineering analyses concerning the feasibility of crossing Ganargua Creek
by HDD and examining proposed crossings of the Canandaigua outlet and Keuka Lake
outlet by HDD, but has not yet completed its engineering review. EPI is also
investigating the feasibility of crossing Shequaga Creek with a bore. Environmental
conditions 32 and 33 require that EPI complete these analyses and file site specific plans

---

[142]  The COE concurs with the NYSDEC's request.

for the crossings prior to construction. The pipeline crossings at Glen Creek and
Townsend Creek are known to be areas where there has been severe erosion, which may
require restorative work outside construction workspaces. Environmental conditions 34
and 35 require EPI to develop plans addressing how these areas would be restored after
construction and to file the plans for this work prior to construction.

279.   Algonquin's pipeline replacement project will cross 10 surface waters, of which
one (Mahwah River) is perennial. Algonquin filed a site-specific crossing plan for the
Mahwah River and associated wetlands. The meandering Mahwah River has moved over
Algonquin's two pipelines within the permanent right-of-way. Algonquin has requested
approval from the Commission, COE, and NYSDEC to permanently relocate a section of
the Mahwah River channel by about 30 feet to the south to prevent scour over the
pipelines. Algonquin contends that this will facilitate construction, minimize
construction impacts to the river, and allow Algonquin to restore and maintain cover over
the two pipelines in the future. We believe that Algonquin's plan is acceptable, since it
addresses the issue of constructing its pipeline at this location and anticipates the
possibility of continued meandering of the Mahwah River channel which may affect
pipeline operation in the future. However, Algonquin must receive approval from the
COE and NYSDEC for this modification. Those decisions are pending.

280.   Algonquin requested variances from sections V.B.2.a. and VI.B.1.a. of the
Procedures so that it may place extra workspaces within the 50-foot-wide setback from
waterbodies and wetlands. Algonquin provided specific locations where it will use the
variances. Environmental condition 43 approves the request at the identified locations
only and requires Algonquin to file, prior to construction, site specific plans showing all
construction workspaces where the variance is used.

281.   In its November 15, 2006 comment letter, the DOI recommends that the applicants
survey waterbody contours prior to clearing and construction in order to ensure that
streams are restored to a stable pattern, profile, and dimensions. The DOI asserts that the
applicants should restore contours of temporarily disturbed waterbodies to as close to pre-
construction conditions as practicable.

282.   We will require the applicants to restore waterbodies to pre-construction
conditions in a manner that is consistent with section V.C. of the Procedures. This
includes stabilizing the stream banks and restoring the waterbody to as close as
practicable to the pre-construction contour. The applicants' environmental construction
measures (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) include
measures consistent with section V.C. of the Procedures.

Docket No. CP98-150-006, et al.                                                          - 86 -

### 6.    Wetlands

283.    According to field delineations and reviews of national wetland inventory maps, the NE-07 project facilities will cross approximately 674 wetlands (a crossing length of 28.2 miles), affecting an estimated 185.6 acres during construction. Included in this total will be approximately 30 crossings of NYSDEC-regulated freshwater wetlands (a total crossing length of 3.1 miles), affecting about 25.7 acres during construction. Construction of the aboveground facilities for the NE-07 project components will convert a total of 0.1 acre of wetland to developed land. In addition, Millennium will permanently fill 13 small wetlands within its permanent right-of-way, impacting 0.26 acre of wetland.

284.    The primary effect on wetlands from pipeline construction will be the temporary and permanent conversion of palustrine forested wetlands (PFO) to non-forested wetland within the pipeline right-of-way and other temporary workspaces. The applicants will clear approximately 31.7 acres of PFO (including mixed PFO and other wetland types), of which approximately 21.3 acres will be permanently converted to palustrine emergent marsh wetlands and scrub shrub wetlands within the permanent right-of-way. The remaining 10.4 acres of PFO will be allowed to revert to forested wetland, representing a long-term impact as it will take over 25 years to re-establish forest vegetation. The applicants minimized potential impacts on PFO by routing the pipeline facilities within or adjacent to existing cleared rights-of-way for a significant percentage of the project's total length. Generally, following an existing right of way corridor through forested areas is preferable to establishing a new corridor, since a portion of the cleared corridor can be used for some of the construction and permanent right-of-way. Further, the COE required Millennium, EPI, and Algonquin to develop wetland mitigation plans that address compensation for the loss of permanent forested wetlands and for restoration of forested wetlands affected by clearing temporary workspaces.

285.    On December 4, 2006, in response to an October 13, 2006 site visit to the 4.8-mile-long pipeline right-of-way in Rockland County, Algonquin filed supplemental information, including correspondence with the COE and NYSDEC, regarding wetland impacts. Based on agency consultation, Algonquin proposes to reduce the size of additional temporary workspaces to eliminate impacts to forested wetlands in wetlands 02, 03, 04, and 07. However, depending on the final plan for the crossing of these waterbodies, forested wetland impacts will not be completely eliminated in wetland 01 or during the crossing of the Mahwah River. Algonquin indicates that it has not finalized the plan for crossing the Mahwah River, since it is still negotiating with the affected landowner. Since this plan may differ from the plan filed with the Commission, we will add environmental condition 56 to this order:

Docket No. CP98-150-006, et al.                                    - 87 -

> Prior to construction, Algonquin shall file with the Secretary, for review
> and written approval of the Director of OEP, the final site-specific plan for
> crossing the Mahwah River developed in consultation with the COE,
> NYSDEC, and the affected landowner(s).

286.    Further, Algonquin contends that it eliminated impacts for forested wetlands at the
Oxford compressor station.  Originally, construction would have impacted an estimated
0.5 acre of forested wetland associated with wetland 01 at this site.  Algonquin modified
its workspace requirements to eliminate this impact.

287.    There will be minimal, short-term effects on palustrine emergent marsh wetlands
and scrub shrub wetlands within temporary workspaces and the permanent right-of-way,
as these areas will be allowed to revegetate naturally and will be restored in vegetative
cover similar to that found prior to construction.  If seeding is used in wetland areas, the
seed mix will contain native plant species.  Consistent with section VI.C.4 of the Plan,
wetland restoration plans will include measures for re-establishing herbaceous and/or
woody species, controlling the invasion and spread of undesirable exotic species (*e.g.*,
purple loosestrife and phragmites), and monitoring the success of the revegetation and
weed control efforts.  The success of restoration will be monitored for at least three years.
If revegetation is not successful at the end of three years, the applicants will need to
develop and implement (in consultation with a professional wetland ecologist, the COE,
or the NYSDEC, as appropriate) a remedial plan to actively revegetate the wetland.

288.    We understand that the COE may require wetland mitigation and compensation
for loss of forested wetlands as part of the permit the COE will issue to the applicants.
Environmental conditions 37 and 46 require that EPI and Algonquin, respectively,
consult with the COE about wetland mitigation and compensation, consistent with the
preliminary plans proposed by Millennium, and file the final version of the wetland
mitigation and compensation plans with the Secretary.  Millennium already agreed to do
this.

289.    In its November 15, 2006 comment letter, the DOI recommends that the applicants
survey wetland contours prior to clearing and construction in order to ensure that the
wetlands are restored to pre-disturbance hydrological conditions.  The DOI contends that
all wetlands should be delineated prior to construction.

290.    The applicants will delineate wetlands prior to construction in a manner consistent
with section VI.A.1 of the Procedures.  The applicants will restore wetlands consistent
with section VI.C of the Procedures following construction, which also indicates that
wetland hydrology should be maintained.  Section VI.B.2.a. requires the applicants to
comply with COE permit terms and conditions.  Further, the adequacy of the restoration

Docket No. CP98-150-006, et al.                                      - 88 -

of wetland hydrology is reflected in the success of wetland revegetation, which will be monitored for at least three years after construction. We believe that impacts on wetlands will be minimized, if the NE-07 project is constructed in accordance with the construction and restoration measures identified by each applicant in its environmental construction plan (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) and SPCC Plan, as supplemented with the COE-approved mitigation plans and the environmental conditions contained in this order.

## 7.   Vegetation and Wildlife

291.   The construction and operation of the NE-07 project will result in the temporary and permanent alteration of wildlife habitat and have a direct impact on wildlife through disturbance, displacement, and mortality. The clearing of forest for construction and operation of the pipeline and aboveground facilities will result in a change of forested wildlife habitats to herbaceous and shrub habitat types. Construction of the project will permanently affect approximately 439.4 acres of upland forest within the permanent right-of-way and approximately 14.0 acres of forest within aboveground facility sites. After construction, the temporary construction right of way and extra work areas in previously forested areas will be allowed to revegetate naturally and will eventually return to pre-construction conditions.

292.   Within the permanent right-of-way, the applicants will convert forested areas from forest habitat to herbaceous and shrub cover for the operation of the pipeline facilities. Specifically, Millennium will convert approximately 367.8 acres, EPI will convert approximately 81.0 acres, Algonquin will convert approximately 5.2 acres, and Iroquois will convert approximately 2.9 acres.

293.   The New York Natural Heritage Program (NYNHP) identified nine significant natural communities near Millennium's proposed facilities, including the Line A-5 replacement project within Harriman State Park. Millennium's construction plans in these areas were developed with the PIPC to minimize impacts to park resources and are described in the EM&C Plan for Harriman State Park. The NYNHP has not yet responded about potential significant natural communities near Iroquois' Dover compressor station. However, since this is an existing compressor station and the new facilities will be constructed in maintained spaces within and adjacent to the existing facility, we do not anticipate impact to significant natural communities in that area.

294.   The Algonquin pipeline replacement component of the project, the Ramapo station, the Stony Point compressor station, and the Hudson River valve site are in the New York-New Jersey Highlands, an area designated by New York as a Significant Habitat Complex of the New York Bight Watershed. However, all activities and

facilities that will be constructed within the New York-New Jersey Highlands will occur along existing rights-of-way or at existing aboveground facilities. Thus, we do not anticipate any significant impacts to the wildlife of this significant habitat complex as a result of the project.

295.    We believe that potential impacts on wildlife have been reduced to a level that is not significantly adverse, due to the routing of the pipeline facilities within or adjacent to existing cleared rights-of-way and the adoption of restoration procedures that will promote revegetation of temporary work areas to approximate pre-construction habitat conditions. In addition, vegetation maintenance procedures during operation of the NE-07 project components include limitations on the timing and frequency of mowing and other activities to maximize opportunities for general wildlife and avian species to use the habitat, while allowing for operation of the pipeline and aboveground facilities.

## 8.    Fisheries

296.    The final EIS for the original Millennium project included a description of potential impacts to fisheries. Millennium's proposed route modifications herein, including the NYSEG and Warwick Isle route variations, will not affect the previously reported scope of potential fishery impacts or the mitigation measures proposed by Millennium or required by the Commission in its Interim Order and the 2002 *Millennium* Order.

297.    In regard to the Neversink River, Millennium now proposes to use a 7.1-mile-long segment of Columbia's existing 24-inch diameter Line A-5 pipeline for the river crossing, rather than attempting a crossing of the Neversink River, as originally proposed. This will avoid any impacts to fisheries or other aquatic resources in the Neversink River. Most of the streams in the Columbia Line A-5 replacement portion of the project are identified by the NYSDEC as coolwater or warmwater fishery streams, while the Ramapo River and Stony Brook are classified as coldwater fishery streams. The two Ramapo River channels will be crossed using the HDD crossing method and Stony Brook will be crossed using a dry crossing method.

298.    EPI's construction will cross 47 perennial streams classified as warmwater fisheries and three coldwater fisheries. Algonquin's pipeline replacement project will cross the Mahwah River, which supports both warmwater and coldwater fisheries, and an additional nine intermittent waterbodies that support only warmwater fisheries. There will be no impact on fisheries due to construction or operation of Iroquois' facilities.

299.    The construction impacts to fishery resources will include temporary habitat alteration and substrate disturbance at the site of the pipeline installation across

Docket No. CP98-150-006, et al.                                                    - 90 -

waterbodies. In addition, some invertebrates will likely be lost at the immediate waterbody crossings. The applicants propose a waterbody crossing method for each waterbody crossing. The COE and the applicable state permitting agencies are reviewing these proposals as part of the required federal and state permitting processes. The use of HDDs and dry-ditch crossing methods will reduce or eliminate downstream turbidity and sedimentation resulting from construction activities. When successful, HDD crossings will have no in-stream and fisheries impacts. Dry crossing techniques and the use of specified construction timing windows will minimize impact on water quality and will avoid interruption of spawning runs at waterbodies. The operation and routine maintenance of the project facilities will not adversely affect fishery resources.

300.    We believe that implementing the Procedures, as well as the measures identified by each applicant in their environmental construction plans (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) and SPCC Plans, will minimize impacts on fisheries resources.

### 9.    Endangered and Threatened Species

301.    To comply with the requirements of section 7 of the Endangered Species Act, we conducted informal consultation with the FWS and the NMFS regarding the presence of federally-listed or proposed endangered or threatened species and their critical habitats in the project areas. A total of six federally listed endangered or threatened species were considered as potentially occurring in the vicinity of the project facilities. The species include the endangered Indiana bat, shortnose sturgeon, and dwarf wedge mussel. The threatened species include the bald eagle, bog turtle, and Leedy's roseroot. The final Biological Assessment for the NE-07 project is in the final supplemental EIS.

302.    The FWS indicated that suitable summer habitat for the Indiana bat might be present in the vicinity of the NE-07 project. At the request of the FWS, Millennium conducted field surveys in 2005 to assess potential effects of the project on the Indiana bat in Orange and Rockland Counties. Millennium captured fifteen Indiana bats during mist netting surveys including reproductive adult females, adult males, and juveniles. Radiotelemetry studies on the bats captured by Millennium identified 11 roosts, including maternity roosts, in nearby habitat outside the project construction areas. No known bat roosts exist within the project right-of-way. However, Millennium will remove some potential Indiana bat roosting habitat during construction. Considering that the pipeline is a linear project and will be constructed along an existing cleared right-of-way, we estimate this impact to be an insignificant portion of the overall suitable habitat available in the vicinity of the project. We determined that Millennium's proposals may affect, but is not likely to adversely affect, the Indiana bat if tree clearing for construction is limited to the period between October 1 and March 30. This is the only period in which

Docket No. CP98-150-006, et al.                                           - 91 -

Millennium may clear trees or conduct future maintenance activities which might require tree pruning or clearing.[143]  If Millennium must clear trees outside this construction window, it should employ the services of a qualified bat scientist to investigate trees or conduct other surveys, as may be recommended by the FWS, for the presence of Indiana bats, or both, to avoid a take of bats.[144]

303.  A known Indiana bat hibernaculum exists within six miles of Algonquin's Hanover compressor station in Morris County, New Jersey.  Suitable habitat may occur near Algonquin's Stony Point compressor station and the pipeline replacement project in Rockland County and the Southeast compressor station in Putnam County.  Limited clearing of suitable summer roosting, maternity, and foraging trees in these project areas could affect the Indiana bat if it occurs during bat activity periods.  Algonquin completed field surveys of the project locations identified as potential habitat in May and August of 2006.  Based on the executive summary of a report filed by Algonquin on July 31, 2006, no Indiana bats were found.  On September 26, 2006, Algonquin filed a report entitled, *"2006 Summer Mist Net Survey for the Federally-Endangered Indiana Bat on the Algonquin Ramapo Expansion Project."*[145]  Algonquin states that it captured 227 bats representing six species, but none of the captured bats were from a federally threatened or endangered species, and no Indiana bats were captured in any project area.

304.  On December 4, 2006, Algonquin filed supplemental information about Indiana bats and the Hanover compressor station.  Algonquin asserts that subsequent to filing its survey report, the New Jersey field office of the FWS informed Algonquin that an individual immature Indiana bat had been documented during a separate mist survey at the adjacent Morristown Municipal Airport.  Algonquin consulted with the FWS during a site visit to the Hanover compressor station.  As a result of this consultation, Algonquin proposes to incorporate additional conservation measures into the site construction plan to reduce the amount of upland forest that will be cleared at this location, reducing the impact on potential roosting habitat for Indiana bats.  Originally, Algonquin estimated that about 7.83 acres of upland forest would be cleared for construction, but it has reconfigured its workspace and reduced the amount of forest clearing to about 2.16 acres. Algonquin states that it will identify and flag potential roost trees prior to clearing

---

[143] *See* environmental condition 27.

[144] The FWS' comments about impacts on Indiana bats along Millennium's portion of the project are pending.

[145] This document was not available prior to sending the final supplemental EIS to the printer.

Docket No. CP98-150-006, et al.                                                    - 92 -

activities to avoid and preserve these trees. This will occur in areas close to proposed staging areas in the northwest portion of the property and along the gravel access road from Park Avenue eastward along the fence line of the existing compressor station site. Further, Algonquin contends that it will limit tree clearing to the October 1 through March 30 timing window.

305.    Algonquin's reduction in land requirements in upland forest at the Hanover compressor station will minimize impacts on potential Indiana bat roosting trees and its commitment to conduct tree clearing only during the timing window at this location will avoid direct impacts to Indiana bats that might be using the trees for roosting during other time periods. While preliminary results indicate that no Indiana bats were found in other project areas, potential Indiana bat habitat may be affected by construction. For this reason, environmental condition 44 which requires Algonquin to clear trees in the areas surveyed for Indiana bats only between October 1 and March 30, pending comment by the FWS, should remain unchanged.[146]

306.    The FWS commented that impacts to the Indiana bat will be unlikely in EPI's project areas, since Indiana bat habitat does not appear to be within the vicinity of EPI's project components. We concur with this conclusion.

307.    The NYSDEC determined that the shortnose sturgeon potentially occurs in the vicinity of Algonquin's Hudson River valve site. However, the modifications to the Hudson River valve site will not involve any in-water activities in the Hudson River, nor will any of the project components result in any temporary or permanent disturbances to the Hudson River. Algonquin initially proposed using the Hudson River as the source for hydrostatic test water, which means it would place intake hoses into the river. The COE commented that intake hoses installed in navigable waters may be a section 10 regulated activity and there may be an unknown impact on the federally endangered shortnose sturgeon. Subsequently, Algonquin stated that it will not use the Hudson River as a supply source for hydrostatic test water and that it will find an alternative water supply source.

308.    The original Millennium project involved construction across the Haverstraw Bay portion of the Hudson River affecting shortnose sturgeon. Since the NE-07 project will not involve any construction in the bay, in a September 19, 2006 letter, the NMFS concurs with our determination that this project is not likely to adversely affect any listed

---

[146] The FWS' comments about impacts on Indiana bats along Algonquin's portion of the project are pending.

Docket No. CP98-150-006, et al.                                              - 93 -

species under its jurisdiction, including the shortnose sturgeon. Further, because of the change to the project since it was proposed, the NMFS states that the September 14, 2001 Biological Opinion it issued for the original Millennium project is invalid. Due to this letter, our consultation with the NMFS concluded.

309.    The dwarf wedge mussel occurs in the Neversink River in Orange County. Millennium does not propose to replace a segment of Columbia's existing 24-inch diameter Line A-5 pipeline that crosses the Neversink River in order to avoid any construction in the vicinity of the river. Based on this proposed alternative, we concluded that the Millennium's proposal will not adversely impact the dwarf wedge mussel.[147]

310.    The NYNHP indicated that Millennium's project will cross five known bald eagle nesting or wintering areas. Based on the NYSDEC's statements in the final EIS for Millennium's original proposals, no adverse affects on bald eagles are expected at four of those activity areas, because there are no known nests within a half mile of the project and the closest known nest is about 3,000 feet from the project. The NYSDEC requested that there be no construction in areas adjacent to the Mongaup River/Rio Reservoir area between December 1 and July 31 to avoid the nesting and overwintering periods in this bald eagle activity area. Millennium and the FWS agreed to construct the crossing of the Mongaup River between October 15 and November 30.

311.    There may be limited impact on eagles, if blasting is required in designated bald eagle activity areas that are used for nesting and winter habitats near the Mongaup River/Rio Reservoir near MP 330.0. Thus, environmental condition 29 requires Millennium to consult with FWS and the NYSDEC to develop a bald eagle activity area construction plan to address blasting in activity areas. Further, environmental condition 30 requires Millennium to consult with the NYSDEC and FWS at least one month prior to the start of construction to get an update on any additional nests that may have been found in the project area. With implementation of our recommended mitigation, we conclude that the proposed action would not adversely affect or jeopardize the continued existence of the bald eagle.[148]

312.    The FWS indicated that the bog turtle is known to occur in the vicinity of Millennium's proposed construction in Orange County and requested that a Phase I Habitat Assessment survey be conducted to determine if suitable habitat existed for the

---

[147] FWS' comments on the impact to the dwarf wedge mussel are pending.

[148] FWS' comments on the impact to the bald eagle are pending.

Docket No. CP98-150-006, et al.                                    - 94 -

species. Millennium conducted its Phase I bog turtle habitat surveys in the spring and fall of 2005 and in April and May 2006. Of the 96 wetlands surveyed in 2005 and 2006, three wetlands contain potential bog turtle habitat. One wetland exhibits suitable habitat within two breached manmade ponds. The landowner may rebuild the ponds. If this occurs, the wetland would no longer offer suitable habitat for the species. Also, this wetland is in an area of Orange County where no known bog turtle populations occur and that is lacking suitable surrounding habitat. Thus, the site is likely temporary and it is unlikely to contain bog turtles. The second wetland may contain suitable bog turtle habitat, but the vegetation consists primarily of the common reed (*Phragmites australis*), an invasive plant species, whose habitat is not used by the bog turtle due to the lack of basking and nesting habitat. In addition, this wetland is located near the summit of Pound Mountain, an area that is likely inaccessible to the species due to steep slopes and rough, rocky terrain. For this reason, the site is unlikely to contain bog turtles. The third wetland with suitable bog turtle habitat is adjacent to the project construction area and is separated from the right-of-way by a rock wall. Environmental condition 28 requires Millennium to install turtle exclusion fencing during the bog turtle window of activity (April 15 to October 31) along the wetland identified as potential bog turtle habitat, to employ a bog turtle monitor to be on hand when construction coincides with the bog turtle window of activity, to conduct a daily pre-construction survey of the project site, and to provide daily monitoring and relocation of bog turtles to suitable habitat outside the construction area when necessary. If this mitigation is used during construction, we conclude that the bog turtle is unlikely to be adversely affected by construction of Millennium's project.

313.    Algonquin conducted a Phase I Habitat Assessment survey of all areas of potentially suitable bog turtle habitat at the pipeline replacement corridor, Stony Point compressor station, Southeast compressor station, and Oxford compressor station project areas. Algonquin found no suitable habitat at the Oxford compressor station site, some marginal wetland habitat along the pipeline replacement corridor and near the Southeast compressor station, and marginal bog turtle habitat was located both on and adjacent to the Stony Point compressor station. In a January 11, 2006 letter, the FWS concurred with the survey findings for the Oxford compressor station site.[149] Due to the marginal nature of the habitat at the Southeast compressor station and the pipeline replacement area, it may be unlikely that the project will adversely impact the bog turtle at these sites. No wetlands will be directly impacted or disturbed during construction and modifications to the Stony Point or Southeast compressor station. Nevertheless, due to the fact that

--------

[149] FWS' comments on the impact of Algonquin's project on bog turtles at other locations are pending.

Docket No. CP98-150-006, et al.                                             - 95 -

possible habitat was found nearby, Algonquin proposed bog turtle avoidance measures for these two compressor stations. In these measures, Algonquin agreed to install turtle exclusion fencing and to assign a biological monitor to survey for the presence of turtles prior to and during the initial clearing and site preparation required for the staging areas. The biological monitor will inspect the sites periodically during the construction phase of the project to provide oversight for the construction crews, as needed. For these reasons, we conclude that construction and operation of Algonquin's proposals will not adversely affect the bog turtle.

314.   In October 2001, Iroquois conducted field surveys for bog turtles at the Dover compressor station and located potential bog turtle wetland habitat. However, the construction workspace would be at least 300 feet away from the wetland. Thus, we find that Iroquois' proposals will be unlikely to adversely affect the bog turtle.[150]

315.   The FWS indicated that Leedy's roseroot occurs along the face of shale cliffs approximately two miles from portions of EPI's proposed construction. Nevertheless, the FWS believes that the proposed work will not adversely affect Leedy's roseroot, provided that the project activities avoid disturbance of any adjacent cliff vegetation. Because no cliff areas were observed at EPI's project areas and no disturbance of suitable cliff vegetation will occur, we conclude that Leedy's roseroot is unlikely to be adversely impacted by EPI's proposals.

316.   On July 31, 2006, Millennium filed a minor route variation to avoid impacts to one identified timber rattlesnake den and its associated habitat, stating that it will implement the previously agreed-to avoidance and mitigation measures for rattlesnake den sites. Millennium developed this route variation in consultation with the NYSDEC to minimize impacts on this New York state-listed threatened species. In addition, a NYSDEC rattlesnake expert will assess the site to determine if further avoidance measures may be necessary. Algonquin states that it will have a rattlesnake monitor on hand during construction of various components of its project as recommended by the NYSDEC.

### 10.   Land Use

317.   Generally, Millennium's and EPI's pipelines will be installed within a 75-foot-wide right-of-way, of which 50 feet will be maintained for operation. The Algonquin pipeline replacement project will use a 100-foot-wide construction right-of-way, which

---

[150] The FWS comments on the impact of Iroquois' project in New York are pending.

Docket No. CP98-150-006, et al.                                    - 96 -

includes an existing 75-foot-wide permanent easement for operation. The construction of the applicants' pipelines and aboveground facilities will directly disturb approximately 3,461.1 acres of land for the construction rights-of-way, extra work areas, and aboveground facilities. Following construction, the applicants will retain 1,683.5 acres of permanent right-of-way for operation of the pipelines and associated aboveground facilities.

318.    The applicants will construct approximately 212.3 miles of pipeline adjacent to or within existing rights-of-way. The remaining 52.2 miles of pipeline will be constructed on new rights-of-way. The new right-of-way segments will be distributed throughout the length of the NE-07 project and will be incorporated into the proposed route because of topography, engineering, or residential constraints.

## 11.    Residential Areas

319.    There are approximately 173 residential structures within 50 feet of the construction work areas. The Sterling Forest State Park/Laurel Ridge alternative will avoid five of these residences. The Warwick Isle route variation and the Ramapo River HDD variation will avoid planned residential communities. Each applicant will implement mitigation measures contained in its environmental construction plans (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) during construction in residential areas or will use the Plan (Iroquois). These measures will include fencing the construction work area, preserving mature trees and landscaping, reducing the construction work areas as necessary to maintain 25 feet between the residence and the work area (where feasible), using drag section or sewer line construction techniques to install the pipeline, and restoring residential properties immediately after backfilling the trench. Environmental condition 13 requires Millennium, EPI, and Algonquin to update the list of residences within 50 feet of the construction right-of-way prior to construction. Environmental condition 14 requires Millennium, EPI, and Algonquin to file site specific plans for construction within 25 feet of any residence. We find that use of the mitigation measures in the environmental construction plans will minimize temporary impacts due to construction, when construction activities are near residences.

## 12.    Recreation and Public Interest Areas

320.    Millennium's pipeline will cross Soaring Eagle/Mark Twain State Park, Sterling Forest State Park, Harriman Forest State Park, Kakiat County Park, and the Appalachian

Docket No. CP98-150-006, et al.                                        - 97 -

Trail.[151] The pipeline will also cross campgrounds, church grounds, and private shooting ranges. After the draft supplemental EIS was issued, the Harwood Club filed comments opposing the project, since the project might affect the use of its properties in Orange and Sullivan Counties for hunting, fishing, and other recreation. The final supplemental EIS addressed the Harwood Club's questions about pipeline construction and impacts on wildlife. Also, Millennium states that it will work with recreational property owners, which includes the Harwood Club, to minimize impacts to recreational use of property. We conclude that there will be minimal impact on recreation and public interest areas due to effective routing, use of existing corridors, minimizing width of construction rights-of-way, timing of construction activities based on consultations with the appropriate local government and owner representatives, and post-construction restoration. Millennium will use the EM&CP it developed in consultation with the PIPC to mitigate environmental impacts due to construction in Sterling Forest State Park and Harriman Forest State Park.

321.    Algonquin will consult with the PIPC about construction in Harriman State Park and with the Rockland County Division of Environmental Resources about construction in Kakiat County Park. Environmental condition 48 requires Algonquin to file the results of this consultation with the Secretary prior to construction.

### 13.    Coastal Zone Management Consistency

322.    The construction areas for Algonquin's Hudson River valve site modification will be within New York's Coastal Zone Management Boundary. The NYSDOS determined that Algonquin's project meets its general consistency concurrence criteria and that no further review of the proposed activity will be required.[152] No other project construction would affect coastal zone areas.

### 14.    Visual Resources

323.    Approximately 212.3 miles (80 percent) of the proposed pipeline construction will be adjacent to existing rights of way or in roads, reducing the need to establish new utility corridors. The expansion of existing corridors may result in visual impacts, particularly in areas where existing vegetation provides screening of powerline rights-of-way from

---

[151] We addressed the crossing of the Appalachian Trail in the final EIS for Millennium's original proposals. That discussion is incorporated by reference.

[152] NYSDOS' General Concurrence was dated March 15, 2006.

Docket No. CP98-150-006, et al.                                                      - 98 -

nearby residences. To mitigate for this visual impact, the applicants will minimize
clearing of trees and vegetation that provide important visual screening of an existing
right of way from adjacent residences. Where screening must be removed for safety
considerations, the applicants will plant fast growing trees or shrubs within temporary
work areas between a residence and an existing right-of-way.

324.   Aboveground facilities will result in various visual impacts. Millennium will
construct its Corning compressor station adjacent to an existing compressor station that is
already a dominant visual element. The modifications to Algonquin's existing
compressor station sites will not significantly change visual impacts. EPI will construct
its proposed Oakfield compressor station on agricultural and open lands. The
construction will change the viewshed of the residents who live nearby. This impact may
be substantial to these residents, but it will be minimized and partially obscured by
topography. EPI will consider additional screening to mask the facility. Algonquin will
construct its proposed Oxford compressor station within an area that will be obscured
from the viewsheds by forest.

325.   Iroquois' proposed construction at the Brookfield compressor station will be
adjacent to existing aboveground natural gas facilities. The property and the surrounding
area are also visually affected by the cleared 90-foot-wide Algonquin pipeline right-of-
way, the cleared 50-foot-wide Iroquois pipeline right-of-way, a powerline right-of-way,
and a railroad. The new facilities will be viewed together with these existing features.
Iroquois will retain the wooded buffer along High Meadow Road and the 68.3-acre
property is mainly covered with forested areas, which will be retained during operation of
the facility. These forested areas will partially screen the facility. The buildings Iroquois
will construct to house the new facilities and to minimize visual impact will be "barn-
like" and similar in architecture to other buildings in the general area. If needed, Iroquois
will also minimize lighting and develop additional landscaping.

326.   We have not identified any visual affects to State or National Register of Historic
Places eligible or potentially eligible properties. Thus, no additional mitigation measures
are required.

### 15.   Cultural Resources

327.   The applicants filed with the Commission and the state historic preservation
offices (SHPOs) cultural resource survey reports covering approximately 245.6 miles
(93 percent) of the pipeline routes and extra work areas including access roads, pipe
storage/contractor yards, compression station properties, and measuring stations.
Approximately 8.8 miles along the Millennium's route and 9.6 miles along EPI's route
have yet to be surveyed due to denial of access. No areas remain to be surveyed for

Docket No. CP98-150-006, et al.                                                  - 99 -

Algonquin's or Iroquois' proposals. The New York and Connecticut SHPOs commented on the reports and made recommendations for additional work to several specific components of the projects. We concur with the SHPOs' recommendations. Because additional surveys and testing are still required and final determinations of eligibility and effect have not been made for this project, we anticipate executing a programmatic agreement with the New York State Historic Preservation Officer and the Advisory Council on Historic Preservation for construction in New York. Also, we recommend that construction be deferred until cultural resource surveys, testing, and any required mitigation plans have been completed and the reports filed, along with the SHPOs' comments, as appropriate.

### 16.    Air and Noise

328.    We identified no significant short- or long-term impact on air or noise quality that will result from construction and operation of the NE-07 project. We anticipate that the project will meet all applicable federal, state, and local air quality and noise regulations. The applicants will comply with the Clean Air Act's[153] state improvement plan and the timely attainment of the national ambient air quality standards. With the implementation of the recommended mitigation measures, we find that sound levels attributable to the project will be adequate to protect human health and welfare with an adequate margin of safety.

329.    Algonquin, Millennium, EPI, and Iroquois cumulatively propose the construction of four new compressor stations, the modification and/or upgrading of four existing compressor stations, and the construction of approximately 265 miles of pipeline and related facilities. During operation, the compressor stations will emit varying quantities of criteria pollutants. However, the combustion of natural gas produces significantly lower emissions when compared to the combustion of coal or oil. One of the project's primary goals is to increase the availability and use of natural gas as opposed to other traditional fossil fuels.

330.    To address the Clean Air Act general conformity rule, we performed an applicability analysis to determine if a formal conformity determination must be completed. Since the emissions from the project construction and operation will be below the applicability threshold and will not be regionally significant, we determined that a formal conformity determination was not required.

---

[153] 42 U.S.C. § 7401-7671q.

Docket No. CP98-150-006, et al.                                                    - 100 -

331.   Several components of the new and modified compressor stations, as well as
construction associated with the project, will generate noise.  The compressor station
components generating noise include, but will not be limited to:  the turbine, compressor,
turbine exhaust and ducting, aboveground piping, lube oil coolers, gas after coolers, air
intake systems, air handling units, and blowdown equipment.  The use of noise control
measures for the compressor stations and associated equipment will be necessary to
reduce the potential impact to surrounding areas and ensure compliance with federal,
state, and local regulations.  Noise control measures that have been evaluated and will be
incorporated where necessary include, but will not be limited to:  the use of appropriate
building materials, installation of muffler systems, use of acoustical pipe insulation, and
the installation of air intake and blowdown silencers.  Environmental conditions 31
(Millennium), 38 (EPI), 49 and 50 (Algonquin), and  53 and 54 (Iroquois) require that the
noise levels of the new and modified compressor stations not exceed a day-night sound
level (Ldn) of 55 standard A weighting curve for sound levels (dBA) at nearby noise
sensitive areas (NSAs) when the stations are operated at full load.  We will require the
applicants to conduct post-construction noise surveys no later than 60 days after placing
the compressor stations in service.  If the surveys show that noise levels exceed an Ldn of
55 dBA at the NSAs, we will require the applicants to install additional noise controls to
meet the level within one year of the in-service date of the facilities.

332.   Construction noise will be intermittent and will vary from hour to hour at any
single location depending on the equipment in use and the operation being performed.
Since construction will move at about 400 feet per day, the duration of exposure to high
noise levels related to construction will be limited to a relatively short period of time at
any one location.

### 17.    Reliability and Safety

333.   We have not identified any unacceptable reliability or safety risks associated with
the project.  Millennium, Algonquin, Iroquois, and EPI will design, construct, operate,
and maintain the pipelines and aboveground facilities in accordance with the DOT's
Minimum Federal Safety Standards in 49 C.F.R. Part 192.  These regulations are
intended to ensure adequate protection for the public and to prevent natural gas facility
accidents and failures.  Part 192 specifies material selection and qualification, design
requirements, and protection from internal, external, and atmospheric corrosion.
Pipelines and compressor stations are built in areas of varying population density
throughout the United States.  Because avoidance of populated areas is not always
possible, the standards in the Federal regulations become more stringent as the human
population density increases.  Millennium, Algonquin, Iroquois, and EPI will select
contractors to construct the pipeline according to these standards and each company's
individual project specific plans.  These facilities will be designed to maintain minimal

Docket No. CP98-150-006, et al.                                              - 101 -

hazard potential to the surrounding area. Thus, we find that this project does not present a substantial safety risk to the public.

334.    Ms. Supa is concerned about the safety and reliability of Columbia's Line A-5 and the line's ability to provide gas service to the Endicott and Union Center meter and regulating stations. She notes that gas pressure on Line A-5 will be lowered to 300 psi, but that this is a "feeble and unsafe" attempt to keep the aging Line A-5 in service.

335.    Ms. Supa's comments refer to the continued operation of segments of Line A-5 as laterals for delivery of gas to customers at the two meter and regulating stations. The operating pressure will be reduced since the laterals will no longer be operated as Columbia's mainline due to the construction of Millennium's pipeline. Existing service obligations will be maintained at these delivery points via these segments of the old Line A-5 pipeline, so there will be no loss of service. In its November 29, 2006 supplemental filing, Millennium contends that this pipeline segment has a maximum operating pressure of 702 psig, but that the existing market demand can be met while operating at 300 psig. Millennium also asserts that future market growth in this area may be accommodated by operating the pipeline segment at higher pressure. Since all of the pipeline facilities will be operated in compliance with the requirements for operation and maintenance under the DOT's Minimum Federal Safety Standards at 49 C.F.R. Part 192, we find that there is no safety risk to the public.

## 18.    Additional Requirements

336.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. We encourage cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[154]

337.    The applicants shall notify the Commission's environmental staff by telephone or facsimile of any noncompliance identified by other federal, state, or local agencies on the same day that they are notified. The applicants shall file written confirmation of such notification with the Secretary within 24 hours.

---

[154] *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988); *National Fuel Gas Supply v. Public Service Comm.*, 894 F.2d 571 (2d Cir. 1990); and *Iroquois Gas Transmission System, L.P.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

Docket No. CP98-150-006, et al.                                         - 102 -

338.   At a hearing held on December 21, 2006, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the applications, as supplemented, and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

        (A)  The certificate issued in the 2002 *Millennium* Order is amended to permit Millennium to acquire, construct, and operate facilities, as more fully described in the applications to amend in Docket Nos. CP98-150-006, CP98-150-007, and CP98-150-008 and the body of this order.

        (B)  The certificate issued in the 2002 *Millennium* Order is amended to permit Millennium to lease capacity from Columbia, as more fully described in the application and in the body of this.

        (C)  Millennium's motion to vacate the authorization issued in the Interim Order and the 2002 *Millennium* Order is granted.

        (D)  Millennium's proposal for regulatory asset treatment is accepted, subject to the condition that Millennium will not propose to recover any unrecovered costs under the negotiated contracts from any other non-negotiated rates customer and that Millennium will only record regulatory assets to the extent its capacity is subscribed.

        (E)  Millennium shall file actual tariff sheets at least 90 days prior to the in-service date of the proposed facilities that reflect compliance with the NAESB standards in effect at that time and the modifications discussed in this order.

        (F)  In Docket No. CP06-76-000, a certificate of public convenience and necessity is issued authorizing Algonquin to construct and operate facilities, as described more fully in this order and in the application.

        (G)  Algonquin's proposed incremental reservation rate under Rate Schedule AFT-1 is approved.

        (H)  Algonquin shall ensure that the fuel use costs for its proposal are the responsibility of the expansion shippers and Algonquin.

Docket No. CP98-150-006, et al.                                              - 103 -

(I) Algonquin shall file a tariff sheet consistent with its *pro forma* tariff sheet at least 60 days prior to its proposed effective date.

(J) The certificate issued in the *Iroquois* Order is amended to permit Iroquois to construct and operate facilities, as more fully described in the application in Docket No. CP02-31-002 and the body of this order.

(K) Iroquois' request for pre-approval of rolled-in rate treatment is granted, subject to the conditions described in the body of this order.

(L) The certificate issued in the 2002 *Millennium* Order is amended to permit Columbia to abandon facilities, as more fully described in the applications in Docket Nos. CP98-151-003 and CP98-151-004 and in the body of this order.

(M) The certificate issued in the 2002 *Millennium* Order is amended to permit Columbia to lease capacity from Millennium, as more fully described in the applications and in the body of this order.

(N) Columbia's request for a limited-term certificate, with pre-granted abandonment authority on the in-service date of Millennium's system, is granted.

(O) Columbia's request for waiver of the compliance and reporting requirements for the limited-term certificate is denied.

(P) Columbia is prohibited from submitting a TCRA filing to recover the Account 858 costs associated with the Millennium lease until it submits an NGA section 4 filing to remove the costs of the Line A-5 facilities from its base rates.

(Q) Columbia shall notify the Commission within 10 days of the date of the abandonment of Line A-5.

(R) In Docket No. CP06-5-000, a certificate of public convenience and necessity is issued authorizing EPI to construct and operate the facilities described in this order and in EPI's preliminary determination.

(S) In Docket No. CP06-6-000, a blanket transportation certificate is issued to EPI under Subpart G of Part 284.

(T) In Docket No. CP06-7-000, a blanket construction certificate is issued to EPI under Subpart F of Part 157.